Kevin H. Marino
John A. Boyle
Jennifer P. Montan
MARINO, TORTORELLA & BOYLE, P.C.
437 Southern Boulevard
Chatham, New Jersey 07928-1488
(973) 824-9300
*Attorneys for Plaintiff*
*2 Hopkins Lane, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------------------x

2 HOPKINS LANE, LLC,

                Plaintiff,

      v.

BOROUGH OF HADDONFIELD ZONING
BOARD OF ADJUSTMENT and BOROUGH
OF HADDONFIELD,

             Defendants.

-------------------------------------------------------------x

CASE NO. _____

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

*(Document filed electronically)*

## COMPLAINT

Plaintiff, 2 Hopkins Lane, LLC ("2HL"), through its undersigned attorneys, by way of

Complaint against Defendants, Borough of Haddonfield Zoning Board of Adjustment (the "Zoning

Board") and Borough of Haddonfield ("Haddonfield" or the "Borough"), alleges as follows:

### NATURE OF THE ACTION

1.     This is an action for compensatory and punitive damages, as well as equitable,

injunctive and declaratory relief, arising from Defendants' improper, unlawful and discriminatory

conduct with regard to 2HL's attempts to develop a 19.2-acre property into a residential drug and

alcohol treatment facility.

2.      2HL is an affiliate of Recovery Centers of America, LLC ("RCA").  As an affiliate of RCA, Plaintiff's mission is to provide neighborhood-based recovery campuses for patients suffering from drug and alcohol addiction.

3.      To fulfill that mission, 2HL entered into an agreement with Bancroft Neurohealth ("Bancroft") to purchase the subject property in Haddonfield.  Bancroft had used the property as a residential treatment facility to treat behavioral healthcare recipients with developmental disabilities, a use that had been previously recognized multiple times by the Zoning Board as a pre-existing, non-conforming use in the zone where the property is located.

4.      2HL planned to similarly use the existing facility to operate a residential rehabilitation facility to treat behavioral health care recipients suffering from drug and alcohol addiction.  2HL's proposed use would constitute a continuation of the existing use, without any physical expansion or intensification, and thus would constitute a permitted pre-existing, non-conforming use.

5.      Upon learning of 2HL's intended use of the subject property, Defendants began their illegal and discriminatory efforts to impede 2HL's plan to operate a residential rehabilitation facility.  Initially, a representative of Haddonfield contacted Bancroft and advised it that 2HL would never receive the approvals necessary to operate a residential rehabilitation facility and Bancroft would be better served by selling the property to Haddonfield instead.

6.      Haddonfield's efforts to impede the sale were unsuccessful and 2HL applied for a zoning permit to operate a residential treatment facility at the property.  Haddonfield's Zoning Officer wrongfully and with discriminatory intent denied 2HL's application.  2HL appealed that decision and was prepared to present evidence in support of its application.  The Zoning Board,

however, deprived 2HL of the opportunity to present its evidence at a full and fair hearing and improperly denied the appeal application.

7.     2HL thereafter filed a lawsuit against the Zoning Board based on that wrongful denial.  Ultimately, to avoid protracted and costly litigation, 2HL entered into a Settlement Agreement in which it assigned to Haddonfield its rights under its sale agreement with Bancroft and retained an option to purchase a portion of the property to develop an age-targeted townhouse community.

8.     From the outset, Haddonfield never intended to perform its obligations under the Settlement Agreement or to allow 2HL to exercise its option and develop an age-targeted development on the property.  Rather, Haddonfield entered into the Settlement Agreement to achieve one goal: stop the development and operation of a residential drug and alcohol rehabilitation facility on the property. After they accomplished that goal, Defendants engaged in an extended course of intentional, improper and dilatory conduct designed to prevent 2HL from developing the contemplated age-targeted community (the "Bancroft Redevelopment"), which was a major incentive for 2HL to settle its prior litigation with Haddonfield and relinquish a lucrative opportunity to develop a drug and alcohol rehabilitation facility on the subject property.

9.     Haddonfield repeatedly breached the Settlement Agreement by failing to fulfill its obligations and engaging in conduct that prevented 2HL from performing its obligations. Specifically, Haddonfield: (a) adopted redevelopment plans that materially deviated from and thus violated the Settlement Agreement; (b) took an unreasonable amount of time to negotiate and adopt an amended redevelopment agreement, which still failed to conform to the Settlement Agreement; (c) refused to rule on or execute 2HL's proposed development plans and applications for the  age-targeted community; and (d) forced 2HL to expend significant effort and incur

substantial costs to fulfill its obligations under the agreement, only to further delay the development process and arbitrarily deny necessary approvals.

10.     Further, the Borough obtained court-ordered immunity from "builder's remedy" lawsuits through July 1, 2025, based on the Borough's adopted Amended Third Round Housing Element and Fair Share Plan ("Fair Share Plan"), which stipulated that the Bancroft Redevelopment would account for twenty of the Borough's eighty-three affordable units.  The Borough, however, has thwarted 2HL's significant efforts to move the Bancroft Redevelopment forward.  In other words, the Borough received court-ordered immunity from builder's remedy lawsuits based on the Fair Share Plan, which is itself dependent upon the Bancroft Development's affordable-housing units, but has refused to take contractually required actions that are necessary for the Bancroft Development to actually begin and progress to completion.

11.     For these reasons, amplified below, 2HL seeks recission of the Settlement Agreement, which it was fraudulently induced to enter, and reasserts its claims against Defendants under the Constitution of the United States, 42 U.S.C. § 1983, 42 U.S.C. § 12132 (the "Americans with Disabilities Act" or "ADA"), 42 U.S.C. § 3601 (the "Fair Housing Amendments Act" or "FHAA"), 29 U.S.C. § 791 (the "Rehabilitation Act" or "RA"), the Constitution of the State of New Jersey, the New Jersey Municipal Land Use Law, N.J.S.A. 40:55D-69 *et. seq.* (the "MLUL"), and N.J.S.A. 10:5-1 (the "New Jersey Law Against Discrimination" or "NJLAD").

12.     In the alternative, 2HL seeks (i) compensatory damages resulting from the harm caused by Haddonfield's breaches of the Settlement Agreement's express and implied terms, including the substantial expenses 2HL has incurred in attempting to develop the contemplated age-targeted community and the lost profits that would have resulted from the timely completion of that project; and (ii) the revocation of the Borough's immunity from builder's remedy lawsuits

and the grant of a builder's remedy permitting the development of four-hundred market-rate units with a twenty percent set aside.

## THE PARTIES

13.     Plaintiff 2HL is a Delaware limited liability company with offices located at 2701 Renaissance Blvd., Fourth Floor, King of Prussia, Pennsylvania, 19406.  2HL is an affiliate of RCA, an organization committed to providing cutting edge treatment for drug and alcohol addiction in neighborhood-based residential treatment facilities around the country.

14.     Defendant Borough of Haddonfield Zoning Board of Adjustment is a quasi-judicial body created by the Borough of Haddonfield and is vested with authority under the MLUL to, among other things, hear and decide appeals where it is alleged by an applicant that there is an error in any decision made by an administrative officer.

15.     Defendant Borough of Haddonfield is a municipal corporation with the power to zone pursuant to the MLUL.  As a matter of law, the Borough is responsible for the conduct and policies of the Zoning Board and the Planning Board of the Borough of Haddonfield (the "Planning Board") and is liable to 2HL for the wrongs alleged herein.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the federal claims alleged in this Complaint under 28 U.S.C. §§ 1331 & 1343 and over the state claims alleged in this Complaint under 28 U.S.C. § 1367.

17.     Venue is proper under 28 U.S.C. § 1391(b)(1) & (2) because Defendants are residents of this judicial district, the events or omissions giving rise to the claims set forth herein occurred in this judicial district, and a substantial part of the property that is the subject of the action is situated in this judicial district.

**FACTUAL ALLEGATIONS**

### A.  In 2015, 2HL Entered An Agreement To Purchase Property In Haddonfield With The Intent To Use It To Operate A Drug And Alcohol Rehabilitation Clinic.

18.     On March 13, 2015, 2HL entered into an Agreement of Sale (the "Sale Agreement") with Bancroft to purchase a 19.2-acre property located at 2 Hopkins Lane, Haddonfield, New Jersey, more specifically known as Block 13, Lot 25, and Block 14, Lot 2, as shown on the official tax map of the Borough of Haddonfield (the "Property").

19.     At the time, Bancroft was occupying and operating the Property as a residential treatment facility to treat behavioral healthcare recipients with developmental disabilities.  On numerous occasions, the Zoning Board had previously recognized that use—a residential treatment facility—as a pre-existing, non-conforming use in the R-2 Residential Zone, in which the Property is located.

20.     When entering into the Sale Agreement, 2HL intended to use the Property as a residential rehabilitation facility to treat disabled persons suffering from drug and/or alcohol dependency.  That proposed rehabilitation facility would have used the existing site's building footprint and would not have required any physical expansion.

21.     Thus, Plaintiff's proposed use of the Property was the same as the use to which Bancroft was then putting the Property, which the Zoning Board had, on several prior occasions, deemed a permitted pre-existing, non-conforming use.

### B.  Haddonfield Attempted To Impede The Sale Of The Property To 2HL And Wrongly Denied Plaintiff's Application For A Zoning Permit And Subsequent Appeal Of That Denial.

22.     Residents of Haddonfield immediately expressed their opposition to 2HL's plans. Members of the community vehemently opposed the development and operation of a residential drug and alcohol treatment facility, asserting that such a facility would bring drugs and criminals

into their town and thus be a danger to the community. This discriminatory sentiment was widespread and permeated Defendants' decision-making with respect to 2HL's use of the Property.

23.     In or around May 2015, 2HL's attorneys learned that Haddonfield attempted to impede the sale of the Property to 2HL.  Specifically, a representative of Haddonfield contacted Bancroft and advised that 2HL would never receive the approvals necessary to operate a residential rehabilitation facility and that Bancroft would be better served by selling the Property to Haddonfield. Such efforts were unsuccessful.

24.     On August 3, 2015, 2HL submitted to Haddonfield an application for a zoning permit to operate a residential treatment facility at the Property to treat behavioral healthcare recipients who are disabled as a result of drug and alcohol addiction.

25.     Just four days later, on August 7, 2015, Haddonfield's Zoning Officer denied 2HL's permit application on the ground that 2HL's proposed residential treatment facility is not a permitted use in the R-2 Zone, even though that precise use is a pre-existing, non-conforming use previously recognized by the Zoning Board and the use to which Bancroft was then putting the Property.

26.     On August 17, 2015, 2HL filed a timely appeal of the Zoning Officer's permit denial in accordance with the MLUL, N.J.S.A. 40:55D-72(a) ("Appeal Application").  2HL argued that its proposed use was substantially the same as the existing, non-conforming use to which Bancroft had put the Property and was not an intensification of that use and that, as a result, 2HL was entitled to a zoning permit.

27.     Prior to the appeal hearing, the Solicitor for the Zoning Board notified 2HL that it would not be permitted to present any evidence or testimony at the hearing.  In response, 2HL's

counsel advised the Solicitor that precluding 2HL from introducing evidence and testimony at the appeal hearing was a violation of its due process rights and the MLUL.

28.     On September 15, 2015, 2HL and its counsel appeared at the appeal hearing prepared to present testimony from a Bancroft executive about its use of the Bancroft facility and 2HL's expert, Timothy Kernan, who is a Professional Engineer, Professional Planner, and Certified Municipal Engineer with Maser Consulting.

29.     The proposed testimony would have demonstrated that 2HL's proposed use of the Property as a residential treatment facility (i) was substantially the same as, and therefore would have conformed to, Bancroft's pre-existing, non-conforming use; and (ii) would not have resulted in any intensification of the pre-existing, non-conforming use, but rather in a reduction in its intensity.

30.     Despite 2HL's objections, the Solicitor again advised that 2HL would not be permitted to present its proposed testimony or introduce any documents into evidence. As a result, 2HL was precluded from presenting any evidence at the hearing in support of its appeal of the denial of its zoning permit.

31.     At the close of the appeal hearing, the Zoning Board voted 6-1 to affirm the decision of the Zoning Officer and deny 2HL's zoning permit and appeal applications.

32.     As a result, the Zoning Board achieved what the Borough and the community at large had wanted: stopping the development and operation of a drug and alcohol rehabilitation facility in Haddonfield.

33.     This discriminatory intent was evident from Defendants' actions, including Haddonfield's attempts to impede the sale of the Property from Bancroft to 2HL as well as the

Zoning Officer's wrongful denial of 2HL's zoning permit on the grounds that the proposed facility was not a permitted use despite clear evidence to the contrary.

34.     The discriminatory intent was also evident from the Zoning Board's denial of 2HL's Appeal Application.  Prior to and at the start of hearing on the appeal, 2HL informed the Zoning Board that it was prepared to present fact and expert witness testimony that would demonstrate 2HL was entitled to the zoning permit as a matter of law.  The Zoning Board, however, flatly refused to provide 2HL with a full and fair hearing on the merits (or, for that matter, any hearing), prevented 2HL from presenting that evidence, and summarily denied the application and thereby excluded the development and operation of a drug and alcohol rehabilitation facility for disabled individuals in its community.

35.     In 2019, several years after Defendants fraudulently induced 2HL to forfeit the opportunity to purchase the entire Property, Haddonfield Mayor Neal Rochford candidly admitted this discriminatory intent to exclude the drug and alcohol rehabilitation facility when he referred at a Commissioner Meeting to the "costs associated with stopping the drug and alcohol rehabilitation center in that location." (*See* Exhibit 1, Minutes of the Commissioner Meeting of February 26, 2019.)

## C. 2HL Filed A Lawsuit Based On The Wrongful Denial Of Its Zoning Permit Application And Then Entered Into The Settlement Agreement with Haddonfield To Resolve The Dispute.

36.     On October 5, 2015, 2HL filed a complaint against the Zoning Board (the "Zoning Litigation") in the Superior Court of New Jersey based on the denial of 2HL's application for a zoning permit.  In that Complaint, 2HL asserted claims for, *inter alia*, violations of its constitutional due process rights and violations of the Americans with Disabilities Act, the Fair Housing Act of 1988, the Rehabilitation Act of 1973, and the New Jersey Law Against Discrimination.

37.     Because it was still committed to developing and operating a residential drug and alcohol treatment facility on the Property, 2HL sought in its Complaint—in addition to monetary damages—injunctive and declaratory relief that would have forced Haddonfield and the Zoning Board to grant the approvals necessary for that project.

38.     On January 11, 2016, 2HL and Haddonfield entered into the Settlement Agreement to, *inter alia*, resolve the Zoning Litigation.  A true and exact copy of the Settlement Agreement and accompanying exhibits are attached to this Complaint as Exhibit 2.

39.     2HL and the Zoning Board then filed a Stipulation of Dismissal with Prejudice of the Zoning Litigation on February 26, 2016.

40.     In accordance with the Settlement Agreement, 2HL assigned the Sale Agreement to Haddonfield in exchange for a payment from Haddonfield of $12.9 million, with $11.5 million going to Bancroft and $1.4 million going to 2HL.  (Ex. 2, §§ 3-4.)

41.     Pursuant to the Settlement Agreement, 2HL retained an option (the "Option") to purchase an 8.2-acre portion of the Bancroft site (the "Buy Back Property") for $671,071 per acre (for a total of $5,502,782) for the development of an "age targeted townhouse" community similar to the "Concept Plan" attached as Exhibit B to the Settlement Agreement.  (Ex. 2, §§ 5-6.)  The Settlement Agreement defines the "age targeted townhouse" community as:

> a community targeting elderly residents whose children have reached adulthood and have moved from the family home. Some of these elderly residents have manageable physical limitations that lend to construction considerations such as limited number of stairs to climb, limited number of floors, reduced size of units for residents to maintain, limited number of bedrooms needed, etc.

(Ex. 2, § 14.)  If 2HL does not exercise the option, the Settlement Agreement obligates Haddonfield to pay 2HL an additional $600,000.  (Ex. 2, § 4.)

42.    The Settlement Agreement recognized that developing the contemplated retirement community would require several actions and approvals by Haddonfield.  Specifically, Section 10 of the Agreement provides that 2HL "would entertain exercising its option to purchase the 'Buy Back Property'" in accordance with the Settlement Agreement if the following terms and conditions are satisfied:

a) The Buy Back Property is declared to be an area in need of redevelopment in accordance with New Jersey's Redevelopment Law.

b) A Redevelopment Plan has been adopted in accordance with the New Jersey Redevelopment Law providing for seventy (70) market rate townhouses units which are 30 feet wide and 35 feet in height, plus ten (10) affordable units contained within five (5) duplexes consistent with 2HL, LLC's suggested concept plan attached as Exhibit B.

c) 2HL, LLC or an urban redevelopment entity assignee of 2HL, LLC has been named the redeveloper of the Buy Back Property as per the New Jersey Redevelopment Law, and under the terms and conditions herein.

d) Haddonfield will enter into an agreement with the redeveloper (2HL, LLC or urban redevelopment entity) regarding a payment in lieu of taxes (PILOT) program reasonably acceptable to 2HL, LLC regarding the "Buy Back Property," on terms to be determined by Haddonfield.

e) Following the approval of a Redevelopment Plan, Haddonfield and 2HL, LLC will enter into a redevelopment agreement providing, among other things, the details of the project generally described in Exhibit B, the commitments as to the timing of commencement and completion of the project, representations, warranties, defaults, notices and other similar provisions.

f) The Borough will have adopted a bond ordinance providing for the funding of the acquisition of the Bancroft Site following the approval by the Borough of the Redevelopment Plan.

g) 2HL, LLC has received all local, county and state approvals and permits necessary to purchase the Buy Back Property and construct the contemplated age targeted town house community.

11

(Ex. 2, § 10(a)-(g).)

43.     The Settlement Agreement contains numerous provisions requiring Haddonfield to cooperate with 2HL in the fulfillment of these terms and conditions.  For example, Section 10 provides, in pertinent part:

> The above referred to terms and conditions are referred to collectively as "Entitlements."  Haddonfield has not represented that any one or all of the above terms and conditions will be satisfied. However, Haddonfield *will exercise its best efforts to cooperate with 2HL, LLC to cause to occur* a quality constructed age targeted townhouse community which is in the best interests of the residents of Haddonfield on a portion of the Bancroft site.

(Ex. 2, § 10(h) (emphasis added).)

44.     The Settlement Agreement also contains a provision regarding "Cooperation by Parties," which provides as follows:

> The Parties agree without cost or expense to the Party other than payroll, professional fees, and internal administrative costs, that it will *fully cooperate with and give full assistance in that party's best interest in the effort to develop the age targeted townhouse community* and regarding any litigation or challenge to such efforts, including but not limited to, cooperation with each other's Consultants. Neither party is obligated to cooperate regarding any decision <u>not</u> in that party's best interest.

(Ex. 2, § 17 (emphasis added).)

45.     The above negotiated terms and Haddonfield's assurances of cooperation were material to the Settlement Agreement and to 2HL's decision to enter into it and thereby (i) settle its claims against the Zoning Board, (ii) dismiss the Zoning Litigation, and (iii) forfeit the lucrative opportunity to develop a residential drug and alcohol treatment facility on the Property.

46.     Further, in order to exercise the Option, purchase the Buy Back Property and develop the proposed retirement community, 2HL must fulfill numerous conditions that require approvals or actions by Haddonfield (and/or constituent boards and committees under its control).

12

For example, 2HL is subject to the requirement that the design of the townhouses must be "consistent with the historic nature of Haddonfield" and the "final design must be reviewed by the Haddonfield Historic Preservation Commission and approved by the Haddonfield Planning Board as per the New Jersey Land Use Act." (Ex. 2, § 12.)  Further, the "final Redevelopment Plan must be approved by Haddonfield as per the New Jersey Redevelopment Law."  (Ex. 2, § 13.) Additionally, 2HL's ability to file and proceed with its application requires execution of its applications and/or approvals by the Haddonfield Zoning and Planning Boards.

47.     As a result, Haddonfield expressly agreed in the Settlement Agreement that it would "properly notice and conduct and hold all required public meetings, hearing and votes required to satisfy the terms of this Agreement and facilitate the development of the Age Targeted Townhouse Community in accordance with the Municipal Land Use Law and the Redevelopment Law."  (Ex. 2, § 21.)

**D. Plaintiff Settled The Zoning Litigation In Return For Another Development Opportunity And Promised Cooperation From Haddonfield, Only To Face Delay Tactics And Other Conduct That Frustrated The Settlement Agreement's Purpose Because Haddonfield Never Intended To Fulfill Its Obligations.**

48.     Despite negotiating and executing the Settlement Agreement, Haddonfield never intended to fulfill the obligations imposed on it by that Agreement.  Rather, Haddonfield misrepresented its intentions and misled 2HL to believe it was going to honor the negotiated terms of the Settlement Agreement.  It did so because its singular goal was to prevent 2HL—at any and all costs—from operating a drug and alcohol rehabilitation facility on the Property.  To that end, Haddonfield's plan had two parts:  first, to use the Settlement Agreement as a means to end the immediate threat posed by the Zoning Litigation—a court order allowing 2HL to operate a drug and alcohol treatment facility on the Property—and second, to delay and ultimately thwart 2HL's

efforts to develop the Bancroft Development for so long that 2HL would eventually give up, accept a minimal additional payment and go away.

49.     As a result of the Sale Agreement, 2HL had a lucrative opportunity to develop a residential drug and alcohol rehabilitation facility on the Property and thereby further RCA's purpose of implementing its innovative treatment model through operation of residential treatment centers in communities throughout the nation.

50.     By entering into the Settlement Agreement, 2HL forfeited that opportunity in its entirety.  Its decision to do so was based on the negotiated terms and conditions of the Settlement Agreement and Haddonfield's false assurances that it would cooperate with 2HL in the development of the contemplated age-targeted-community, in accordance with the Agreement.

51.     From the start, Haddonfield misrepresented its intentions with respect to the Settlement Agreement in order to induce 2HL to enter into the Agreement and forgo its opportunity to develop a residential drug and alcohol rehabilitation facility on the Property.

52.     The execution of the Settlement Agreement achieved Defendants' goal, as stated by Mayor Rochfield, of "stopping the drug and alcohol rehabilitation center in that location."

53.     Upon securing 2HL's relinquishment of its ability to develop and operate a rehabilitation facility, Haddonfield failed to fulfill its contractual obligations and engaged in intentional conduct that has delayed the contemplated development and frustrated 2HL's rights and benefits under the Settlement Agreement.

54.     On January 12, 2016, Haddonfield, by Resolution, redesignated the Property as an area in need of development.

55.     Then, on April 6, 2016, the Planning Board affirmed and recommended that Haddonfield adopt the Bancroft Redevelopment Plan (the "Redevelopment Plan"), which Haddonfield later did.

56.     The adopted Redevelopment Plan, however, deviated materially from the Concept Plan in the Settlement Agreement and thus violated the terms of that Agreement.  Those deviations included: (a) pricing restrictions that attempted to require the pricing on the development's townhouses to be at or below the median price of a home in Haddonfield; (b) a maximum average townhouse unit size of 2,000 square feet; and (c) a provision requiring a minimum of seventy-five percent of the market-rate townhouses to be designed and constructed with the master bedroom on the same floor as the principal communal living spaces.

57.     Because Haddonfield failed to follow the agreed-upon Concept Plan in the Settlement Agreement, 2HL was forced to engage in lengthy efforts—from April 2016 through early 2018—first to inform Haddonfield of the Redevelopment Plan's improper deviations and then to work with Haddonfield to attempt to arrive at a new redevelopment plan consistent with the Settlement Agreement.  Those efforts included the following:

   a.  2HL's counsel corresponded with Haddonfield on numerous occasions, prior to and after adoption of the initial Redevelopment Plan, to inform Haddonfield that the draft and final Redevelopment Plans did not conform to either the Concept Plan or the requirements of the Settlement Agreement.

   b.  2HL provided Haddonfield with proposed amendments that would have brought the plan in line with the Concept Plan and in compliance with the Settlement Agreement.

   c.  2HL spent thousands of dollars refining the Concept Plan and presenting professional studies, including market studies, to Haddonfield and its constituent boards and committees.

   d.  2HL attended numerous meetings, participated in many public hearings and other proceedings, and spent hundreds of thousands of dollars in plan development, professional fees and legal fees.

58.     Despite 2HL's efforts to cooperate with Haddonfield in the creation of a redevelopment plan that complied with the Settlement Agreement, on February 13, 2018 (nearly two years after adoption of the original Redevelopment Plan), Haddonfield adopted an amended Redevelopment Plan.  That amended Plan was still substantially inconsistent with the Concept Plan and thus not in accordance with the Settlement Agreement.

59.     In addition to its efforts to cooperate with Haddonfield on the Redevelopment Plan, 2HL also attempted to fulfill its obligations under the Settlement Agreement that were necessary to move forward with the development.  Once again, however, Haddonfield engaged in conduct designed to prevent Plaintiff from satisfying those obligations, completing the development of the Buy Back Property and receiving the expected benefits of the Settlement Agreement.

60.     For example, Defendant refused to execute or declined to rule on Plaintiff's development plan and permit applications, which blocked Plaintiff's ability to file or proceed with its application.  Indeed, on September 18, 2020, 2HL filed with the Planning Board complete applications for Subdivision and Site Plan Approval for development of the Buy Back Property and submitted copies of those applications to Haddonfield.  But in the more than two years since the filing of those applications, Haddonfield has refused to sign them and affirm that they are consistent with the Redevelopment Plan.

61.     Likewise, in accordance with Section 12 of the Settlement Agreement, 2HL complied with Haddonfield's required Historic Preservation Process, an undertaking that cost thousands of dollars and resulted in months of delays prior to finally receiving approval from the Historic Preservation Commission ("HPC").  After the HPC granted the requisite approval, however, Haddonfield—*ex parte* and without notice to 2HL—revised the approval and changed the HPC recommendation to a negative recommendation.

62.     Haddonfield also refused to agree to a financial agreement ("PILOT Agreement") containing provisions contemplated by the Settlement Agreement.  Because receipt of a PILOT Agreement is an essential component of the Settlement Agreement and the contemplated development of the Buy Back Property, the parties engaged in months of negotiations to reach satisfactory terms and conditions on such an agreement.

63.     The resulting PILOT Agreement was memorialized in a February 26, 2019 Redevelopment Agreement, which was signed by both parties and adopted on the same date by Haddonfield pursuant to Resolution 2019-02-26-049.  On April 3, 2019, however, Haddonfield reneged on that signed and adopted PILOT Agreement by sending an email containing unilateral revisions that eliminated the agreed-upon PILOT terms entirely.  On April 9, 2019, Plaintiff's counsel responded with objections to Haddonfield's unilateral revisions and requested that the parties meet to discuss a reasonable alternative solution for all parties.  To date, Haddonfield has declined to either honor the original PILOT Agreement or agree upon a different solution.

64.     Finally, Haddonfield's wrongful delays resulted in 2HL being subject to recently implemented Department of Environmental Protection rules that are stricter than previous rules and detrimental to 2HL's ability to develop an age-targeted townhouse community in accordance with the Settlement Agreement and applicable law.

65.     Haddonfield's above-described wrongful conduct—including its failure to adopt a redevelopment plan consistent with the Concept Plan, its conduct that resulted in unnecessary delays and costs to 2HL, its arbitrary refusals to consider 2HL's plans and applications, and its denial of agreed-upon benefits—constituted breaches of its contractual obligations, as set forth in the Settlement Agreement, (i) to "exercise its best efforts" to "fully cooperate with and give full assistance in" the effort to develop the contemplated retirement community and (ii) to "properly

notice and conduct and hold all required public meetings, hearing and votes required to satisfy the terms of" the Settlement Agreement and facilitate the proposed development.  (Ex. 2, §§ 10(h), 17, 21.)

66.     On June 1, 2020, the Honorable Nan S. Famular, P.J. Ch. entered an Order granting the Borough a conditional judgment of compliance and repose—*i.e.*, court-ordered immunity from builder's remedy lawsuits—based upon review of the Borough's Fair Share Plan. A true and exact copy of the June 1, 2020 Court Order is attached to this Complaint as Exhibit 3.

67.     The Court determined that the Borough had stipulated to a judicially approved Fair Share Housing Obligation for the period from 1987 through July 1, 2025.

68.      As a result of the Court's determination, the Borough has received immunity from builder's remedy lawsuits through July 1, 2025.

69.     Because the Borough's Fair Share Plan represented that the Bancroft Redevelopment would account for twenty of the Borough's eighty-three affordable units, the grant of court-ordered immunity from builder's remedy lawsuits was based largely on the Bancroft Redevelopment.  A true and exact copy of the Borough's Fair Share Plan is attached to this Complaint as Exhibit 4.

70.     The Borough, however, has not complied with its total affordable housing obligation because, as detailed above, it has intentionally and wrongfully prevented the Bancroft Redevelopment from moving forward.  As a result, the Borough has at least twenty affordable housing units fewer than required.

71.     Finally, the Borough recently took additional steps with respect to the Bancroft property that will further impact 2HL's rights. In late 2021, the Borough Commissioners voted to

demolish buildings on the Property, specifically, buildings on Block 14, Lot 2.  That demolition began in or around April 2022.

72.     Because of those actions, the preexisting buildings that 2HL had intended to use as its planned drug and alcohol rehabilitation facility will no longer be available for that use.   As a result, 2HL would now be required to incur substantial additional costs to construct new buildings for use as its planned drug and alcohol rehabilitation facility. This action follows.

## COUNT ONE
### (Equitable Fraud/Fraudulent Inducement)

73.     2HL repeats and realleges the allegations contained in Paragraphs 1 through 72 of this Complaint as though fully set forth herein.

74.     2HL's claims under federal and state law as alleged in this Complaint must be viewed through the prism of Defendants' equitable fraud and fraudulent inducement.  From the moment they learned of 2HL's intended use of the Property, Defendants have engaged in wrongful conduct designed to prevent 2HL from developing and operating a drug and alcohol rehabilitation facility.  Upon learning of the Sale Agreement between 2HL and Bancroft, Haddonfield attempted to interfere with the sale of the Property and contacted Bancroft, stating that its interest would be best served by selling Haddonfield the Property because 2HL would never receive the necessary approvals to operate the proposed rehabilitation facility. Those efforts failed.

75.     When 2HL filed an application for a zoning permit, the zoning officer wrongfully denied the permit.  When 2HL appealed that decision, the Zoning board improperly denied 2HL the ability to present evidence in support of its application and thereafter arbitrarily denied the Appeal Application.

76.     When 2HL filed a lawsuit challenging that denial, Haddonfield continued its efforts to preclude the development of a treatment facility.

77.     Haddonfield participated in negotiations with 2HL and entered into the Settlement Agreement in which 2HL agreed to settle its claims and give up the opportunity to develop a residential drug and alcohol treatment facility on the Property.

78.     In negotiating the terms and entering into the Settlement Agreement, Haddonfield promised that it would perform its obligations and cooperate with and give full assistance to Plaintiff in its efforts to develop the townhouse community.   Haddonfield, however, misrepresented its intentions and never actually intended to perform the contract.

79.     As described above, Haddonfield not only failed to fulfill its obligations, but engaged in a pattern and practice specifically designed to prevent 2HL from fulfilling its obligations under the Settlement Agreement that were necessary to move forward with the development.   For example, Haddonfield refused to rule on 2HL's development and permit applications and unilaterally changed the HPC's positive recommendation and approval to a negative recommendation.

80.     Haddonfield made false assurances that it would perform under the Agreement with the intent to induce 2HL to enter the Settlement Agreement and relinquish its claims against Haddonfield and forfeit the opportunity to develop a treatment facility.

81.     Haddonfield's assurances that it would perform were material to 2HL's decision to enter into the Settlement Agreement.   2HL would not have entered the Settlement Agreement absent Haddonfield's assurances that it would fulfill its obligations.

82.     2HL reasonably relied on Haddonfield's assurances that it would perform as agreed.

83.     By entering the Settlement Agreement, 2HL (i) settled its claims against the Zoning Board, (ii) dismissed the Zoning Litigation, (iii) assigned the Sale Agreement to Haddonfield, and

(iv) forfeited the lucrative opportunity to develop a residential drug and alcohol treatment facility on the Property.

84.     2HL thus relied to its detriment on Haddonfield's false assurances of performance and thus has suffered and will continue to suffer substantial damages.

WHEREFORE, Plaintiff demands judgment in its favor and against the Defendants, jointly and severally, and requests that the Court grant the following relief:

(a)  Entry of an Order rescinding the Settlement Agreement;

(b)  Compensatory damages;

(c)  Punitive damages;

(d)  Attorneys' fees and costs; and

(e)  Such other and further relief as the court deems equitable and just.

<b><u>COUNT TWO</u></b><br><b>(Violation of Title II of the ADA)</b>

85.     2HL repeats and realleges the allegations contained in Paragraphs 1 through 84 of this Complaint as though fully set forth herein.

86.     The American with Disabilities Act requires that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, program, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132. The ADA makes it unlawful for a public entity, in determining the site or location of a facility, to make selections that have the purpose or effect of excluding individuals with disabilities, denying them benefits, or otherwise subjecting them to discrimination. 28 C.F.R. § 35.130(4)(1).

87.     2HL's patients are qualified persons under the ADA with disabilities that affect one or more major life activities of central importance to most people's daily lives, including abstaining from alcohol or drug abuse.

88.     2HL's criteria for admission to its treatment program are that each of its patients be diagnosed as suffering from dependence, and participate or agree to participate in substance abuse treatment.

89.     2HL's patients are not illegally using controlled substances. As such, their patients are "qualified persons with disabilities" within the meaning of the ADA, 42 U.S.C. § 12102(2) and 28 C.F.R. § 35.104.

90.     The Zoning Board is a qualifying public entity within the meaning of the ADA. 42 U.S.C. § 12131(l)(A).

91.     Section 12132 of the ADA constitutes a general prohibition against discrimination on the basis of disability by public entities.

92.     The Zoning Board is violating 2HL's and its patients' rights under the ADA, and its implementing regulations by: (i) effectively banning the residential treatment facility center applied for by 2HL; (ii) refusing to grant a reasonable accommodation or even have a reasonable accommodation procedure for 2HL; and (iii) allowing official and community prejudice against 2HL's disabled patients to permeate the zoning hearing and its decision to deny 2HL's appeal application.

93.     The Zoning Board's actions violate Title II of the ADA, and such actions harmed and continue to harm 2HL and the persons with disabilities that 2HL serves.

94.     Because of the Zoning Board's improper denial of 2HL's right to appeal the decision of an administrative official, 2HL expended significant time and financial resources, was

22

threatened with the loss of opportunity to conduct their business and provide a much-needed service, and is suffering substantial damages because of the Zoning Board's conduct.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, and requests that the Court grant the following relief:

(a) Declaratory relief stating that Defendants' discriminatory and improper denials of 2HL's zoning permit and appeal resulting in the exclusion of residential treatment facilities like the one proposed by 2HL violate the ADA, and that 2HL and its patients are entitled to reasonable accommodations to facilitate the development and operation of the rehabilitation facility as planned;

(b) Entry of an Order overturning the denial of 2HL's zoning permit application, approving the Appeal Application, and issuing 2HL a Zoning Permit;

(c) Preliminary and injunctive relief permitting 2HL's development and operation of the rehabilitation facility as planned, and enjoining the Defendants from any further demolition of the structures currently located on the Property and from obstructing or interfering with 2HL's development and operation thereof;

(d) Compensatory damages;

(e) Punitive damages;

(f) Attorneys' fees and costs; and

(g) Such other and further relief as the Court deems necessary and appropriate.

## **COUNT THREE**
### **(Violation of the Fair Housing Amendment Act of 1988)**

95.     2HL repeats and realleges the allegations contained in Paragraphs 1 through 94 of this Complaint as though fully set forth herein.

96.     The Fair Housing Amendment Act, 42 U.S.C. § 3601, et seq., guarantees fair housing to handicapped individuals.

97.     Under the FHAA, the term "handicap" means, with respect to a person, a "physical or mental impairment which substantially limits one or more of such person's major life activities, a record of such impairment, or being regarded as having such an impairment." 42 U.S.C. § 3602(h). The term "physical or mental impairment" includes "alcoholism" and "drug addiction

(other than addiction caused by current, illegal use of a controlled substance)." 24 C.F.R. § 100.201.

98.     2HL's patients are qualified individuals with disabilities within the meaning of 42 U.S.C. § 12101.

99.     Under the FHAA, it is unlawful to discriminate against or otherwise make unavailable or deny a dwelling to any buyer or renter because of a handicap of that buyer, renter, or person residing in or intending to reside in that dwelling after it is sold, rented, or made available. 42 U.S.C. § 3604(f)(1)

100.    2HL's residential treatment facility is a dwelling under the FHA.

101.    Defendants have discriminated against qualified persons under the FHA and Defendants' actions in refusing to grant 2HL and its patients a reasonable accommodation constitute unlawful discrimination in direct violation of the FHAA.  As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer substantial damages.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, and requests that the Court grant the following relief:

(a) Declaratory relief stating that Defendants' discriminatory and improper denials of 2HL's zoning permit and appeal resulting in the exclusion of residential treatment facilities like the one proposed by 2HL violate the FHAA, and that 2HL and its patients are entitled to reasonable accommodations to facilitate the development and operation of the rehabilitation facility as planned;

(b) Entry of an Order overturning the denial of 2HL's zoning permit application, approving the Appeal Application, and issuing 2HL a Zoning Permit;

(c) Preliminary and injunctive relief permitting 2HL's development and operation of the rehabilitation facility as planned, and enjoining the Defendants from any further demolition of the structures currently located on the Property and from obstructing or interfering with 2HL's development and operation thereof;

(d) Compensatory damages;

(e) Punitive damages;

(f)  Attorneys' fees and costs; and

(g)  Such other and further relief as the Court deems necessary and appropriate.

## COUNT FOUR
### (Violation of the Rehabilitation Act of 1973)

102.    2HL repeats and realleges the allegations contained in Paragraphs 1 through 101 of this Complaint as though fully set forth herein.

103.    The Rehabilitation Act requires that no qualified individual with a disability shall solely by reason of her or his disability, be excluded from participation in or be denied the benefits of or be subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a).

104.    Section 508 of the Rehabilitation Act defines "program or activity" as "all of the operations" of specific entities, including "a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(l)(A).

105.    Zoning decisions by a municipality are normal functions of a governmental entity and thus covered by the Rehabilitation Act.

106.    2HL's patients are qualified persons under the Rehabilitation Act with disabilities that affect one or more major life activities of central importance to most people's daily lives, including abstaining from alcohol or drug abuse.

107.    2HL's criteria for admission to its treatment program are that each of 2HL's patients be diagnosed as suffering from dependence, and participate or agree to participate in substance abuse treatment.

108.    2HL's patients are not illegally using controlled substances. As such, their patients are "qualified persons with disabilities" within the meaning of the Rehabilitation Act, 29 U.S.C. § 706(8)(C)(ii)(II).

109.    The Zoning Board is a qualifying public entity within the meaning of the Rehabilitation Act.

110.    Section 508 of the Rehabilitation Act constitutes a general prohibition against discrimination on the basis of disability by public entities.

111.    Defendants have violated 2HL's and its patients' rights under the Rehabilitation Act by: (i) effectively banning the residential treatment facility center applied for by 2HL; (ii) denying a fair hearing and denying the Appeal Application; (iii) refusing to grant a reasonable accommodation or even have a reasonable accommodation procedure for 2HL; and (iv) allowing official and community prejudice against 2HL's disabled patients to permeate the zoning hearing and its decision to deny 2HL's appeal application.

112.    The Zoning Board's actions violate the Rehabilitation Act and such actions harmed and continue to harm 2HL and the persons with disabilities that 2HL serve.

113.    Because of the Zoning Board's discriminatory reaction and behavior, 2HL has expended time and financial resources and are threatened with the loss of opportunity to conduct their business and provide a much-needed service.  As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer substantial damages.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, and requests that the Court grant the following relief:

(a) Declaratory relief stating that Defendants' discriminatory and improper denials of 2HL's zoning permit and appeal resulting in the exclusion of residential treatment facilities like the one proposed by 2HL violate the Rehabilitation Act, and that 2HL and its patients are entitled to reasonable accommodations to facilitate the development and operation of the rehabilitation facility as planned;

(b) Entry of an Order overturning the denial of 2HL's zoning permit application, approving the Appeal Application, and issuing 2HL a Zoning Permit;

(c) Preliminary and injunctive relief permitting 2HL's development and operation of the rehabilitation facility as planned, and enjoining the Defendants from any further

demolition of the structures currently located on the Property and from obstructing or interfering with 2HL's development and operation thereof;

(d) Compensatory damages;

(e) Punitive damages;

(f) Attorneys' fees and costs; and

(g) Such other and further relief as the Court deems necessary and appropriate.

**COUNT FIVE**
**(Violation of 42 U.S.C. § 1983)**

114.    2HL repeats and realleges the allegations contained in Paragraphs 1 through 113 of this Complaint as though fully set forth herein.

115.    Under color of State law, the Zoning Board improperly denied 2HL a full and fair hearing and Zoning Permit by interfering with its right to appeal the decision of the Zoning Officer.

116.    The Zoning Board's illegal and discriminatory actions in denying Plaintiff the right to a full and fair hearing on its Appeal Application, including the presentation of testimony, and in denying Plaintiffs Appeal Application, are not roughly proportional to the public good sought to be achieved and are grossly disproportionate to any asserted public interest because they unduly deprive 2HL of its constitutional rights far beyond what is reasonable, legal, or necessary.

117.    The Zoning Board's actions are illegal because they prevent, frustrate, and impede 2HL's use and enjoyment of its Property.

118.    The Zoning Board's actions have denied disabled individuals with a life-threatening disease the ability to obtain the treatment they need and cost 2HL substantial damages.

119.    The Zoning Board's conduct was arbitrary, capricious, unreasonable, malicious, in bad faith and, accordingly, shocks the conscience.

120.    Accordingly, the Zoning Board's actions violate the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.  As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer substantial damages.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, and requests that the Court grant the following relief:

(a) Declaratory relief stating that Defendants' discriminatory and improper denials of 2HL's zoning permit and appeal resulting in the exclusion of residential treatment facilities like the one proposed by 2HL violate the Constitution and 42 U.S.C. § 1983, and that 2HL and its patients are entitled to reasonable accommodations to facilitate the development and operation of the rehabilitation facility as planned;

(b) Entry of an Order overturning the denial of 2HL's zoning permit application, approving the Appeal Application, and issuing 2HL a Zoning Permit;

(c) Preliminary and injunctive relief permitting 2HL's development and operation of the rehabilitation facility as planned, and enjoining the Defendants from any further demolition of the structures currently located on the Property and from obstructing or interfering with 2HL's development and operation thereof;

(d) Compensatory damages;

(e) Punitive damages;

(f) Attorneys' fees and costs; and

(g) Such other and further relief as the Court deems necessary and appropriate.

## COUNT SIX
**(Substantive Due Process – Fifth and Fourteenth Amendments, and 42 U.S.C. § 1983)**

121.    2HL repeats and realleges the allegations contained in Paragraphs 1 through 120 of this Complaint as though fully set forth herein.

122.    The Zoning Board's discriminatory actions in denying 2HL a fair hearing and in denying its Appeal Application without the benefit of testimony that would have proved that Plaintiff was entitled to a Zoning Permit violated 2HL's right to substantive due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution, by arbitrarily, irrationally and unreasonably interfering with 2HL's right to use and develop its Property.

28

123.    The Zoning Board's actions were undertaken in bad faith and shock the conscience.

124.    2HL, the equitable owner of the Property, has the right to use and enjoyment thereof.

125.    That right includes the ability to develop the Property and operate the rehabilitation facility.

126.    2HL has distinct and definite investment-backed expectations in its ability to develop, use and enjoy the Property.

127.    The Zoning Board's actions, which were arbitrary, capricious, illegal, and conscience-shocking, directly interfered with 2HL's legitimate investment-backed expectations.

128.    The Zoning Board's actions, including the improper refusal to provide 2HL with a full and fair hearing on its appeal of an administrative official's denial of its zoning permit application, deprived 2HL of a legally-permitted, economically beneficial use of the Property and are causing 2HL to incur substantial damages.

129.    By virtue of the Zoning Board's arbitrary, capricious, and unreasonable exercise of its powers, the Zoning Board has violated the Fifth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, and requests that the Court grant the following relief:

(a) Declaratory relief stating that the Defendants' improper refusal to provide a full and fair hearing and denial of 2HL's Appeal Application constituted violations of the Constitution and 42 U.S.C. § 1983, and that 2HL and its patients are entitled to reasonable accommodations to facilitate the development and operation of the rehabilitation facility as planned;

(b) Entry of an Order overturning the Zoning Board's decision denying the Appeal Application for a Zoning Permit and approving the Appeal Application and issuing 2HL a Zoning Permit;

(c) Preliminary and injunctive relief permitting 2HL's development and operation of the rehabilitation facility as planned, and enjoining the Defendants from any further demolition of the structures currently located on the Property and from obstructing or interfering with 2HL's development and operation thereof;

(d) Compensatory damages;

(e) Punitive damages;

(f) Attorneys' fees and costs; and

(g) Such other and further relief as the Court deems necessary and appropriate

## COUNT SEVEN
### (Violation of State Law)

130.    2HL repeats and realleges the allegations contained in Paragraphs 1 through 129 of this Complaint as though fully set forth herein

131.    As detailed above, the Zoning Board was wrong as a matter of law, palpably abused its discretionary authority, and acted in an arbitrary and capricious manner in its treatment of 2HL's Appeal Application.

132.    The Zoning Board is a quasi-judicial body charged with providing applicants with a fair and impartial hearing on matters before it, and whose function is to apply the facts presented at the hearing to the legal requirements so that it may decide whether 2HL's proposed use as a residential treatment facility is a pre-existing, non-conforming use entitling 2HL to a zoning permit.

133.    The Zoning Board failed to properly act within its quasi-judicial capacity by depriving the Plaintiff of the opportunity to a fair hearing when it refused to allow the presentation of testimony and evidence in support of the Appeal Application.

134.    The Zoning Board's refusal to provide Plaintiff with the opportunity to present evidence in support of its Appeal Application deprived Plaintiff of receiving a Zoning Permit to which it is entitled as a matter of law.

135.    The Zoning Board's refusal to provide a proper hearing that included the presentation of testimony and evidence in support of the Appeal Application and the Zoning Board's denial of the Appeal Application in contravention of the law, have denied disabled individuals with a life-threatening disease the ability to obtain the treatment they need.

136.    The Zoning Board's actions are conscience shocking and in direct contravention of the Municipal Land Use Law, the Borough's own Ordinances, and the laws of the State of New Jersey and are causing 2HL to incur substantial damages.

137.    The Zoning Board palpably abused its discretionary authority in refusing to hear testimony and decide the Appeal Application on the merits.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, and requests that the Court grant the following relief:

(a) Declaratory relief stating that the Zoning Board's actions were arbitrary, capricious, unreasonable, and in violation of the New Jersey Municipal Land Use Law, the Borough's own Ordinances, and the laws of the State of New Jersey;

(b) Entry of an Order overturning the Zoning Board's decision denying Plaintiff's Appeal Application for a Zoning Permit;

(c) Preliminary and injunctive relief permitting 2HL's development and operation of the rehabilitation facility as planned, and enjoining the Defendants from any further demolition of the structures currently located on the Property and from obstructing or interfering with 2HL's development and operation thereof;

(d) Compensatory damages;

(e) Punitive damages;

(f) Counsel fees and costs; and

(g) Such other and further relief as the Court deems necessary and appropriate.

## <u>COUNT EIGHT</u>
### (Violation of New Jersey Law Against Discrimination)

138.    2HL repeats and realleges the allegations contained in Paragraphs 1 through 137 of this Complaint as though fully set forth herein.

31

139.    The New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.*, prohibits a "municipality, county or other local civil or political subdivision of the State of New Jersey, or an officer, employee, or agent thereof to exercise the power to regulate land use or housing in a manner that discriminates" on the basis of disability. N.J.S.A. 10:5-12.5.

140.    Under the NJLAD, disability means "physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness" or "any mental, psychological or developmental disability . . . resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically," N.J.S.A. I 0:5-5(q), which definition has been construed by the Court to include alcohol and substance dependence.

141.    The Zoning Board violated 2HL's rights and the NJLAD by failing to provide a full and fair hearing and summarily denying the Appeal Application without justification in contravention of the MLUL based upon improper discrimination against 2HL and its patients.

142.    The Zoning Board's conduct was arbitrary, capricious, unreasonable, malicious, in bad faith and, accordingly, shocks the conscience.

143.    The Zoning Board's wrongful actions prohibit 2HL from providing a residential treatment facility on a property where it is permitted to operate and such action is discriminatory on its face against persons with disabilities, a discrete and insular minority that faces restrictions and limitations and has been subjected to a history of purposeful unequal treatment.

144.    Because of the Zoning Board's denial of 2HL's right to appeal and the administrative official's decision, 2HL has expended significant time and financial resources, has lost the opportunity to conduct its business and provide a much-needed service, and is incurring substantial damages.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, and requests that the Court grant the following relief:

(a) Declaratory relief stating that the Board's actions in excluding 2HL's residential treatment facility violate the NJLAD;

(b) Entry of an Order overturning the Zoning Board's decision denying Plaintiff's Appeal Application for a Zoning Permit;

(c) Preliminary and injunctive relief permitting 2HL's development and operation of the rehabilitation facility as planned, and enjoining the Defendants from any further demolition of the structures currently located on the Property and from obstructing or interfering with 2HL's development and operation thereof;

(d) Compensatory damages;

(e) Punitive damages;

(f) Counsel fees and costs; and

(g) Such other and further relief as the Court deems necessary and appropriate.

## COUNT NINE
### (Breach of Contract)

145.    2HL repeats and realleges the allegations contained in Paragraphs 1 through 144 of this Complaint as though fully set forth herein.

146.    The Settlement Agreement obligates Haddonfield to cooperate with and give full assistance to 2HL to develop an age targeted townhouse community that is consistent with the Concept Plan in the Settlement Agreement.

147.    As detailed above, Haddonfield failed to cooperate with and provide assistance to 2HL.  To the contrary, Haddonfield has engaged in a pattern and practice specifically designed to prevent 2HL from developing the contemplated retirement community and thereby to thwart a significant benefit 2HL was to have received from the Settlement Agreement.

148.    For example, Haddonfield adopted a redevelopment plan that deviated from the Concept Plan, which caused years of delay and additional efforts by and costs to 2HL to negotiate

an amended plan.  The adopted amended plan, however, still failed to conform to the Concept Plan and thus failed to satisfy the Settlement Agreement.  To this date, Haddonfield has not adopted a redevelopment plan conforming to the Concept Plan.  Haddonfield's failure to adopt a redevelopment plan consistent with the Settlement Agreement and to cooperate with 2HL in reaching such a plan in a reasonable time constitute breaches of the express terms of the Settlement Agreement.

149.    The Settlement Agreement also obligates Haddonfield to properly notice, conduct and hold all required public meetings, hearing and votes required to satisfy the terms of the Agreement and facilitate the development of the retirement community.

150.    In violation of that obligation, Haddonfield has engaged in conduct that prevented 2HL from receiving approvals that are necessary under the Settlement Agreement and New Jersey law to develop the age-targeted community.  For example, Haddonfield (i) refused to rule on 2HL's development and permit applications; and (ii) unilaterally changed the HPC's positive recommendation and approval to a negative recommendation.  Not only do these actions constitute failures by Haddonfield to cooperate with and provide assistance to 2HL, they also expressly breach Haddonfield's obligation to properly notice, conduct and hold all required public meetings, hearing and votes required to satisfy the terms of the Settlement Agreement.

151.    As a direct and proximate result of Haddonfield's above-described breaches of the Settlement Agreement, 2HL has suffered and will continue to suffer significant damages.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, and requests that the Court grant the following relief:

(a) Compensatory damages in an amount to be determined at trial plus interest, attorneys' fees and costs of suit;

(b) Preliminary and permanent injunctive relief requiring Defendant to cooperate with Plaintiff in its development efforts and permitting Plaintiff to construct and operate the

contemplated townhouse community per the Concept Plan and in accordance with the terms of the Settlement Agreement; and

(c) Such other and further relief as the court deems necessary and appropriate.

## COUNT TEN
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

152.    2HL repeats and realleges the allegations contained in Paragraphs 1 through 151 of this Complaint as though fully set forth herein.

153.    There is a covenant of good faith and fair dealing implied in every contract, including the Settlement Agreement, that encompasses a pledge that no party will engage in conduct that destroys or injures the right of the other party to receive the fruits of the contract.

154.    As detailed above, the Borough (directly or through entities under its control) has engaged in conduct that has prevented performance under the Settlement Agreement, prohibited 2HL from developing the contemplated retirement community and resulted in the withholding of the benefits to which 2HL is entitled under that Agreement.

155.    Various obligations under the Settlement Agreement, as well as 2HL's ability to develop the contemplated retirement community, are dependent upon agreements and/or approvals by Haddonfield and/or entities under its control (*i.e.*, the Zoning and Planning Boards).

156.    As detailed above, however, Haddonfield and the relevant entities under its control engaged in conduct that either delayed or entirely prevented 2HL from reaching such agreements or from receiving required approvals under relevant New Jersey law that were necessary for 2HL to fulfill its obligations under the Settlement Agreement and to allow it to develop the contemplated retirement community.

157.    That conduct includes but is not limited to:  (a) wrongfully refusing to rule on or execute 2HL's development and permit applications to allow 2HL to proceed with its application; (b) refusing to agree to PILOT terms and conditions in accordance with the Settlement Agreement;

(c) delaying the Historic Preservation Process and, without explanation, changing the positive approval and recommendation to negative ones; and (d) causing delays and/or taking inordinate amounts of time to negotiate and agree upon final terms of necessary redevelopment plans or agreements.

158.    The Borough's conduct has not only hindered 2HL's efforts to develop the retirement community, but its delays also resulted in 2HL being subject to recently implemented environmental protection rules that impose stricter burdens and are detrimental to its future ability to develop the contemplated townhouse community.  As a result, 2HL has incurred significant costs and has been precluded from reaping expected profits from the development.  That conduct constitutes breaches of the implied covenant of good faith and fair dealing.

159.    As a direct and proximate result of Defendant's breaches of the implied covenant of good faith and fair dealing, 2HL has suffered and will continue to suffer significant damages.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, and requests that the Court grant the following relief:

(a)  Compensatory damages in an amount to be determined at trial, plus interest, attorneys' fees and costs of suit; and

(b)  Such other and further relief as the Court deems necessary and appropriate.

## COUNT ELEVEN
### (Revocation of Immunity from Builder's Remedy)

160.    2HL repeats and realleges the allegations contained in Paragraphs 1 through 159 of this Complaint as though fully set forth herein.

161.    As the New Jersey Supreme Court held in *Southern Burlington County NAACP v. Township of Mt. Laurel*, 67 N.J. 151 (1975) ("*Mount Laurel I*") and clarified in *Southern Burlington County NAACP v. Township of Mt. Laurel*, 92 N.J. 158 (1983) ("*Mount Laurel II*"), every municipality—including the Borough—has an obligation under the New Jersey Constitution

to adopt land-use regulations that provide a realistic opportunity for the construction of the municipality's "fair share" of the regional need for affordable housing for low and moderate income families.

162.   Further, the New Jersey Fair Housing Act, N.J.S.A. 52:27D-301, *et seq.* (the "NJ FHA") and the New Jersey Constitution obligate the Borough to exercise its zoning powers to provide a realistic opportunity for the development of its fair share of the regional need for affordable housing.  For ease of reference, the obligations and requirements imposed by the New Jersey Constitution, *Mount Laurel I*, *Mount Laurel II*, the MLUL and the NJ FHA are referred to collectively herein as the "*Mount Laurel* Obligations."

163.   In *In re N.J.A.C. 5:96 and 5:97* ("*Mt. Laurel IV*"), the New Jersey Supreme Court held that a trial court should render "[a] preliminary judicial determination of [a municipality's] present and prospective need" for affordable housing using the process authorized in that decision because such a determination "will assist in assessing the good faith and legitimacy of the town's plan." 221 N.J. 1, 29 (2015).

164.   By Order dated June 1, 2020 (*see* Ex. 3) in keeping with the *Mt. Laurel* Obligations and guidance offered by *Mt. Laurel IV*, Judge Famular granted the Borough a conditional judgment of compliance and repose based on review of the Borough's Fair Share Plan, which represented that the Bancroft Redevelopment would account for twenty of the eighty-three affordable units.

165.   The Court determined that the Borough had stipulated to a judicially approved Fair Share Housing Obligation for the period from 1987 through July 1, 2025.

166.    As a result of the Court's determination, the Borough has received court-ordered immunity from builder's remedy lawsuits through July 1, 2025.

167.    The Borough, however, has not complied with its total affordable-housing obligation because it has intentionally and wrongfully prevented the Bancroft Redevelopment from moving forward.  The Borough is thus short at least twenty affordable housing units.

168.    The "turn square corners" doctrine holds that the government may not "conduct itself so as to achieve or preserve any kind of bargaining or litigational advantage." *New Concepts For Living, Inc. v. City of Hackensack*, 376 N.J. Super. 394, 401 (App. Div. 2005).

169.    As detailed above, the Borough has failed to "turn square corners" and has violated the covenant of good faith and fair dealing by engaging in an extended course of intentional, improper and dilatory conduct designed to prevent 2HL from moving forward with the Bancroft Redevelopment.

170.    Because of the Borough's action, the Borough is deprived of twenty age restricted affordable housing units.

171.    As a result of the Borough's bad faith actions, the Borough is no longer entitled to immunity from builder's remedy lawsuits.  As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer substantial damages.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, and requests that the Court grant the following relief:

(a)  A declaration that the Borough has violated its *Mount Laurel* Obligations by failing to implement the terms of its Fair Share Plan, rendering its actions unconstitutional, unlawful and void;

(b)  A declaration that the Borough is no longer immune form builder's remedy lawsuits because of the Borough's bad faith actions;

(c)  Compensatory damages in an amount to be determined at trial, plus interest, attorneys' fees and costs of suit; and

(d)  Preliminary and permanent injunctive relief requiring Defendant to cooperate with Plaintiff in its development efforts and permitting Plaintiff to construct and operate the

Bancroft Redevelopment per the Concept Plan and in accordance with the terms of the Settlement Agreement; and

(e)  Such other and further relief as the Court deems equitable and just.

### COUNT TWELVE
### (Builder's Remedy for Project)

172.    2HL repeats and realleges the allegations contained in Paragraphs 1 through 171 of this Complaint as though fully set forth herein.

173.    As explained above, the New Jersey Constitution mandates that each municipality adopt land-use regulations that provide a realistic opportunity for the construction of the municipality's regional fair share of low and moderate-income housing units pursuant to *Mount Laurel I.*

174.    The New Jersey Supreme Court has provided a judicial mechanism to enforce this mandate known as a "builder's remedy" pursuant to *Mount Laurel II.*

175.    The builder's remedy allows a developer to construct a portion of a project as affordable housing within a municipality when the developer demonstrates that the municipality's zoning ordinances are unconstitutional because they fail to provide a realistic opportunity for affordable housing.

176.    A builder's remedy would compel the Borough to allow a proposed development as long as it provides for a substantial set-aside of affordable housing, typically twenty percent of the total number of rental housing units, as provided by Council on Affordable Housing ("COAH") regulations.

177.    Accordingly, 2HL seeks an order granting it a builder's remedy to permit the development of at least 400 units with a twenty percent affordable housing set aside pursuant to the requirements of COAH.

178.    The Property is fully suitable for such development and meets all inclusionary site suitability factors under COAH regulations.

179.    There are no substantive environmental impediments, wetlands, stream corridors or environmental pollution that would preclude residential development of the Property.

180.    The Property has clear title.

181.    The Property is within a sewer service area, and sanitary sewer and potable water service is immediately available.

182.    The Borough has failed to meet its responsibility under the MLUL to implement in good faith its Fair Share Plan, and to adopt zoning ordinances that would address the Borough's affordable housing obligations.

183.    2HL is ready, willing and able to construct housing on the Property, including a substantial number of units priced to be available to low and moderate income households, in accordance with COAH standards.

184.    2HL's proposal is reasonable and consistent with (i) sound land use planning, and (ii)  the planning objectives set forth in COAH regulations.

185.    2HL's proposal is consistent with the master plan and zoning regulation of neighboring municipalities inasmuch as the proposal will, if implemented, enable the Borough to meet and satisfy the regional need for housing suitable and affordable to low and moderate income families.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, and requests that the Court grant the following relief:

(a)  Compensatory damages in an amount to be determined at trial, plus interest, attorneys' fees and costs of suit; and

(b)  Granting Plaintiff a builder's remedy so as to permit the development of 400 market-rate units with a 20% set aside; and

(c) Such other and further relief as the Court deems equitable and just.

Dated: December 6, 2022            **MARINO, TORTORELLA & BOYLE, P.C.**

By: _____

Kevin H. Marino
John A. Boyle
Jennifer P. Montan
437 Southern Boulevard
Chatham, New Jersey 07928-1488
Tel: (973) 824-9300
*Attorneys for Plaintiff*
*2 Hopkins Lane, LLC*

## **DEMAND FOR TRIAL BY JURY**

Plaintiff, 2 Hopkins Lane, LLC, hereby demands a trial by jury as to all issues so triable in this case.

Dated:   December 6, 2022                                  **MARINO, TORTORELLA & BOYLE, P.C.**

By:  _____
Kevin H. Marino
John A. Boyle
Jennifer P. Montan
437 Southern Boulevard
Chatham, New Jersey 07928-1488
Tel: (973) 824-9300
*Attorneys for Plaintiff*
*2 Hopkins Lane, LLC*

# EXHIBIT 1

<u>**COMMISSIONER MEETING OF FEBRUARY 26, 2019**</u>

The meeting was called to order at 7:34 p.m. in the auditorium of the Borough Hall.  The announcement of Public Meetings was read by Mayor Rochford.  After the Pledge of Allegiance and a moment of silence, roll call was taken.  Mayor Rochford, Commissioner Kasko and Commissioner Moscatelli were present along with the Borough Administrator, Borough Solicitor and Borough Clerk.

Commissioner Moscatelli made a motion to approve the minutes to the February 12, 2019 Commissioner Meetings.  Commissioner Kasko seconded the motion, which was then approved unanimously.

Resolution 2019-02-26-042 was introduced the appointment of a new member to the Fire Department.  As there were no questions the Commissioners voted unanimously to approve the resolution.  Assistant Chief Tim Green then introduced James Killmeyer to the Commissioners and Mayor Rochford sworn him in as a new Firefighter for Haddon Fire Company No. 1.

Next, Ordinance 2019-01 was introduced for second reading, which is a capital bond ordinance in the amount of $570,000.  Mayor Rochford opened the Public Hearing and Commissioner Moscatelli reviewed the projects that would be done through this bond.  As no questions were asked Commissioner Kasko made a motion to close the Public Hearing and adopt the ordinance on second reading.  Commissioner Moscatelli seconded the motion, which was then approved unanimously by the Commissioners.

Mayor Rochford, Commissioner Kasko and Commissioner Moscatelli voted affirmatively to pass the following consent agenda resolutions with no questions asked:

2019-02-26-043     Authorization to Pay Vouchers
2019-02-26-044     Authorization to Advertise Bids – Stump Grinding Services
2019-02-26-045     Authorization to Extend Participation in Camden County Cooperative Pricing System – Bid A-27/2018 for Copy and Computer Paper and Envelopes
2019-02-26-046     Authorization to Sign Agreement with Haddonfield Outdoor Sculpture Trust for the Placement of Sculptures in Tatem Gardens
2019-02-26-047     Authorization for the Approval of General Event Permit Applications - Various

Resolution 2019-02-26-048 was then introduced, which authorized the signing of a settlement agreement with Fair Share Housing Corporation (FSHC) regarding Court Docket No. CAM-L-2596-15 pertaining to the Borough's Affordable Housing requirements.  Mayor Rochford thanked all of the Borough's professionals who have worked on this issue.  Commissioner Moscatelli reviewed the various areas in town that were listed as placed that affordable housing would be required if the properties were ever sold for residential development.  These properties would not be required to be sold for residential use.  He noted that the Supreme Court has been ruling on these cases across the State since the Coalition on Affordable Housing (COAH) was disbanded by the former Governor.  Furthermore, he pointed out that this type of housing would be most likely be used by

cops, teachers, etc. Commissioner Kasko commented that multiple borough commissions and boards have been dealing with this issue for some time and he thanked everyone for their hard work. Mayor Rochford stated that this is a fair settlement, which is reasonable and doable.

Rich Hluchen, Redman Avenue, commented on the fact that this resolution was added to this evening's agenda just today and asked why this is being pushed through. He asked the Commissioners to allow the public a period of time to review the document. In his opinion this constituted as a lack of transparency on the part of the Commissioners and asked that the decision on this be tabled to a later meeting. Mayor Rochford pointed out that the borough has been working towards this settlement for a very long time. Mr. Hluchen commented that this is not the way open government should work. Commissioner Kasko stated that he did not have a problem waiting. The Borough Solicitor pointed out that any changes made at this point would have to go back to the Mediator and the Master, although, there is no harm in delaying a vote by two weeks if there are no changes.

David Hunter, Windsor Avenue, stated that this resolution should not have been on the agenda because the residents should have been given the chance to review the document first.

David Siedell, Chews Landing Road, asked if the approval of this document was necessary to be able to move forward with the remaining items on the agenda regarding the Bancroft property. Mayor Rochford indicated that it was not necessary. Mr. Siedell then spoke about the bedroom requirements as mentioned in the settlement agreement and asked how many bedrooms would be required at both the Snowden Avenue project and the Bancroft site. The Borough Administrator reviewed the number of 3-, 2-, and 1-bedroom units would be at each. Mr. Siedell noted that the Acme property does have a deed restriction that states it could not be sold to another grocery store. He then reviewed various sites that could be converted to affordable housing and pointed out that at there could be a maximum of 44 new students at the Bancroft site alone. This almost pushed the School District into a Group 3 classification. Commissioner Moscatelli pointed out that the Borough is being ordered by the Courts to do this.

Robin Potter, Warwick Avenue, seeking information as a resident. Asked that more information be provided on the Snowden Lot, as well as other places throughout town, and that a copy of this settlement agreement be provided on the website for more residents to be able to review. Mayor Rochford indicated that it would be put on the website.

Commissioner Kasko made a motion to Table Resolution 2019-02-16-048 to the March 12, 2019 agenda. Commissioner Moscatelli seconded the motion, which was then approved unanimously by the Commissioners.

The Elizabeth Haddon School fourth graders in attendance were asked to stand and introduced themselves, as well as ask any questions they may have. In attendance were Max Shah, Westmont Avenue; Jack Pachtinger, North Drive; William Hawkins, Aveondale Avenue; William O'Donnell, Homestead Avenue; Nora Kruza, Homestead Avenue;

Payton Nussey, Redman Avenue; Nino DeFeo, W. Mount Vernon Avenue; Sara Mullins, W. Redman Avenue; Emma Kelly, West End Avenue; Enis Mujde, Haddon Commons and Lily Mullins, W. Redman Avenue, who asked why people can't own pigs in town.  Mayor Rochford replied that he would be more than willing to sit down with her to review the reasons for this, but just at a later date.

Ed McManimon, the Borough's Redevelopment and Bond Attorney from McManimon, Scotland & Bauman, LLC, provided a power point presentation, which provided an overview of the Redevelopment Agreement and Financial Agreement.

The Borough Administrator then reviewed the Payment In Lieu of Taxes financial impact information.

Ordinance 2019-02 was then introduced for first reading, which authorizes the Financial Agreement, or Payment In Lieu of Taxes (PILOT) program.  Mayor Rochford announced that the second reading and public hearing on the ordinance would be held at the March 12, 2019 regularly scheduled Commissioner Meeting.  Commissioner Moscatelli then provided a brief history of what has occurred regarding the Bancroft property over the past four years, starting with the purchase of the property by Mr. Brian O'Neill, who initially wanted to put a drug rehabilitation center at the site.  He further pointed out the Borough is already paying costs on this site for the debt service incurred to purchase the property from Mr. O'Neill.  He also noted that the Borough will be sitting down with the Board of Education (BOE) in the near future to negotiate what portion would be provided to the schools, as we are not looking to cut them out.  Although this is not a perfect agreement, the "bones" are sound.  We are hopeful that this development will work out as we expect.  We cannot promise that, but there were costs associated with stopping the drug and alcohol rehabilitation center in that location.  Mayor Rochford commented on the long tradition of excellence in our schools and the three Commissioners here understand the importance or supporting our school system.  He then opened the floor up for questions on the ordinance.  Mr. McManimon suggested questions on both the ordinance and the following resolution for the development agreement.  The Commissioners agreed to have Resolution 2019-02-26-049 also read by title at this time, which was done by the Clerk.

Herb Hess, Redman Avenue, started off by asking who pays the PILOT.  The borough Administrator replied that it would be the occupants/owners of the units once purchased.  Mr. Hess then asked if it was the Commissioners who determined if the BOE would receive any of the money from the PILOT, to which the Administrator replied affirmatively.  Mr. Hess then spoke on the potential increase in the number of students and the effects that would have on the schools.  The Administrator noted that at a bare minimum the PILOT would cover at least the costs of any new students and the Commissioners want to make the BOE as whole as they can after any expenses are dealt with.  Mr. Hess pointed out that the funds received could be less than what is being presents because of payments provided to the BOE.  Commissioner Moscatelli pointed out that there is no intention to cut the BOE out of this PILOT.  He further noted that these PILOT payments would come to the Borough and we would come to an agreement with the BOE, so that they can budget and plan for the future.  Mr. Hess noted that we do not know what the impact to the schools will be at this time.

John Burmaster, W. Summit Avenue, asked what amount the County would be receiving from the PILOT.  Mayor Rochford stated that the County is entitled to 5% in a PILOT program, instead of the usual 28% that they usually get.  The Administrator pointed out that this difference is why the portion that the municipality is collecting is larger and keeping it either for ourselves or the school board.  Mr. Burmaster commented on a statement made by someone earlier that "without these tax breaks they wouldn't have done this development here".  He always thought that Haddonfield was a community where redevelopers would love to work.  If this developer is representative of other developers does this mean that Haddonfield isn't such a desirable place to live as he thought it was.  Mr. McManimon pointed out that the statement about the tax breaks was a part of the purchase agreement between Mr. O'Neill and the Borough.  Mr. Burmaster then commented out the $600,000 payoff to Mr. O'Neill to get him to go away; if these tax breaks were not offered then he could take this money and not do this development.  Commissioner Moscatelli noted that the option to take the $600,000 is at the discretion of the developer.  Mr. McManimon pointed out that the developer retained rights when he sold this property to the Borough.  Mr. Burmaster then asked if there were no alternative to this situation.  Discussions continued on the PILOT program and who benefited from it.  Commissioner Moscatelli pointed out that the developer does not get a benefit from the PILOT.  This is an incentive for him to sell the units once they are completed.

Mr. Siedell talked about the mechanics of the PILOT program and noted that the paperwork starts when the project is built.  Therefore, he feels that this is an incentive to build quickly, which could lead to a quality issue with the units.  The Borough Solicitor pointed out that typically a builder does not finish a unit until a buyer buys it so that the final details are done to the buyers wishes.  Mr. Siedell then asked about the model units and questioned if part of the agreement could be that the PILOT starts when the Certificate of Occupancy (CO) is issued.  Commissioner Moscatelli pointed out that the land tax is lower than the PILOT, which is already designated to start when the CO is issued.  Mr. Siedell finished by recommending that clarifying language be included in the PILOT as to when it officially begins.  Mayor Rochford noted that there are specific references in the Developer's Agreement, which clarify that information.

Chris Maynes, Roberts Avenue, read from the following prepared statement:

> "In January of 2016, the Borough signed a deal with Brian O'Neill, the prospective Bancroft developer, which conceptually outlined a development of 70 market-rate age-targeted townhomes, plus 10 affordable units.
>
> Since that agreement was signed, the Commissioners have taken several significant actions – none of which were mandated by the Agreement, but all of which were to the benefit of the developer with no offsetting benefit to Haddonfield.
>
> Let me be specific:

Last February, you adopted a dozen changes to the Bancroft Redevelopment Plan – all requested by the developer – while Haddonfield received nothing in return from the developer, except perhaps the speedier development of now 90 townhomes, which will further flood our already over-crowded schools – without providing truly senior targeted housing at a price affordable to, and in a configuration desirable to, seniors.

You adopted those changes with brazen disregard for the recommendation of our very well-respected Planning Board, which voted 8-0 to reject 9 of the proposed 13 amendments, with the other 4 amendments being primarily just clarifications of language in the Original Plan.

Yet, in the pre-amble to the proposed Redevelopment Agreement that is now under consideration, you have described the Planning Board's 8-0 rejection of all of the meaningful amendments to the Original Plan, this way:

Quote…

"Whereas, on December 17th, 2017, the Planning Board by voice vote, and then in a resolution on January 2, 2018, essentially codified its recommendations in favor of certain amendments to the Original Redevelopment Plan and against others."

I have never seen a more gross mischaracterization of the truth then those words right there.

A voice vote?  Misleading.  Why not say in a unanimous 8-0 vote?

…codified its recommendations in favor of certain amendments. Misleading.  The 4 amendments not outright rejected by the Planning Board were merely to clarify certain items in the Original Plan and were not meaningful changes.  The Planning Board did not "recommend in favor" of any of amendment that changed the Original Plan in any meaningful way.

…codified its recommendations…. against others… Misleading.  Against others?  The Planning Board did not merely recommend against others. They outright rejected all nine of the meaningful amendments – such as the amendment which (1) increased impervious coverage and density in order to increase economic profit to the developer (Planning Board's words, not mine); (2) nullified the goals and objectives of the redevelopment plan, such as truly age-targeted senior housing; (3) increased overall building size in violation of prescribed bulk standards; (4) increased square footage and price, contrary to the Original Plan's goal of affordable age-targeted senior housing; (5) increased the length and width of the townhouses (more square footage equals more money in the developers pockets); (6) increased allowable height of the building to 45 feet; (7) allowed elevators

as an option to replace single-level living for seniors (because we can all afford elevators when we "downsize" from a $477k house to a larger $600k townhome).

You actually managed to jam three materially misleading phrases into that one sentence.

But it gets better:

Then the Redevelopment Agreement goes on to sell the developer the land at $597k per acre, down $74k per acre from the $671k per acre in original agreement.   $74k times 8.2 acres is another $606,800 to the developer.

So those were some highlights from the Redevelopment Agreement.

Then there's the proposed Financial Agreement, where you give another $6.6M to the developer in the form of tax breaks, based on the assumption of 80 homes assessed at a very conservative $500k, plus 10 homes assessed at $250k, being phased in over three years.  QUOTING FROM OUR ORIGINAL AGREEMENT WITH O'NEILL... the payments in lieu of taxes will be "on terms to be determined by Haddonfield."  Nowhere does the agreement state that we must charge the developer anything less than the going tax rate, so why would we do it?  It does say, the payments would "reasonably acceptable to the developer."  Since when is anything less than 100% of the same tax rate that an average citizen pays not reasonable – particularly to a billionaire developer?

Let's shift gears and talk about the schools.

You've spent the last year and a half trying to convince us that 90 townhomes wouldn't bring students to our already over-crowded school district.  You even came up with a quantitative analysis that projected that this development would only bring 4.6 students to the district.

You said families don't move into the Mews or the Commons, so they won't move in to these brand new townhomes, which are conveniently located blocks from a great elementary school and steps from what is arguably the best public high school in the state, and a stone's throw from an expansive, well-maintained county park.

Times are changing, even in the three short years since the Agreement was signed with O'Neill.  The Mews now has 3 and soon to be 4 families with school age children – the most recent being a family with 3 kids 11 or under and soon to be another family with 2 kids.  So there's your 4.6 students right there, and the shovels haven't even hit the dirt yet at Bancroft.

Compared to people our age, today's young family is much less concerned with yards and space and more concerned with location and experience.  The following is a quote from Freddie Mac's website:

*"Today's buyers—particularly millennials—don't bring with them the pre-conception that only a house defines a home. They often value experiences, community and social connectivity over square footage, preferring walkable, suburban neighborhoods near public transit, shops and restaurants, even if it means owning smaller properties. Townhouses offer them a gateway to the single-family experience in these communities."*

Does that "walkable, suburban neighborhood" sound familiar?  Try the Bancroft site with 90 newly-constructed townhomes.  We're already seeing it happen in the Mews.

If these townhomes are built, it will almost certainly result in one or both of (a) the need for another school to be built altogether, in which case, say goodbye to Scout Field and hello to another $30M bond; or (b) grade level schools, which will save us a teacher salary or two by ensuring near max capacity in each classroom (Yeah, bigger class sizes!  Everybody wants that.) while resulting in logistical and traffic nightmares like never before.

Can you imagine living on, say Ardmore Ave, and now your 1ST, 3rd, and 5th graders can no longer walk to school together?  Instead you have to drive your 1st grader to Lizzy Haddon, then come back through all the newly-created traffic to get your 3rd grader to Central School, then over to Tatem to drop off your 5th grader?

Think of all the additional traffic, now that the walking population for each grade school is reduced by 2/3 and the driving population is increased by 2/3.

These are the realities of what this development will do to our town and our schools, but you can't see past the next borough budget in order to comprehend this reality.

So where do we go from here?

Well first…

1. If there's anybody in attendance from the BOE, I urge you to get involved and protect your interests.  The Borough has been acting in its own self-interest without any consideration for the real tangible long-term negative effects that their actions will have on our schools.

2. Pass a new ordinance negating the changes to the original redevelopment plan.  Return it to 70 market-rate plus 10 affordable units

and restore the goals and objectives which were designed to ensure that the units would truly be built for seniors. If the developer is not satisfied with the profit he could make from 70 plus 10 units, let him exercise his option to walk away for $600k.

3. Do not sign the Redevelopment Agreement in its current form. Revise the pre-amble language to honestly and accurately memorialize the Planning Board's position, and return the purchase price per acre to the originally-agreed-upon $671k per acre. There is no reason why we should concede another $608k to the billionaire developer in exchange for over-crowded schools.

4. Do not sign the Financial Agreement in its current form. The PILOT should be equal to the tax rate paid by every other citizen in this town. There is no reason why we should concede another $6.6M to the billionaire developer in exchange for over-crowded schools.

5. If you, the commissioners, are not willing to take these actions to protect our interests, then you should ALL resign from office immediately. Step aside and allow citizens to step into your place who will stand firm for Haddonfield and not for the developer.

In January of 2016, the Borough signed a deal with Brian O'Neill, the prospective Bancroft developer, which conceptually outlined a development of 70 market-rate age-targeted townhomes, plus 10 affordable units.

Since that agreement was signed, the Commissioners have taken several significant actions – none of which were mandated by the Agreement, but all of which were to the benefit of the developer with no offsetting benefit to Haddonfield.

Let me be specific:

Last February, you adopted a dozen changes to the Bancroft Redevelopment Plan – all requested by the developer – while Haddonfield received nothing in return from the developer, except perhaps the speedier development of now 90 townhomes, which will further flood our already over-crowded schools – without providing truly senior targeted housing at a price affordable to, and in a configuration desirable to, seniors.

You adopted those changes with brazen disregard for the recommendation of our very well-respected Planning Board, which voted 8-0 to reject 9 of the proposed 13 amendments, with the other 4 amendments being primarily just clarifications of language in the Original Plan.

Yet, in the pre-amble to the proposed Redevelopment Agreement that is now under consideration, you have described the Planning Board's 8-0 rejection of all of the meaningful amendments to the Original Plan, this way:

Quote…

"Whereas, on December 17th, 2017, the Planning Board by voice vote, and then in a resolution on January 2, 2018, essentially codified its recommendations in favor of certain amendments to the Original Redevelopment Plan and against others."

I have never seen a more gross mischaracterization of the truth then those words right there.

A voice vote?  Misleading.  Why not say in a unanimous 8-0 vote?

…codified its recommendations in favor of certain amendments. Misleading.  The 4 amendments not outright rejected by the Planning Board were merely to clarify certain items in the Original Plan and were not meaningful changes.  The Planning Board did not "recommend in favor" of any of amendment that changed the Original Plan in any meaningful way.

…codified its recommendations…. against others… Misleading.  Against others?  The Planning Board did not merely recommend against others. They outright rejected all nine of the meaningful amendments – such as the amendment which (1) increased impervious coverage and density in order to increase economic profit to the developer (Planning Board's words, not mine); (2) nullified the goals and objectives of the redevelopment plan, such as truly age-targeted senior housing; (3) increased overall building size in violation of prescribed bulk standards; (4) increased square footage and price, contrary to the Original Plan's goal of affordable age-targeted senior housing; (5) increased the length and width of the townhouses (more square footage equals more money in the developers pockets); (6) increased allowable height of the building to 45 feet; (7) allowed elevators as an option to replace single-level living for seniors (because we can all afford elevators when we "downsize" from a $477k house to a larger $600k townhome).

You actually managed to jam three materially misleading phrases into that one sentence.

But it gets better:

Then the Redevelopment Agreement goes on to sell the developer the land at $597k per acre, down $74k per acre from the $671k per acre in original agreement.   $74k times 8.2 acres is another $606,800 to the developer.

So those were some highlights from the Redevelopment Agreement.

Then there's the proposed Financial Agreement, where you give another $6.6M to the developer in the form of tax breaks, based on the assumption of 80 homes assessed at a very conservative $500k, plus 10 homes assessed at $250k, being phased in over three years.  QUOTING FROM OUR ORIGINAL AGREEMENT WITH O'NEILL… the payments in lieu of taxes will be "on terms to be determined by Haddonfield."  Nowhere does the agreement state that we must charge the developer anything less than the going tax rate, so why would we do it?  It does say, the payments would "reasonably acceptable to the developer."  Since when is anything less than 100% of the same tax rate that an average citizen pays not reasonable – particularly to a billionaire developer?

Let's shift gears and talk about the schools.

You've spent the last year and a half trying to convince us that 90 townhomes wouldn't bring students to our already over-crowded school district.  You even came up with a quantitative analysis that projected that this development would only bring 4.6 students to the district.

You said families don't move into the Mews or the Commons, so they won't move in to these brand new townhomes, which are conveniently located blocks from a great elementary school and steps from what is arguably the best public high school in the state, and a stone's throw from an expansive, well-maintained county park.

Times are changing, even in the three short years since the Agreement was signed with O'Neill.  The Mews now has 3 and soon to be 4 families with school age children – the most recent being a family with 3 kids 11 or under and soon to be another family with 2 kids.  So there's your 4.6 students right there, and the shovels haven't even hit the dirt yet at Bancroft.

Compared to people our age, today's young family is much less concerned with yards and space and more concerned with location and experience.  The following is a quote from Freddie Mac's website:

*"Today's buyers—particularly millennials—don't bring with them the pre-conception that only a house defines a home. They often value experiences, community and social connectivity over square footage, preferring walkable, suburban neighborhoods near public transit, shops and restaurants, even if it means owning smaller properties. Townhouses offer them a gateway to the single-family experience in these communities."*

Does that "walkable, suburban neighborhood" sound familiar?  Try the Bancroft site with 90 newly-constructed townhomes.  We're already seeing it happen in the Mews.

If these townhomes are built, it will almost certainly result in one or both of (a) the need for another school to be built altogether, in which case, say goodbye to Scout Field and hello to another $30M bond; or (b) grade level schools, which will save us a teacher salary or two by ensuring near max capacity in each classroom (Yeah, bigger class sizes!  Everybody wants that.) while resulting in logistical and traffic nightmares like never before.

Can you imagine living on, say Ardmore Ave, and now your 1ST, 3rd, and 5th graders can no longer walk to school together?  Instead you have to drive your 1st grader to Lizzy Haddon, then come back through all the newly-created traffic to get your 3rd grader to Central School, then over to Tatem to drop off your 5th grader?

Think of all the additional traffic, now that the walking population for each grade school is reduced by 2/3 and the driving population is increased by 2/3.

These are the realities of what this development will do to our town and our schools, but you can't see past the next borough budget in order to comprehend this reality.

So where do we go from here?

Well first…

1. If there's anybody in attendance from the BOE, I urge you to get involved and protect your interests.  The Borough has been acting in its own self-interest without any consideration for the real tangible long-term negative effects that their actions will have on our schools.

2. Pass a new ordinance negating the changes to the original redevelopment plan.  Return it to 70 market-rate plus 10 affordable units and restore the goals and objectives which were designed to ensure that the units would truly be built for seniors.  If the developer is not satisfied with the profit he could make from 70 plus 10 units, let him exercise his option to walk away for $600k.

3. Do not sign the Redevelopment Agreement in its current form.  Revise the pre-amble language to honestly and accurately memorialize the Planning Board's position, and return the purchase price per acre to the originally-agreed-upon $671k per acre.  There is no reason why we should concede another $608k to the billionaire developer in exchange for over-crowded schools.

4. Do not sign the Financial Agreement in its current form.  The PILOT should be equal to the tax rate paid by every other citizen in this town.  There

is no reason why we should concede another $6.6M to the billionaire developer in exchange for over-crowded schools.

5. If you, the commissioners, are not willing to take these actions to protect our interests, then you should ALL resign from office immediately.  Step aside and allow citizens to step into your place who will stand firm for Haddonfield and not for the developer. "

Robert Ray, Marne Avenue, asked how the Borough can legally enforce age targeted sales to new buyers and further, can you enforce age related sales to a second or third buyer of one of these properties.  Ed McManimon replied that the Commissioners have made a covenant with the developer under which the Borough has rights that can be enforced to ensure that.  Mr. Ray commented that he is concerned about discrimination rules.

John Stokes, Farwood Circle, started by commenting on the building referenced in the Redevelopment Agreement as the "hospital", and asked if the developer was being given use of this building at no cost.  Commissioner Moscatelli replied affirmatively.  He felt that the developer should have to pay for this.  Mr. Stokes then reviewed items from the financial information provided.  He did not see how the Borough would come out whole in the PILOT and pointed out that the BOE would not be able to be made whole.  He feels that the gap in the BOE money will only grow as time goes by, which will also affect the local library.  The Borough Administrator commented that while the point is being made that the school, as well as the library, are not going to be 100% made whole during the first 20 years of this process, the issue is, if you look at the costs the borough is going to assume and you look at the taxes we would have collected under a normal method this would not be revenue neutral, which is what the Commissioners wanted it to be.  They wanted this to not have a tax impact on the residents for the debt service on this project, so this does leave less for the school and the library.  Mr. Stokes stated that this is not revenue neutral because you are just transferring the need to increase taxes to the school.  Commissioner Moscatelli noted that an assumption is being made the BOE needs the full 55% of the original tax dollar to be whole.  He also pointed out that there is a value in other items with the Open Space areas that will be achieved.  Further discussions were held regarding the tax impact of this on the Borough, as well as the BOE.  Mr. Stokes then commented on the site plan for the property, which shows a stormwater easement that goes to the Cooper River and asked if the developer was paying for the easement.  Commissioner Moscatelli replied that he is not, which is like other utility easements in place.  Mr. Stokes then asked if this plan follows the Borough's stormwater requirements.  Commissioner Moscatelli pointed out that this is addressed in other documents that are much larger in volume, but that will be put on the website for review.  The Administrator also noted that there may be changes to some of this information as we move forward.

Frances Gramkowski, West End Avenue, stated that there are no teeth in this agreement for age specific people to buy these properties.  He noted that he would not be able to afford one of these units.  He finished by pointing out that people can buy these and pay 30% less in taxes, which puts current residents at a disadvantage.

Jack Tarditi, Washington Avenue, stated that he has been following this process for a few years now and when he read the purchase agreement, he felt that the Borough has missed an opportunity to do something for the residents who have paid for a built this town.  Our residents will not be able to sell their homes and be able to afford to move to the Bancroft site.  It is felt that these townhomes will attract millennials to move to town and send their kids to the best school district in South Jersey.  Mr. Tarditi referenced the motion earlier in the evening to Table the resolution regarding the settlement agreement with FSHC and noted that the Commissioners heard the residents that they needed additional time to look at that agreement, and asked the Commissioners to listen to the residents in this case as well.  Let's not give the developer this PILOT, nor the Redevelopment Agreement.  It is his opinion the developer does not have any legal ground to sue the Borough; let him take his $600,000 and leave, or force him to built it on our terms.  He challenged the Commissioners to take that risk to get the developer to go somewhere else.  Let's start this process over again and put together another plan.

Mr. Hunter commented on the previous question/answer regarding the transfer from one owner of one of these townhomes to another if the restriction would be covered by a covenant that applied to age.  He asked for clarification from Mr. McManimon on the topic.  Mr. McMainomon stated that these units are sold as age targeted, which means adults that do not have minor children living with them.  Mr. Hunter asked if the covenant continues when purchased for a second time.  Mr. McManimon replied that it does not and reviewed the history of the term age targeted within this agreement.  Mr. Hunter then started a discussion on what the Commissioners understood age targeted to mean.  Mr. McManimon clarified the covenant for the property to be age targeted, but that this did not mean you could have people who were of a different age there.  Mr. Hunter then asked what would be the result if the Commissioners decided not to move forward with these agreements, based on the turnout of the residents who are clearly not in favor of this project.  Mayor Rochford replied that we could end up in court for years and years and that the debt service would fall back onto the residents during that period of time.  Mr. Hunter then asked what could be the result if the developer won such a lawsuit against the borough; what would be the financial implication on the borough.  Mr. McManimon replied that the implication that this developer would walk away with just $600,000 is ridiculous; he is not going to do that.  He has a right to the value of this development, whether it is this or ultimately a drug rehabilitation center, he still has rights.  Whether he prevails in those in litigation would have to be determined.  Mr. Hunter thanked the Commissioners for the efforts that they have put into this, even if we do not agree.  Mr. Hunter then talked about age targeted again, and how this is defined by physical attributes, and asked about the financial component of age targeted units.  Commissioner Moscatelli replied that the base unit will be approximately $500,000, which is less that what was originally projected, and is roughly our current average, but these will still be dictated by the market.  The Redevelopment Plan specified that we should target the average cost, which is what this done.  He does sympathize that there are seniors who will not be able to afford to move into a $500,000 townhouse.  This development wasn't meant to cover every need for everybody.  This development was meant to meet the contractual requirements we needed to meet.  There are a lot of things bout this that aren't perfect, but the units they have proposed will meet the redevelopment plan numbers.  Mr. Hunter then asked the Commissioners to not used the age targeted terms because this is misunderstood.  The average resident won't be able

to afford them. This development is for those who can sell their current homes at $700,000 to $800,000. He believes that the people who will be buy these townhomes are young families that can buy this townhouse for $250,000 to $300,000 less that the current market for single family homes, which are currently on the market right now. It is his opinion that this development will absolutely bring many more children into the school system. He understands the difficulties, but if you look at this from the standpoint of what is best for the community this is a disaster.

Kathy Freeman, Chestnut Street, asked if this construction will have go before the Historic Preservation Commission (HPC) and all the usual permits. She asks because the renderings that are being shown are different than what was before the HPC previously. When you talked earlier in the meeting about shoddy construction and that sort of thing, until it is really approved by the HPC and recommendations are made for that construction, will we really know the materials that will be put in that construction? Historically, in the more recent past the HPC has made recommendations to the Planning Board (PB), which don't always meet the boards decisions. She is only commented because it is too soon to know what decisions will be made about the materials and such. Mayor Rochford replied that this will definitely go through the HPC, Shade Tree Commission (STC) and PB. There will be thorough reviews. Commissioner Moscatelli also noted that there are architectural renderings online and agreed that there will have to be an approval process that is followed. The development is in the historic district.

Mark Hodges, Jefferson Avenue, stated that he honored the Commissioners dedication and commitment and he respects that. He then commented that he is a senior officer for a company in the homebuilding business for 35+ years, who has sold homes all over the country, many of them "age targeted". He talked about how age targeted does not mean that these units can't be sold to anyone who walks through the door. This is a fact. Additionally, he believes that the Haddonfield seniors will reject these plans. He urged the Commissioners to recognize that Mr. O'Neill is an expert at doing this. The term "age targeted" is used to pacify those against something like this. He stated that the people in this room are concerned about this issue. He believes that Mr. O'Neill will take the $600,000 and run. He finished by stating that he cares about this town and he believes that the Commissioners are making a bad decision. Commissioner Kasko asked if Mr. Hodges personally knew Mr. O'Neill. He did not, but knows people who work who have worked with him for years. Commissioner Kasko asked him to have people he knew call Mr. O'Neill to urge him to take the money, which is something he insisted on having put into the agreement.

Joe Haro, Haddon Avenue, stated that he felt sad for the Commissioners because they are intimidated by Mr. O'Neill. This is supposed to be a visionary program, not just answering one man's ideas. He then talked about some of those who spoke at tonight's meeting, people who worked to get things done in this town and urged everyone to get a visionary plan for this town.

Rich Hluchen, Redman Avenue, asked if there was anyone in the audience who supported the Bancroft plan. There were no hands raised. He pointed out to the Commissioners that these are the voters and residents who you represent and asked them to keep that in mind. He then talked about the age targeted term being one of

smoke and mirrors. He also noted how amendments have changed this plan so others would be interested, not just seniors. In his opinion the Commissioners caved to Mr. O'Neill demands. He reviewed various points in the resolution as items that needed to be reconsidered so that we got back to the original plan that was more geared towards age targeted. He also noted that there are those that would just take the money and run, he has seen that as a lawyer as well. After reviewing various aspects of the Redevelopment Agreement, he concluded by stating that the agreement was toothless. He then reviewed the Financial Agreement and various issues he had with that document as well. What he is looking for is information that would justify various items in the agreements. He stated that the bottom line is that the age targeted project has been watered down.

Kim Custer, Evergreen Avenue, stated that she helped write the green acres requests for this property and noted that there is a history that needs to be honored. We have an obligation to protect this property. She finished by stating that she is embarrassed about what is happening and called it shameful that we have allowed our historic district to deteriorate to the point that something like this is okay.

Susan Baltake, The Mews, asked if this plan should go forward. Specifically, she pointed out the site plan where the garages are all facing Kings Highway, which is the opposite of the Borough's goal in deemphasizing garages. She stated that the layout should be switched. Additionally, this project creates an almost exclusionary area, which is the opposite of what we do in other areas. Commissioner Moscatelli pointed out that all of the units along Hopkins Lane will be front facing. Those along Kings Highway will back against a berm so that only the second floor will be visible from the street. Ms. Baltake did not feel that mattered, and stated that if that was the case then we should just allow people to plant bushes and such to hide the view of their garages everywhere. It is a case of what is in the public realm and what isn't.

Mr. Stokes asked the Commissioners to seriously consider putting in smaller flats, even if not age restricted. This would then be more affordable for our seniors. Just tell the developer that this is what we want. This could also have a smaller footprint, which would leave more for open space. There would be a lower cost to the developer in site improvements and development.

Mr. Hunter suggested tabling this matter to the next meeting; put this off another two weeks and asked the Commissioners to think about it.

Mr. Hluchen commented that he knew the agreement was fundamentally flawed when he saw that Jack Tarditi's name was misspelled twice.

Mr. Hess asked if Mr. O'Neill had already built a Recovery Center of America (RCA) complex on Burnt Mill Road. Commissioner Kasko stated that he did not believe so at this point. Mr. Hess stated he believed that Mr. O'Neill only intended to flip the land and not build a rehabilitation center.

Commissioner Moscatelli asked Mr. McManimon if the issues raised by Mr. Hluchen were of concern. Mr. McManimon replied negatively.

The Commissioners then approved Ordinance 2019-02 unanimously on first reading.

The Commissioners then approved Resolution 2019-02-26-049 unanimously.

The meeting was adjourned at 10:21 p.m.

Respectfully submitted,


Deanna Bennett, RMC
Borough Clerk

# EXHIBIT 2

<u>AGREEMENT</u>

Agreement made this _____ day of January, 2016, by and between "2 Hopkins Lane, LLC," c/o Jack Plackter, Esquire, Fox Rothschild, LLP, 1301 Atlantic Avenue, Suite 400, Atlantic City, NJ 08401, (hereafter "2HL, LLC") and Borough of Haddonfield, 242 Kings Highway East, Haddonfield, NJ 08033 (hereafter, "Haddonfield").

For the mutual promises, commitments and consideration recited herein the parties agree as follows:

1.   Bancroft Neurohealth, Inc. (hereafter, "Bancroft") operates a school for special needs children as a preexisting nonconforming use, and is the fee owner of real estate at 2 Hopkins Lane, Haddonfield, NJ 08033, designated on the Haddonfield official tax map as Block 13, Lot 25, consisting of approximately 6.072 acres, and Block 14, Lot 2 consisting of approximately 13.151 acres.   Block 13, Lot 25 and Block 14 Lot 2, collectively consisting of 19.223 acres is hereafter known as the "Bancroft Site."

2.   2HL, LLC, a Delaware limited liability company entered into an Agreement of Sale regarding the Bancroft Site with Bancroft on the 13th of March, 2015.   The Agreement of Sale was amended on May 8, 2015, and amended a second time on September 8, 2015. The three documents are attached hereto and made a part hereof (See Exhibit "A".)

3.   2HL, LLC agrees to assign all rights, titles and interest to Haddonfield of the aforementioned Agreement of Sale and the two

amendments regarding the Bancroft Site, collectively referred to the as the "Agreements," (Exhibit "A"), and Haddonfield agrees to accept such assignment of all rights, titles and interests in the aforementioned "Agreements" regarding the Bancroft Site from 2HL,LLC with the approval of Bancroft, in a separate Agreement, for the promises, commitments, and consideration recited herein.

Attached to the May 8, 2015, "Amendment to the Agreement of Sale" is a Lease by and between Rehab Centers of America, L.P. (Landlord) and Bancroft Neurohealth (Tenant).

Haddonfield accepts assignment of the aforementioned Lease as "Landlord" in place of Rehab Centers of America, with Bancroft's approval and agreement, as Tenant and Haddonfield's approval and agreement as Landlord.   Paragraph #3 of the Lease is hereby modified and amended by providing for a Fixed Minimum Rent of ONE HUNDRED AND FIFTY THOUSAND ($150,000.00) DOLLARS per annum for year One and year Two. The monthly rental payments paid by Bancroft to Haddonfield provided for in paragraph #3 are hereby modified and amended to provide a monthly rental fee of TWELVE THOUSAND FIVE HUNDRED ($12,500.00) DOLLARS.

4.   Haddonfield shall pay a purchase price of TWELVE MILLION NINE HUNDRED THOUSAND ($12,900,000.00) DOLLARS to be divided between Bancroft and 2HL,LLC, wherein Bancroft will be paid ELEVEN MILLION FIVE HUNDRED THOUSAND ($11,500,000.00) DOLLARS, as per the terms and conditions recited in the Agreements, and 2HL,LLC will be

-2-

paid ONE MILLION FOUR HUNDRED THOUSAND ($1,400,000.00) DOLLARS initially.  In the event that 2HL,LLC exercises its option to purchase part of the Bancroft site for development of an age targeted townhouse community under the terms and conditions recited herein the payment to 2HL,LLC, shall remain at $1,400,000.00.  In the event that 2HL,LLC does not elect to exercise its option to purchase part of the Bancroft site under the terms and conditions as recited herein, Haddonfield shall pay 2HL,LLC, an additional SIX HUNDRED THOUSAND ($600,000.00) DOLLARS within ninety (90) days of termination of 2HL,LLC's option to purchase for a total payment to 2HL,LLC of TWO MILLION ($2,000,000.00) DOLLARS as compensation to 2HL,LLC for the assignment of the "Agreements" (Exhibit "A"), absent development rights.

The assignment of the "Agreements" to Haddonfield wherein Haddonfield is to become the purchaser of the Bancroft site, and the initial payment of ONE MILLION FOUR HUNDRED THOUSAND ($1,400,000.00) DOLLARS to 2HL,LLC shall occur within ninety (90) days of the adoption of the Redevelopment Plan.  The purchase price payment to Bancroft shall occur as required in the "Agreements" that are assigned to Haddonfield and made a part hereof as Exhibit "A".

In order for Haddonfield to satisfy the THIRTEEN MILLION FIVE HUNDRED THOUSAND ($13,500,000.00) or the TWELVE MILLION NINE HUNDRED THOUSAND ($12,900,000.00) DOLLAR purchase price obligation

-3-

herein, Haddonfield intends to adopt a bond ordinance, in the approximate amount of $13,500,000.00. Haddonfield's payment to 2HL,LLC of $1,400,000.00 or $2,000,000.00 and Haddonfield's payment to Bancroft of $11,500,000.00 are contingent upon the adoption of a bond ordinance. In the event Haddonfield is unable to pass a bond ordinance in the amount of $13,500,000.00, Haddonfield will be unable to satisfy its financial obligations herein, and then in such event this agreement is terminated and is of no legal effect.

5.   2HL,LLC, has the option to purchase from Haddonfield approximately eight and two tenths (8.2) acres of Block 14, Lot 2, wherein such acres are needed for development by 2HL,LLC of the age targeted townhouse community, similar to the attached concept plan in Exhibit "B", provided such concept plan is ultimately adopted and approved by Haddonfield in accordance with New Jersey's Redevelopment Law. The acres subject to the option to purchase are known herein as the "Buy Back Property."

6.   In the event 2HL,LLC exercises its option to purchase, 2HL,LLC shall pay Haddonfield SIX HUNDRED SEVENTY ONE THOUSAND, SEVENTY ONE ($671,071.00) DOLLARS per acre for a total purchase price of FIVE MILLION FIVE HUNDRED TWO THOUSAND SEVEN HUNDRED EIGHT TWO ($5,502,782.00) DOLLARS for the purchase of the eight and two tenths (8.2) acres. In the event more or less acres are needed for the development in question, the purchase price will be proportionally adjusted.

-4-

7.    Haddonfield shall NOT be liable or responsible for the payment of any real estate agent commissions, fees, or costs in any event.    2HL,LLC, Haddonfield and Bancroft have entered into an Agreement wherein Bancroft has accepted liability and responsibility for payment of any and all real estate agents' commissions fees and costs, concerning all or part purchase of the Bancroft Site by any party in these transactions.

8. Haddonfield has adopted a Resolution on September 18, 2015, that was submitted to the Haddonfield Planning Board requesting it to conduct a hearing to determine if the approximate 19.223 acre Bancroft Site is an Area In Need of Redevelopment.  The Planning Board has commenced its hearing, and scheduled a second night of the hearing on December 9, 2015, at 7:30 p.m., which was postponed until January 5, 2016 at 7:30 p.m.  At the January 5, 2016 Planning Board meeting, the Planning Board declared the Bancroft site to be an Area In Need of Redevelopment.

9.  Since the Planning Board determined the Area is in Need of Redevelopment, the Haddonfield Board of Commissioners (hereafter "Commissioners") will address the issue of whether the Bancroft site is an Area In Need of Redevelopment.  If the Commissioners determine that the Area is In Need of Redevelopment, the Commissioners will pursue the preparation and adoption of a Redevelopment Plan utilizing advice from its professionals in particular its planner, Mr. Philip Caton, PP, FAICP, of Clarke,

Caton & Hintz.

10.   2HL,LLC would entertain exercising its option to purchase
the "Buy Back Property" under the terms and conditions as recited
herein provided the following terms and conditions are ultimately
satisfied:

a)   The Buy Back Property is declared to be an area in need
of redevelopment in accordance with New Jersey's
Redevelopment Law.

b)   A Redevelopment Plan has been adopted in accordance with
the New Jersey Redevelopment Law providing for seventy
(70) market rate townhouses units which are 30 feet wide
and 35 feet in height, plus ten (10) affordable units
contained within five (5) duplexes consistent with
2HL,LLC's suggested concept plan attached as Exhibit B.

c)   2HL,LLC or an urban redevelopment entity assignee of
2HL,LLC has been named the redeveloper of the Buy Back
Property as per the New Jersey Redevelopment Law, and
under the terms and conditions herein.

d)   Haddonfield will enter into an agreement with the
redeveloper (2HL,LLC or urban redevelopment entity)
regarding a payment in lieu of taxes (PILOT) program
reasonably acceptable to 2HLC, LLC regarding the "Buy
Back Property," on terms to be determined by Haddonfield.

e)   Following the approval of a Redevelopment Plan,

Haddonfield and 2HL,LLC will enter into a redevelopment agreement providing, among other things, the details of the project generally described in Exhibit B, the commitments as to the timing of commencement and completion of the project, representations, warranties, defaults, notices and other similar provisions.

f) The Borough will have adopted a bond ordinance providing for the funding of the acquisition of the Bancroft Site following the approval by the Borough of the Redevelopment Plan.

g) 2HL,LLC has received all local, county and state approvals and permits necessary to purchase the Buy Back Property and construct the contemplated age targeted town house community.

h) The above referred to terms and conditions are referred to collectively as "Entitlements." Haddonfield has not represented that any one or all of the above terms and conditions will be satisfied. However, Haddonfield will exercise its best efforts to cooperate with 2HL,LLC to cause to occur a quality constructed age targeted townhouse community which is in the best interests of the residents of Haddonfield on a portion of the Bancroft site.

i) 2HL,LLC has the right to waive any and all of the above

-7-

terms and conditions of the "Entitlements."

11.   2HL,LLC must exercise its option to purchase and close on the Buy Back Property within sixty (60) days of a final unappealable decision regarding the Entitlements recited in paragraph 10(a) through (i), or within thirty (30) days of Haddonfield becoming fee owner of the Bancroft Site consisting of 19.223 acres or whichever is a later event.  A final unappealable decision means a final decision by Haddonfield, and all local, county and state agencies, including all final unappealable court decisions.

In addition to the above option to purchase, 2HL,LLC, has the option to terminate this entire Agreement and have this Agreement of no legal effect if Haddonfield does not adopt a final Redevelopment Plan consisting of 70 market rate units and 10 affordable units contained within five (5) duplexes consistent with 2HL,LLC's suggested concept plan.

12.   The townhouses will be designed to be consistent with the historic nature of Haddonfield.  The final design must be reviewed by the Haddonfield Historic Preservation Commission and approved by the Haddonfield Planning Board as per the New Jersey Land Use Act.

13.   The attached Concept Plan (Exhibit "B") is 2HL,LLC's suggested plan.  The final Redevelopment Plan must be approved by Haddonfield as per the New Jersey Redevelopment Law if the area is first declared an Area In Need of Redevelopment.

-8-

14. "Age-targeted townhouse" community refers to a community targeting elderly residents whose children have reached adulthood and have moved from the family home. Some of these elderly residents have manageable physical limitations that lend to construction considerations such as limited number of stairs to climb, limited number of floors, reduced size of units for residents to maintain, limited number of bedrooms needed, etc.

15. The affordable units are to be governed by the Habitability and Affordability Control Law (UHAC). The duplex affordable units shall be designed as indistinguishable as possible from market rate units on the exterior appearance. The affordable units shall not be age targeted and shall have bedroom and price distribution consistent with UHAC.

16. In the event 2HL,LLC is appointed redeveloper, 2HL,LLC will be required to comply with all local, state, and federal laws required for the redevelopment of an age targeted townhouse community in accordance with the Redevelopment Plan and this Agreement.

17. Cooperation by Parties: The Parties agree without cost or expense to the Party other than payroll, professional fees, and internal administrative costs, that it will fully cooperate with and give full assistance in that party's best interest in the effort to develop the age targeted townhouse community and regarding any litigation or challenge to such efforts, including

but not limited to, cooperation with each others' Consultants. Neither party is obligated to cooperate regarding any decision <u>not</u> in that party's best interest.

18.    Entire Agreement: This Agreement and the Exhibits attached hereto, which hereby are incorporated herein and made a part hereof, contain the entire agreement between the Parties.  No representative, agent or employee of any of the Parties has been authorized to make any representations or promises with reference to this Agreement or to vary, alter or modify the terms hereof except as stated herein.  No additions, changes or modifications, renewals or extensions hereof, shall be binding unless reduced to writing and signed by the Parties hereto.

19.    Parties Bound/Assignment: The provisions of this Agreement shall run with the land, and the obligations and benefits hereunder shall be binding upon and inure to the benefit of the Parties, their successors and assigns, including any person, corporation, partnership or other legal entity which at any particular time may have a fee title interest in the Property which is the subject of this Agreement.

20.    Notices: Any notice or transmittal of any document required, permitted or appropriate hereunder and/or any transmittal between the Parties relating to the Property (herein "Notice[s]") shall be written and shall be served upon the respective Parties by facsimile or by certified mail, return receipt requested, or

-10-

recognized overnight or personal carrier such as, for example, Federal Express, with certified proof of receipt, and, where feasible (for example, any transmittal of less than fifty (50) pages), and in addition hereto, a facsimile delivery shall be provided. All Notices shall be deemed received upon the date of delivery set forth in such certified proof, and all times for performance based upon notice shall be from the date set forth therein. Delivery shall be effected as follows, subject to change as to the person(s) to be notified and/or their respective addresses upon ten (10) days' notice as provided herein:

2HOPKINS, LLC

_2701 Renaissance Blvd, 4th Fl_

_King of Prussia   PA 19406_

WITH A COPY TO:    Jack Plackter, Esquire
FOX ROTHSCHILD, LLP
1301 Atlantic Avenue, Suite 400
Atlantic City, NJ 08401
Facsimile: (609) 348-6834

AND

Joseph Rocco, Esquire
Campbell Rocco Law
1701 Renaissance Boulevard
4th Floor
King of Prussia, PA 19406

TO THE BOROUGH OF HADDONFIELD:
DEANNA BENNETT, Municipal Clerk
242 Kings Highway East
Haddonfield, NJ 08033
Facsimile: (856) 795-1445

-11-

```
WITH COPIES TO:          Mario A. Iavicoli
                         Attorney at Law
                         45 Kings Highway West
                         Haddonfield, NJ 08033
                         Facsimile: (856) 429-1098
```

21. Required Notices and Hearings: Haddonfield agrees that it will properly notice and conduct and hold all required public meetings, hearing and votes required to satisfy the terms of this Agreement and facilitate the development of the Age Targeted Townhouse Community in accordance with the Municipal Land Use Law and the Redevelopment Law, with no representation as to what the votes will be.

22. Counterparts: This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signature of each party.

23. Construction of Agreement: This Agreement shall be interpreted in accordance with the rights of the parties hereto and shall be governed by the laws of the State of New Jersey.

24. Preparation: Each of the Parties hereto acknowledges that this Agreement was not drafted by any one of the Parties, but was drafted, negotiated and reviewed by all Parties and, therefore, the presumption of resolving ambiguities against the drafter shall not

-12-

apply.    Each  of  the  Parties  expressly  represents  to  the  other
Parties that: (a) it has been represented by counsel in connection
with  negotiating  the  terms  of  this  Agreement;  and  (b)  it  has
conferred  due  authority  for  execution  of  this  Agreement  upon  the
persons executing it.

    25.   Time shall NOT be of the essence for the performance of
all terms, conditions, obligations and provisions set forth in this
Agreement.

-13-

IN WITNESS WHEREOF, intending to be legally bound hereby, the Parties hereto have executed this Agreement on the date(s) set forth below.

WITNESS/ATTEST:

2 HOPKINS LANE, LLC
A ~~New Jersey~~ Delaware Limited Liability Company

_____
Jack Plackter, Esquire
As to 2HL, LLC

BY: _____
    J. Brian O'Neill, Chief Executive Officer
DATED: 01 / 11 2016

_____
Deanna Bennett, Municipal
Clerk, As to Borough of
Haddonfield

BOROUGH OF HADDONFIELD

BY: _____
    Jeff Kasko, Mayor
DATED: _____ / _____ 2016

-14-

[AGREEMENT TO PURCHASE BANCROFT SITE DATED 3/13/15; AMENDMENT TO AGREEMENT OF SALE DATED 5/8/15, and SECOND AMENDMENT TO THE AGREEMENT OF SALE DATED 9/8/15 ATTACHED HERE]

**EXHIBIT "A"**

-15-

*March 13, 2015*
*JBO   April 2, 2015*

## AGREEMENT OF SALE                    13.th

THIS AGREEMENT OF SALE ("Agreement") is made this 1st day of March, 2015 ("Effective Date"), by and between BANCROFT NEUROHEALTH, a New Jersey nonprofit corporation, with an address of One Hopkins Lane, Haddonfield, New Jersey 08033 ("Seller") and 2 Hopkins Lane, LLC, a Pennsylvania limited liability company, with an address of 2701 Renaissance Boulevard, King of Prussia, Pennsylvania 19406 ("Purchaser"; and together with Seller, sometimes together herein referred to as the "Parties").

### Background

WHEREAS, Seller is the owner in fee simple of certain land comprised of approximately 19.22 acres and the buildings and improvements thereon, identified as Block 13, Lot 25, and Block 14, Lot 2 on the Official Tax Map of the Borough of Haddonfield, Camden County, New Jersey as further described on Exhibit A attached hereto and made a part hereof (the "Property") which Seller currently operates in furtherance of its charitable purpose as a campus for the provision of education and healthcare services to developmentally disabled persons ("Haddonfield Campus");

WHEREAS, Seller desires to transfer and convey to Purchaser, the Property, which term shall include any and all improvements thereon, all of Seller's right, title and interest in and to any real property contiguous thereto which lies within the area of any highway, street, road or avenue, and any and all easements, passageways, rights of way, rights, alleys, ways, waters, privileges, appurtenances and advantages to the same belonging or in any way appertaining thereto, including all municipal, county and state permits, approvals and development agreements, upon the terms and conditions hereafter provided; and

WHEREAS, Purchaser desires to lease back to Seller, for such term of years and upon such terms and conditions as set forth herein, the Property for Seller's continued use of the same for its charitable purposes.

NOW, THEREFORE, Purchaser and Seller, in consideration of the sum of Ten Dollars ($10), receipt of which is hereby acknowledged, as well as the mutual promises and covenants herein contained, intending to be legally bound, do hereby agree as follows:

1.     Agreement to Sell and Purchase.

Seller agrees to sell the Property (as hereafter defined) to Purchaser, and, subject to the provisions of this Agreement, Purchaser agrees to buy the Property from Seller, at the times, in the manner and upon the terms and conditions, herein set forth.

2.     Due Diligence Period, Contingencies, Purchaser's Obligation.

(a)     Purchaser shall have a period of sixty (60) days from the date of the full execution of this Agreement (the "Due Diligence Period") to conduct any and all surveys, appraisals, investigations (including, without limitation, environmental investigations), evaluations, inspections, tests and other due diligence desired by Purchaser. Seller will provide to the Purchaser (without representation or recourse) copies of any surveys, title reports, Phase I and Phase II environmental assessments, tax certificates, soil surveys and testing, engineering studies for water and waste water systems, documentation regarding utility capacity and the

service provider of such utilities, or other property information related to the Property in its possession within five (5) days of the Effective Date. Purchaser, its employees, agents, contractors and subcontractors, are hereby given the right to enter upon the Property during the Due Diligence Period for the purpose of inspecting the Property and performing such water, soil and other tests as Purchaser deems necessary to satisfy itself concerning the condition of the Property, provided Purchaser shall not engage or utilize a Licensed Site Remediation Professional at the Property. Purchaser's (and its employees, agents, contractors and subcontractors) entry onto the Property pursuant to this Article 2(a) shall be subject to the provisions of Article 14 hereof.

(b)     Purchaser may elect to cancel this Agreement, on or prior to expiration of the Due Diligence Period at Purchaser's sole discretion, for any reason or for no reason at all, in which event the Deposit (as hereafter defined) shall be returned to Purchaser, this Agreement shall terminate and the Parties shall have no further liabilities hereunder except those which specifically survive termination of the Agreement (the "Surviving Obligations"). Purchaser shall be deemed to have elected to proceed under this Agreement unless, prior to expiration of the Due Diligence Period, Purchaser notifies Seller in writing that Purchaser has elected to terminate this Agreement. Insert Rider A [initials]

(c)     In the event that Purchaser permits the Due Diligence Period to expire without having terminated this Agreement, Purchaser acknowledges for Purchaser and Purchaser's successors, heirs and assigns that Purchaser has been given a reasonable opportunity to inspect and investigate the Property and all aspects relating thereto, including, without limitation, all of the physical, environmental, zoning and operational aspects of the Property, either independently or through agents and experts of the Purchaser's selection. Seller and Purchaser agree that, except as provided for in this Agreement, the Property shall be sold and the Purchaser shall accept possession of the Property on the Closing Date "AS IS", "WHERE IS", "WITH ALL FAULTS", with no right of set-off or reduction in the Purchase Price, provided that the Property shall be conveyed at Closing in substantially the same condition as it was on the date of this Agreement, reasonable wear and tear excepted, and that, except as expressly provided for in this Agreement, such sale shall be without representation or warranty of any kind, whether express, implied, statutory or otherwise.

(d)     In the event that Purchaser or its agents do physical damage to the Property or improvements thereon in connection with its due diligence activities, Purchaser shall promptly restore the Property and improvements to their original condition. In the event the disturbed areas are not restored to Seller's reasonable satisfaction within 30 days of Purchaser's receipt of written notice from Seller, Seller may complete such restoration and charge the Purchaser for the same.

3.     Purchase Price.

(a)     Within three (3) business days following expiration of the Due Diligence Period, unless this Agreement has been, or is deemed, terminated, Purchaser shall deliver to Land Services USA, INC., ("Escrow Agent") a cash deposit in the amount of One Hundred Thousand Dollars ($100,000) (together with all interest earned thereon the "Deposit") in order to secure Purchaser's obligations hereunder.

2

(b)    In the event that Purchaser Defaults (as hereafter defined) and Seller is not otherwise in default of this Agreement, Seller shall retain the Deposit, which shall constitute full, complete and liquidated damages to Seller and shall be Seller's sole and exclusive remedy, in lieu of any other liability of Purchaser. The Deposit shall be credited against the Purchase Price payable at Closing.  Upon the occurrence of any event of Default by Seller, Seller shall immediately repay the Deposit to Purchaser.

4.    Closing; Lease.

(a)    Closing ("Closing") of title shall take place on a date specified by Purchaser on not less than ten (10) days prior written notice to Seller but in any event, not later than thirty (30) days following Final Approval of the Approvals ("Closing Date").

(b)    Closing shall take place at 10:00 a.m. on the Closing Date at the offices of Purchaser's attorney or Purchaser's title company, as determined by Purchaser. Formal tender of an executed deed and the Purchase Price is hereby waived.

(c)    At Closing, Seller shall have the right to lease the Property back from Purchaser pursuant to the Lease in the form set forth in Exhibit B which is attached hereto and made a part hereof (the "Lease") which shall include the obligation of Seller to provide purchaser with a Subordination, Non-Disturbance and Attornment agreement from Seller's lender on terms reasonably acceptable to Tenant and such lender.

5.    Condition of Title. At Closing, title is to be (i) good and marketable of record, free and clear of all liens, encumbrances, judgments, mortgages, leases (except the Lease), easements or restrictions other than ordinary utility easements or recorded covenants which would not impair the use or development of the Property as contemplated by Purchaser, other than those easements and restrictions of record identified on Exhibit C attached hereto and made a part hereof and (ii) insurable as such at regular rates by Purchaser's title company by a bargain and sale deed with covenants against grantor's acts in a form acceptable to Purchaser (the "Deed"), subject only to such title matters as accepted or deemed accepted by Purchaser hereunder.

(a)    Purchaser may elect to furnish to Seller no later than expiration date of the Due Diligence Period, a copy of a title commitment with respect to the Property prepared by the title insurer together with a statement specifying any defects in title ("Purchaser's Statement"). Not later than ten (10) days after Seller receives Purchaser's Statement, Seller shall notify Purchaser of which of the objections Seller shall cure prior to or at Closing, including when and in what manner said items are to be cured. If Purchaser is dissatisfied with Seller's response, Purchaser shall have ten (10) days from receipt of Seller's response (or if no response if given, Purchaser shall have fifteen (15) days from the date of Purchaser's Statement) to either (i) terminate this Agreement, in which event the Deposit shall be returned to Purchaser, and thereafter neither party shall have any further rights or liabilities hereunder other than the Surviving Obligations or (ii) agree to accept the exceptions which appear on Purchaser's Statement and which are not identified as those which are to be cured by Seller prior to or at Closing and proceed under this Agreement. If Seller agrees to cure but fails to do so, Purchaser shall have the right to (i) delay Closing to a date specified by Purchaser so that Seller or Purchaser removes or cures such objections at Seller's expense or (ii) terminate this Agreement whereupon the Deposit shall be automatically refunded to Purchaser and thereafter neither party

3

shall have any further rights or liabilities hereunder, except for any obligation or liability of Purchaser or Seller which, by the express terms of this Agreement, survives any termination of this Agreement. At Closing, Seller shall pay and release all amounts secured by mortgages, deeds of trust or other liens on the Property ("Monetary Liens") and terminate all existing tenancies or rights to possession of the Property ("Tenancy Rights") except the Lease.

(b)     Following the date of this Agreement, Seller shall not mortgage, assign, rent, lease, convey, grant a security interest in, grant easements upon, contract to sell or otherwise encumber, restrict or dispose of all or any part of the Property or any interest therein or use thereof without Purchaser's prior written approval.

6.     Purchaser's Default.  In the event that, unless due to Seller's Default (as hereafter defined), Purchaser shall fail to complete Closing under this Agreement or otherwise fail to perform any of its obligations under this Agreement, in each case within the time frames set forth herein, any of which failure is not cured within thirty (30) days following written notice from Seller, such failure shall be deemed a "Default" hereunder, and Seller shall be entitled to terminate this Agreement, and retain the Deposit as liquidated damages.

7.     Purchaser's Representations and Warranties.

(a)     In order to induce Seller to enter into this Agreement and to sell the Property, and with full knowledge that Seller is relying thereon, Purchaser hereby warrants and represents to Seller as follows:

(1)     Power and Authority. Purchaser represents and warrants that Purchaser has full power and authority to enter into and fulfill Purchaser's obligations under this Agreement and the execution, delivery and performance of this Agreement by Purchaser constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms.

(2)     Approvals. No consent, waiver, or approval by any other party is required in connection with the execution and delivery by Purchaser of this Agreement, or the performance by Purchaser of its obligations hereunder or any instrument contemplated thereby.

(3)     No Violation. Neither the entering into of this Agreement nor the consummation of such sale will constitute a violation or breach by Purchaser of any contract or other instrument to which Purchaser is a party or to which Purchaser is subject or by which any of Purchaser's assets or properties may be affected, or of any judgment, order, writ, injunction or decree issued against or imposed upon Purchaser, nor will the said sale result in a violation of any applicable law, order, rule, or regulation of any governmental authority.

(4)     Litigation. There is no litigation or proceeding pending, or to Purchaser's actual knowledge, threatened before any court or administrative agency which will adversely affect the validity or enforceability of this Agreement, or which relates to this Agreement or any activities of Purchaser or its agents, employees or contractors in connection to the Agreement.

8.     Seller's Default. In the event that, unless due to Purchaser's Default, (as above defined), Seller shall fail to complete Closing under this Agreement or otherwise fail to perform any of its obligations under this Agreement, in each case within the time frames set forth herein,

4

any of which failure is not cured within thirty (30) days following Seller's receipt of written notice from Purchaser, such failure shall be deemed a "Default" hereunder, and Purchaser shall be entitled to either (i) terminate this Agreement in which event the Deposit shall be returned to Purchaser and neither party shall have any further rights or liabilities hereunder except the Surviving Obligations or (ii) pursue specific performance.

9.   Seller's Representations and Warranties; Purchaser's Acceptance of the Property.

In order to induce Purchaser to enter into this Agreement and to purchase the Property, and with full knowledge that Purchaser is relying thereon, Seller hereby warrants and represents to Purchaser as follows:

(1)   Power to Perform.   Seller has full power and authority to enter into and fulfill Seller's obligations under this Agreement and the execution, delivery and performance of this Agreement by Seller constitutes a valid and binding obligation of Seller enforceable in accordance with its terms.   No consent, waiver, or approval by any other party is required in connection with the execution and delivery by Seller of this Agreement or the performance by Seller of its obligations hereunder or any instrument contemplated thereby. Neither the entering into of this Agreement nor the consummation of such sale will constitute a violation or breach by Seller of any contract or other instrument to which Seller is a party or to which Seller is subject or by which any of Seller's assets or properties may be affected, or of any judgment, order, writ, injunction or decree issued against or imposed upon Seller, nor will the said sale result in a violation of any applicable law, order, rule, or regulation of any governmental authority.

(2)   Payment of Costs.   All of Seller's contractors, subcontractors, laborers and materialmen performing work upon or furnishing labor or materials to improve or benefit the Property or any portion thereof have been, or will be, paid in full by Seller by the Closing.   Seller will execute the necessary affidavits and indemnification agreements reasonably required by Purchaser's title insurance company to eliminate from its Owner's Title Policy any exceptions for unfiled construction liens.

(3)   Foreign Person.   Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code and Seller shall execute an Affidavit at Closing confirming the accuracy of such representation.

(4)   Assessments for Public Improvements.   Prior to the date hereof, no notice was served upon Seller for assessments against the Property for public improvements which remain unpaid.   Seller shall pay all assessments made prior or subsequent to the date hereof but prior to the date of the Closing in connection with any improvements on the Property.

(5)   Violations.   There is not pending, or to Seller's best knowledge (without duty of inquiry), threatened from any federal, state, county or local authority any proceeding, notice, suit or judgment relating to any violation at the Property of zoning, building, fire, air-pollution, health, soils conservation or other law, order, ordinance or regulation, or seeking or requiring any improvement, alteration, addition, correction or other work on or about the Property, whether related to the Property or to the activities of any owner or occupant thereof.

5

(6)     Litigation.   There is no litigation or proceeding pending, or to
Seller's best knowledge (without duty of inquiry), threatened before any court or administrative
agency which will adversely affect the validity or enforceability of this Agreement, or which
relates to this Agreement or the transactions contemplated hereby, or the Property or any
activities of Seller or its agents, employees or contractors at, on or about the Property, or which
will result in a lien, charge, encumbrance or judgment against any part of or any interest in the
Property.

(7)     Leases; Agreements.   There are no leases or other agreements for
the use or occupancy of any portion of the Property other than the Lease.   There are no
agreements between Seller (or any agent of Seller) and third parties respecting the operation,
management or maintenance of the Property which are not terminable on or before expiration or
termination of the Lease (and which Seller shall terminate at or before expiration or termination
of the Lease).

(8)     Real Estate Tax Exemption.   The Property is currently listed as
exempt from real estate taxes as a charitable use. The Seller has no notice of any change to this
exemption from the Borough of Haddonfield.

(9)     Environmental Laws.   Seller has received no notice of and knows
of no facts which might constitute violations of any environmental laws related to Seller's use,
ownership or occupancy of the Property.

(10)    Discharges.   To Seller's best knowledge (without duty of inquiry),
information and belief, there has been no emission, spill, release or discharge of any toxic or
hazardous substances into or upon the air, soils or any improvements located thereon, surface
water or ground water, or the sewer, septic system or waste treatment, storage or disposal system
servicing the Property.   Seller shall give to Purchaser immediate oral and written notice of any
Hazardous Discharge (as defined below).

(11)    Flood Zone.   The federal and state governments have designated
certain areas as flood hazard areas. If the Property is located in a flood hazard area, the use of the
Property may be limited. The Seller is not aware that the Property is in a flood hazard area,
however if the Purchaser's inquiries reveal the Property is in a flood hazard area, the Purchaser
may terminate this Agreement.

(12)    Underground Tanks.   Seller is aware of approximately seven (7)
underground storage tanks, one (1) of which remains in use and one (1) of which was recently
decommissioned.   There are at least five (5) others that were either decommissioned or removed.
Seller shall deliver to Purchaser within five (5) business days following the date of this
Agreement copies of all information within Seller's possession with respect to such underground
tanks.

(13)    Condemnation.   Seller has not received any notice or
communications from any governmental unit or other body having the power of eminent domain,
nor to Seller's best knowledge (without duty of inquiry) is there any pending or threatened
condemnation proceedings in connection with the Property or any part thereof.

6

(14)   Best Knowledge.  As used in this Article 9, any reference to Seller's "best knowledge" shall mean the knowledge of a member of senior management of Seller, without duty of inquiry.

(15)   Representations and Warranties to Survive Closing.  Each of the representations and warranties of the Seller contained herein or made in writing pursuant to this Agreement, shall be true and correct as of the Agreement Date and as of the Closing Date, shall be deemed to be material and shall survive the execution and delivery of this Agreement and Closing hereunder until expiration or early termination of the Lease.  All statements contained in any certificate or other instrument delivered at any time by Seller in conjunction with the transaction contemplated hereby shall constitute representations and warranties.  If there is any change in any of the representations and warranties set forth in this Agreement between the date of this Agreement and Closing that Purchaser becomes aware of (whether as a result of a Seller disclosure or otherwise), Purchaser may terminate this Agreement in which event Seller shall reimburse Purchaser for Purchaser's Reimbursable Costs, or proceed to Closing, in which event Purchaser shall be deemed to have waived the breach of the applicable representation or warranty. Seller hereby indemnifies and agrees to defend and hold Purchaser harmless from all claims, costs, liabilities, judgments or expenses resulting from any representations and warranties in Section 19 being untrue; provided that as a condition precedent of such indemnification, any claim brought by Purchaser against Seller must be brought during the survival period of the representations and warranties of Seller.

10.   Documents at Closing.

(a)   At Closing, Seller shall deliver or cause to be delivered to Purchaser the following:

(1)   duly executed and acknowledged Bargain and Sale Deed with covenant against grantor's acts in the proper form for recordation;

(2)   duly executed Lease in substantially the same form as attached as Exhibit B;

(3)   duly executed and acknowledged standard affidavit of title;

(4)   the FIRPTA affidavit required under Article 9(3) with respect to Seller not being a foreign person;

(5)   possession of the Property, free and clear of all rights of others but subject to the rights and interests of Seller pursuant to the Lease;

(6)   such other and further documents as may be reasonably required by the terms of this Agreement or may be reasonably necessary or incidental to consummating the transaction contemplated hereby;

(7)   payment of Seller's share of all Closing costs, other adjustments and credits as set forth in Article 11 below; and

(8)   HUD-1.

7

(b) At Closing, Purchaser shall deliver or cause to be delivered to Seller the following:

(1) duly executed Lease;

(2) payment of the Purchase Price and Purchaser's share of all Closing costs, other adjustments and credits as set forth in Article 11 below; and

(3) HUD-1.

11. Closing Costs; Adjustments and Credits.

(a) Seller shall continue to pay all property and liability insurance premiums, and all utility charges directly to the utility companies after the Closing under the terms of the Lease for the term of the Lease.

(b) Notwithstanding anything contained in the foregoing provisions:

(1) Seller shall pay for preparation of the Deed, the New Jersey Realty Transfer Tax, the cost of discharge of any existing mortgages, liens or judgments filed against the Property.

(2) Seller and Purchaser shall each pay one-half (1/2) of the title company's attendance charges, if any, and their own legal fees.

(3) Purchaser shall pay for the costs of recordation of the Deed for the Property, the one percent (1%) "Mansion Tax," if applicable, all title insurance premiums and search fees, and all other Closing costs.

(4) Any assessments due and payable prior to Closing shall be paid by Seller. Any assessments due and payable after Closing shall be paid by Purchaser.

(c) All other charges and fees incurred in the ordinary course of business customarily prorated and adjusted in similar transactions shall be prorated at Closing and thereafter assumed by Purchaser, unless specifically assumed by Seller under the Lease for the term of the Lease.

(d) The provisions of this Article 11 shall survive Closing.

12. Brokerage. Seller and Purchaser each warrant to the other that neither has dealt with any agent, broker or finder with respect to the transaction contemplated by this Agreement, except that Seller acknowledges that it has an agreement with CBRE, Inc. for certain brokerage and other consulting services which Seller agrees it shall have sole responsibility to pay, and Purchaser acknowledges that it has an agreement with Realvest Advisors, LP for certain brokerage and other consulting services which Purchaser agrees it shall have sole responsibility to pay. In the event that any claim for commission or finder's fees is brought by any person or entity as a consequence of the transaction contemplated hereby and as a result of any action or omission of either Seller or Purchaser, Seller or Purchaser, as the case may be, shall hold harmless the other party against loss, cost and reasonable attorney's fees arising as the consequence of the claim for the commission or fee.

8

13.   Approvals.  Purchaser's obligation to purchase the Property is contingent upon Purchaser's timely receipt of all Approvals (as hereafter defined).  Purchaser shall have two hundred seventy (270) days following expiration of the Due Diligence Period (the "Approval Period"), within which to obtain Final Approval (defined below) of all approvals, variances, permits, permissions, waivers and other relief and permissions including, without limitation, township and county (if required) site plan approval, subdivision approvals, any state approvals (including without limitation any requirements from NJDEP), utility capacity approvals, easements and other agreements required for such use, development and construction, required from any and all governmental or quasi-judicial governmental bodies or outside agencies having jurisdiction over the Property in connection with Purchaser's proposed development and use of the Property as a residential drug and alcohol treatment facility and related residential "stepdown" sober living housing, if desired by Purchaser, the conditions of which approvals, variances, permits, permissions, waivers and other relief must be acceptable to Purchaser in its sole and absolute discretion (the "Approvals").  Purchaser shall keep Seller apprised of all efforts to secure the Approvals and Seller shall be permitted to attend all public meetings and all meetings with the Borough of Haddonfield, Camden County or State of New Jersey representatives with regard to the Approvals.  Seller shall be granted access to all plans and submissions related to the Approvals.  If Purchaser has not obtained all the Approvals by the end of the Approval Period, Purchaser may either terminate this Agreement, in which event the Deposit shall be returned to Purchaser, or Purchaser may extend the Approval Period to a date expiring three hundred (300) days following expiration of the Approval Period by written notice to Seller prior to expiration of the Approval Period and by posting an additional deposit in the amount of One Hundred Thousand Dollars ($100,000.00) ("Additional Deposit") with the Escrow Agent, upon which the Deposit and the Additional Deposit shall be deemed part of the Deposit for all purposes under this Agreement and the Deposit shall thereupon be non-refundable except in the event of termination of this Agreement by Purchaser as a result of a Seller Default, Seller being unable to convey title as required pursuant to this Agreement, or condemnation, but applied to the Purchase Price at Closing.  The Approvals shall not be deemed to have been obtained unless and until:  (i) all of the Approvals have been reviewed and finally approved by the appropriate governmental agencies, (ii) any ordinances with respect thereto have taken effect, (iii) the time has passed for appeal of all Approvals, (iv) no notice of referendum or initiative with respect to any Approval has been published or publicized and (v) any appeals or litigation with respect to (iii) or (iv) above have been prosecuted and resolved in a manner which is satisfactory to Purchaser and is not subject to remand to lower courts or governmental agencies, all of the enumerated processes being the "Final Approval".  Seller shall at no cost to Seller reasonably cooperate with Purchaser in the pursuit of the Approvals including, without limitation, executing any application or consent necessary to apply for each and every Approval.

14.   Purchaser's Entry Rights.  Seller shall permit Purchaser, its employees, agents, contractors and subcontractors to enter upon the Property and the building on the Property at any time after the date hereof and while thereon make surveys, take measurements, perform test borings or other tests of surface and subsurface conditions, make structural engineering studies and inspect the Property.  No invasive testing that would disturb any improvements on the Property shall be undertaken without Seller's prior written consent in its sole discretion. In connection with Purchaser's (or its employee, agents, contractors and subcontractors) entry onto the Property pursuant to Article 2(a) or this Article 14, Purchaser shall (a) schedule with Seller in advance and a Seller's representative shall be entitled to accompany the Purchaser's representatives; (b) keep the Property free of any liens or third-party claims resulting therefrom,

9

(c) indemnify and hold harmless Seller from and against any and all damages, claims, actions, penalties, liabilities, losses and expenses incurred by or asserted against Seller arising from personal injury or property damage as a result of Purchaser's (or its employees, agents, contractors and subcontractors) entry onto the Property, (d) procure public liability insurance with limits of not less than $1,000,000 per occurrence/aggregate, and provide to Seller, prior to entering onto the Property, a certificate of insurance evidencing such coverage and naming Seller as an additional insured and (e) restore the Property to the condition as existed prior to Purchaser's (or its employees, agents, contractors and subcontractors) entry onto the Property. The provisions of this Article 14 shall survive Closing or termination of this Agreement.

15.     Condemnation.  In the event that between the date of this Agreement and the Closing Date any condemnation or eminent domain proceeding is threatened or initiated which might result in the taking of any part of the Property, Seller shall immediately notify Purchaser and Purchaser, at its option, may terminate this Agreement by the sending of written notice to Seller within ten (10) days after receipt of notice of the condemnation or eminent domain from the Seller.  If Purchaser does not terminate this Agreement, the Parties shall consummate the transaction contemplated by this Agreement in which event the Purchase Price shall be reduced by the total of any awards or damages actually received by Seller, and Seller shall assign to Purchaser all of Seller's right to sums thereafter receivable on account of such award, provided, however, that in the event the award of condemnation obtained from the condemning authority, whether by adjudication or settlement, is in excess of the Purchase Price, said excess amount shall be paid to Seller.  This provision shall survive closing of title.

16.     Risk of Loss; Casualty.

Until Closing shall occur, the risk of loss or damage to the Property is assumed by Seller.  Seller shall maintain in effect through the date of Closing and the term of the Lease policies of fire and casualty insurance for the full replacement value of the Property.  In the event of any fire or other casualty, Seller shall use the insurance proceeds to repair the damage and Closing shall proceed as scheduled.  If Closing is scheduled to occur prior to completion of any restoration or demolition, Seller shall nonetheless complete restoration or demolition during the term of the Lease, without any abatement of rent due and owing under the Lease.

17.     Seller Covenants.

(a)     Seller covenants and agrees during the term of this Agreement as follows:

(1)     To maintain in full force and effect general comprehensive liability insurance with single limit coverage of no less than $1,000,000.  Seller shall deliver a certificate evidencing such insurance simultaneously with the execution hereof and shall also deliver replacement certificates at least thirty (30) days prior to expiration of same.  Such policy shall name Purchaser as an additional insured, and shall provide that no cancellation or expiration may occur without the giving of thirty (30) days prior notice to Purchaser;

(2)     To timely pay any assessments with respect to the Property; and

(3)     Not to encumber or lien or permit to be encumbered with any encumbrance, lien or other claim or right which may affect title thereto, the Property, or other rights, appurtenances and herediments to be conveyed pursuant to this Agreement.

10

(b)    Between the date of this Agreement and the Closing Date, Seller shall:

(1)    Maintain the Property in its present condition, reasonable wear and tear and, subject to Article 16, damage by fire and casualty excepted, including without limitation, periodic and seasonal maintenance (such as maintenance of lawns, shrubbery, walks, parking areas and other common areas in the usual and customary manner). Operate and manage the Property in substantially the same manner as it has been operated and managed prior to the date of this Agreement.

(2)    Not enter into any leases of the Property without Purchaser's prior written consent.

18.    Borough Certificate. If the Borough of Haddonfield requires that a certificate of occupancy, certificate of continued occupancy, smoke detector certification or any other or similar inspection or occupancy certificate be obtained in connection with the conveyance of the Property to Purchaser, Seller shall, at its cost, obtain such documents.

19.    Notices. All notices, requests and other communications under this Agreement shall be in writing and shall be sent by certified or registered mail, postage pre-paid, return receipt requested, or nationally recognized overnight delivery service, or by facsimile transmission, confirmed by either of the foregoing methods addressed as follows:

If intended for Purchaser:

[SPE]
c/o Recovery Centers of America
2701 Renaissance Boulevard
King of Prussia, PA 19406
Attention: Chairman and CEO
Fax No.: _____

with a copy to:

Campbell Rocco Law, LLC
2701 Renaissance Boulevard
King of Prussia, PA 19406
Attention: Joseph D. Rocco, Esq.
Fax No.: _____

If intended for Seller:

Bancroft NeuroHealth
800 N. Kings Highway, Suite 401
Cherry Hill, NJ 08034
Attention: Toni Pergolin, CEO and President
Fax No.: (856) 216-0643

with a copy to:

11

> Archer & Greiner, P.C.
> One Centennial Square
> Haddonfield, NJ 08033
> Attention: Gary Green, Esq.
> Fax No.: (856) 795-0574

or at such other address of which Seller or Purchaser shall have given notice as herein provided. All such legal notices, requests and other communication may be given by the legal counsel for such party. Any notice by Purchaser hereunder may be given by email by Purchaser (or its counsel) and shall be deemed received on the date upon which Purchaser (or its counsel) sends such email to Seller.

20. <u>Miscellaneous.</u>

(a) Purchaser and Seller agree that neither party shall record this Agreement or any notice of same. In the event that one party records this Agreement, then, at the option of the other party, this Agreement shall terminate and be null and void.

(b) The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent hereof of any of the provisions hereof.

(c) This Agreement shall be governed by and construed according to the laws of the State of New Jersey.

(d) This Agreement of Sale, along with the Lease, constitute the entire agreement between the Parties with respect to the Property and other subject matter hereof. All previous communications between the Parties, either oral or written, not contained herein are hereby withdrawn and annulled, including without limitation the contents of that certain letter of intent dated December 9, 2014, signed by the Parties. This Agreement may be modified only by a writing executed by the Parties hereto.

(e) This Agreement shall be binding upon and inure to the benefit of the Parties hereto, and their respective heirs, personal representatives, successors and assigns in interest hereunder.

(f) This Agreement may be signed in one or more counterparts (or with counterpart signature pages) which, taken together, shall constitute a fully executed Agreement and shall be considered a single document. Telefax or PDF signatures shall be taken as originals.

(g) If any date on which a time period scheduled to expire herein or on which payment or performance is due falls on a non-business day, the subject date shall be extended to the next business day.

(h) Purchaser shall not be permitted to assign this Agreement upon Seller's prior written consent.

12

(i)    Bulk Sale Compliance.

(1)    Purchaser shall have the right to comply with N.J.S.A. 54:50-38 and Seller shall cooperate in connection with such compliance. In furtherance thereof: (i) Seller shall prepare and deliver to Purchaser the Asset Transfer Tax Declaration (the "TTD") in the form prescribed by the Director of the New Jersey Division of Taxation (the "Director"), so that such form is received by Purchaser not less than twenty (20) days prior to the Closing; and (ii) Purchaser shall deliver a Notification of Sale, Transfer, or Assignment in Bulk (Form C-9600), together with the completed TTD and a fully executed copy of this Agreement (the "Tax Notification"), to the Director by registered or certified mail or overnight delivery, so that it is received by the Director at least ten (10) days prior to the Closing (provided Purchaser has received the TTD from Seller pursuant to clause (i) of this sentence). Seller shall provide all information reasonably requested by Purchaser to enable Purchaser to complete the Tax Notification, as soon as reasonably possible after request by Purchaser.

(2)    If, at any time prior to Closing, the Director informs Purchaser that a possible claim (the "Claim") for any taxes imposed or to be imposed on Seller, including any interest or penalties thereon, any cost or fees imposed by the Director related thereto and any tax on the gain from the sale of the Property (collectively, "Taxes"), exists and the amount thereof (the "Deficiency"), then Purchaser and Seller shall close as scheduled and without delay, and Purchaser shall withhold the portion of the Purchase Price equal to the amount of the Deficiency, which amount so withheld shall be placed in an escrow account (the "Tax Escrow"), which Tax Escrow shall be held by the Escrow Agent until the Deficiency has been resolved with the Director or paid by or on behalf of the Seller. Seller and Purchaser shall jointly designate an FDIC insured banking institution authorized to do business in New Jersey, with offices located in New Jersey, which is reasonably acceptable to Seller and Purchaser, in which Escrow Agent shall deposit the Tax Escrow. Unless, on or before the Closing Date, Seller and Purchaser designate a different banking institution in writing pursuant to the immediately preceding sentence, Seller and Purchaser hereby designate the Trust Account of _____ in _____ for the deposit of the Tax Escrow by Escrow Agent. If, after Closing the Director or Seller requests that the Purchaser pay all or any portion of the Deficiency on behalf of Seller, then Purchaser shall direct Escrow Agent to, and Escrow Agent shall, promptly release to the Division of Taxation such amount from the Tax Escrow. If the Director informs Purchaser that the Deficiency has been fully paid or that the Purchaser has no further liability for the Deficiency, then Purchaser shall promptly direct the Escrow Agent to, and Escrow Agent shall, promptly release the remaining balance of the Tax Escrow to Seller. Notwithstanding anything to the contrary contained herein, Seller shall have the right to negotiate with the Director regarding the Claim and the Deficiency; provided, however, that: (i) Purchaser shall be entitled to comply with all instructions of the Director; (ii) the Closing shall not be delayed as a result thereof; and (iii) Purchaser shall not be liable for any amount in excess of the Tax Escrow. In no event shall Escrow Agent fail to make any distribution provided for hereunder, including, without limitation, on the grounds that Seller contests any finding of the Director. Notwithstanding anything to the contrary contained herein, Purchaser shall not be liable for any Taxes and Seller shall indemnify and hold Purchaser harmless from any liability or cost incurred in connection with any claim for any such Taxes, including any interest and penalties thereon and cost and fees imposed by the Director relating thereto. The indemnification provision contained in this Section 20(i) shall survive the termination of this Agreement and/or the Closing under this Agreement.

13

(3)     If, prior to Closing, the Director (i) shall inform Purchaser that the Director has no claim or that Purchaser is not  required to withhold any portion of the Purchase Price, or (ii) does not inform Purchaser that the Director has a Claim or that Purchaser is required to withhold a portion of the Price, then, in either event, there shall be no Tax Escrow and the full Purchase Price (subject to any other adjustments provided for in this Agreement) shall be paid to Seller at Closing without any withholding under Section 20(i)(2) above.

[Signatures appear on the following page.]

14

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement of Sale the day and year first above written.

SELLER:

BANCROFT NEUROHEALTH, a New Jersey nonprofit corporation

By: _____
    Toni Pergolin, President and CEO

PURCHASER:

2 HOPKINS LANE, LLC

By: Recovery Centers of America Holdings, LLC, its sole member

By: Recovery, LLC, its sole member

By: _____
    Name:  J. Brian O'Neill
    Title:   Chairman and CEO

15

EXHIBIT A

Legal Description of Property

EXHIBIT B

Lease

17

<u>EXHIBIT C</u>

<u>Easements and Restrictions of Record</u>

12130910v2

Rider A

Either Purchaser or Seller may elect to cancel this Agreement on or prior to the expiration of the Due Diligence Period in the event the Parties cannot agree upon the form of Lease to be included as Exhibit B to this Agreement.

SELLER:

BANCROFT NEUROHEALTH, a New Jersey nonprofit corporation

By: _____
       Toni Pergolin, President and CEO

PURCHASER:

2 HOPKINS LANE, LLC

By: Recovery Centers of America Holdings, LLC, its sole member

By: Recovery, LLC, its sole member

By: _____
       Name:   J. Brian O'Neill
       Title:   Chairman and CEO

service provider of such utilities, or other property information related to the Property in its possession within five (5) days of the Effective Date. Purchaser, its employees, agents, contractors and subcontractors, are hereby given the right to enter upon the Property during the Due Diligence Period for the purpose of inspecting the Property and performing such water, soil and other tests as Purchaser deems necessary to satisfy itself concerning the condition of the Property, provided Purchaser shall not engage or utilize a Licensed Site Remediation Professional at the Property.  Purchaser's (and its employees, agents, contractors and subcontractors) entry onto the Property pursuant to this Article 2(a) shall be subject to the provisions of Article 14 hereof.

(b)     Purchaser may elect to cancel this Agreement, on or prior to expiration of the Due Diligence Period at Purchaser's sole discretion, for any reason or for no reason at all, in which event the Deposit (as hereafter defined) shall be returned to Purchaser, this Agreement shall terminate and the Parties shall have no further liabilities hereunder except those which specifically survive termination of the Agreement (the "Surviving Obligations").  Purchaser shall be deemed to have elected to proceed under this Agreement unless, prior to expiration of the Due Diligence Period, Purchaser notifies Seller in writing that Purchaser has elected to terminate this Agreement. Insert Rider A.

(c)     In the event that Purchaser permits the Due Diligence Period to expire without having terminated this Agreement, Purchaser acknowledges for Purchaser and Purchaser's successors, heirs and assigns that Purchaser has been given a reasonable opportunity to inspect and investigate the Property and all aspects relating thereto, including, without limitation, all of the physical, environmental, zoning and operational aspects of the Property, either independently or through agents and experts of the Purchaser's selection. Seller and Purchaser agree that, except as provided for in this Agreement, the Property shall be sold and the Purchaser shall accept possession of the Property on the Closing Date "AS IS", "WHERE IS", "WITH ALL FAULTS", with no right of set-off or reduction in the Purchase Price, provided that the Property shall be conveyed at Closing in substantially the same condition as it was on the date of this Agreement, reasonable wear and tear excepted, and that, except as expressly provided for in this Agreement, such sale shall be without representation or warranty of any kind, whether express, implied, statutory or otherwise.

(d)     In the event that Purchaser or its agents do physical damage to the Property or improvements thereon in connection with its due diligence activities, Purchaser shall promptly restore the Property and improvements to their original condition. In the event the disturbed areas are not restored to Seller's reasonable satisfaction within 30 days of Purchaser's receipt of written notice from Seller, Seller may complete such restoration and charge the Purchaser for the same.

3.     Purchase Price. Insert Rider B

(a)     Within three (3) business days following expiration of the Due Diligence Period, unless this Agreement has been, or is deemed, terminated, Purchaser shall deliver to Land Services USA, INC., ("Escrow Agent") a cash deposit in the amount of One Hundred Thousand Dollars ($100,000) (together with all interest earned thereon the "Deposit") in order to secure Purchaser's obligations hereunder.

2

Rider B

    Purchase Price.  The purchase price ("Purchase Price") payable by Purchaser to Seller for the Property shall be Eleven Million Five Hundred Thousand Five Hundred Dollars ($11,500,000).  The Purchase Price shall be paid, subject to prior payment of all of the Closing Costs, other adjustments and/or credits set forth in this Agreement, by certified, bank or title company check or by federal funds wire transfer, to the account of Seller.

                        SELLER:

                        BANCROFT NEUROHEALTH, a New Jersey nonprofit corporation

                        By: _____
                            Toni Pergolin, President and CEO

                        PURCHASER:

                        2 HOPKINS LANE, LLC

                        By: Recovery Centers of America Holdings, LLC, its sole member

                        By: Recovery, LLC, its sole member

                        By: _____
                            Name:  J. Brian O'Neill
                            Title:  Chairman and CEO

## AMENDMENT TO AGREEMENT OF SALE

**THIS AMENDMENT TO AGREEMENT OF SALE** (this "Amendment") is made as of May ⅗, 2015 ("Effective Date"), by and between BANCROFT NEUROHEALTH, a New Jersey nonprofit corporation, with an address of One Hopkins Lane, Haddonfield, New Jersey 08033, ("Seller") and 2 Hopkins Lane LLC, a Pennsylvania limited liability company with an address of 2701 Renaissance Boulevard, 4ª Floor, King of Prussia, PA 19406 ("Purchaser").

### RECITALS

**WHEREAS,** Seller and Purchaser are parties to that certain Agreement of Sale ("Agreement") with an effective date of March 13, 2015, as amended by that certain Rider A and that certain Rider B (collectively the "Agreement")with respect to the purchase of that certain land comprised of approximately 19.22 acres and the buildings and improvements thereon, identified as Block 13, Lot 25, and Block 14, Lot 2 on the Official Tax Map of the Borough of Haddonfield, Camden County, New Jersey (the "Property").

**WHEREAS,** Seller and Purchaser desire to amend the Agreement as set forth in this Amendment.

### TERMS

**NOW, THEREFORE,** in consideration of the foregoing, of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser, intending to be legally bound, covenant and agree as follows:

1. **Incorporation of Recitals.** The foregoing Recitals are hereby incorporated in and made a part of this Amendment by this reference.

2. **Certain Definitions.** Except as otherwise defined in this Amendment, each capitalized term shall have the meaning ascribed to such term in the Agreement.

3. **Amendment to Agreement.** As of the Effective Date of this Amendment, the Agreement is hereby amended as follows:

   a. **Due Diligence Period.** Section 2.a. of the Agreement is hereby modified so that the Due Diligence Period is extended until and shall expire on the date which is ninety (90) days from the Effective Date of the Agreement.

   b. **Rider A.** Rider A of the Agreement is hereby deleted in its entirety. Exhibit B of this Amendment (Lease) shall hereafter be deemed to be Exhibit B of the Agreement (Lease).

4. **Agreement in Full Force and Effect; No Conflicts; No Defaults.** The Agreement remains in full force and effect and unmodified, except as modified or amended by this Amendment. If there shall be any conflict or inconsistency between the terms and

#10753998 v1

conditions of this Amendment and those of the Agreement, the terms and conditions of this Amendment shall control. Both parties acknowledge that there are no defaults under the Agreement as of the Effective Date of this Amendment.

5.      **Binding Effect.** This Amendment shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors and assigns.

6.      **Counterparts.** This Amendment may be executed in two (2) or more counterpart copies, by facsimile or electronically via "PDF" signatures, all of which counterparts shall have the same force and effect as if the parties hereto had executed a single copy of this Amendment.

7.      **Entire Agreement.** The Agreement, as further amended by this Amendment, contains, and is intended as, a complete statement of all of the terms of the arrangements between the parties with respect to the matters pertaining to the Property, supersedes any previous agreements and understandings between the parties with respect to those matters, and cannot be changed or terminated orally.

8.      **Governing Law.** This Amendment shall be governed by and construed in accordance with the substantive laws of the Commonwealth of Pennsylvania.

9.      **Authority.** Seller and Purchaser each represent and warrant to one another: (a) the execution, delivery and performance of this Amendment has been duly approved by such party and no further corporate action is required on the part of such party to execute, deliver and perform this Amendment; (b) the person(s) executing this Amendment on behalf of such party have all requisite authority to execute and deliver this Amendment; and (c) this Amendment, as executed and delivered by such person(s), is valid, legal and binding on such party, and is enforceable against such party in accordance with its terms.

**[Remainder of Page Intentionally Blank]**

-2-

#10753598 v1

IN WITNESS WHEREOF, the duly authorized officers or representatives of Seller and Purchaser have executed this Amendment under seal as of the day and year first hereinabove written.

SELLER:

BANCROFT NEUROHEALTH, a New Jersey nonprofit corporation

By: _____
    Toni Pergolin, President and CEO

PURCHASER:

2 HOPKINS LANE, LLC

By; TRC-RE, LLC, a Delaware limited liability company

By: Recovery Center of America Holdings, LLC, a Delaware limited liability company, its sole member

By: Recovery LLC, a Delaware limited liability company, its sole member

By: _____
    Name:  Brian O'Neill
    Title:   Chairman and CEO

EXHIBIT B

LEASE

#10753998 v1

**LEASE FOR:**      Approximately 19.22 acres identified as Block 13, Lot 25 and Block 14, Lot 2 on the Official Tax Map of the Borough of Haddonfield, and all existing buildings and improvements situate thereon

**LANDLORD:**      REHAB CENTERS OF AMERICA, L.P.

**TENANT:**      BANCROFT NEUROHEALTH, a New Jersey nonprofit corporation

THIS LEASE AGREEMENT ("Lease Agreement") is made the _____ day of _____, 2015, by and between REHAB CENTERS OF AMERICA, L.P. with an address of 2701 Renaissance Boulevard, King of Prussia, Pennsylvania 19406 ("LANDLORD"), and BANCROFT NEUROHEALTH, a New Jersey nonprofit corporation with an address of One Hopkins Lane, Haddonfield, New Jersey 08033 ("TENANT").

WITNESSETH:

LANDLORD owns certain land situate at Block 13, Lot 25 and Block 14, Lot 2 on the Official Tax Map of the Borough of Haddonfield, and all existing buildings and improvements situate thereon (the "Leased Premises"), having acquired title to the same from TENANT on even date. LANDLORD and TENANT now desire to have LANDLORD lease back to TENANT the entire Leased Premises under the terms and conditions set forth in this Lease Agreement.

NOW THEREFORE, KNOW ALL MEN BY THESE PRESENTS, that for the rents paid, all other good and valuable consideration recited herein, and intending to be legally bound hereby, the parties agree, as follows:

**1.**      **Leased Premises**. LANDLORD does demise, lease, and let unto TENANT, and TENANT does rent and take from LANDLORD, the entire Leased Premises.

**2.**      **Term.** The term of this Lease Agreement (the "Term") shall commence on the date of this Lease Agreement (the "Occupancy Date") and shall extend and continue until the earlier of (i) Seller's relocation of its Haddonfield Campus, or (ii) two (2) years from the Occupancy Date. Each consecutive twelve (12) month period commencing with the date of this Lease Agreement is herein referred to as a "Lease Year".

**3.**      **Rent**.

a.      Fixed Minimum Rent. TENANT agrees to pay, without set-off, deduction or abatement all rents, including the Fixed Minimum Rent as set forth below (the "Fixed Minimum Rent"). The Fixed Minimum Rent and Additional Rent (as hereafter defined) are sometimes together referred to herein as "Rent." The Fixed Minimum Rent shall be as follows:

Lease Years One and Two: $690,000 per annum

TENANT shall pay to LANDLORD the Fixed Minimum Rent during the Term of this Lease Agreement and any extension or renewal thereof in equal monthly installments of $57,500.00, in advance, on or before the first day of each month. The monthly installments of Fixed Minimum Rent for any portion of a month at the beginning or end of the Term shall be apportioned on a proportionate basis.

b.      Additional Rent. Additional Rent includes all amounts due under this Lease Agreement that are not Fixed Minimum Rent. Together, Fixed Minimum Rent and Additional Rent are referred to herein as "Rent."

          i.      Taxes. LANDLORD shall pay any real estate taxes which may become due with respect to the Leased Premises.

          ii.     Reimbursement. TENANT shall, upon demand, reimburse LANDLORD for any amounts expended by LANDLORD pursuant to Paragraph 13a.iii. of this Lease.

          c.     Place of Payment. TENANT agrees to pay all Rent and other sums and charges herein to be paid by TENANT to LANDLORD'S address set forth above or to such other person or to such other place or places as shall be designated by LANDLORD to TENANT in writing from time to time hereafter.

**4.**     **Utilities**. TENANT shall pay, at its sole cost and expense, to the utility companies billing the same, before delinquency shall occur, all service and usage charges for the utilities serving the Leased Premises during the Term.

**5.**     **Use and Occupancy**. The Leased Premises shall be used only for TENANT'S existing business purposes, including on-site residential facilities, and for no other purpose whatsoever. TENANT shall obtain any necessary certificate of occupancy or other certificate permitting the TENANT to use the Leased Premises for the stated purpose. TENANT shall not perform any acts or carry on any practices which may cause waste to the Leased Premises or carry on any unlawful activities upon the Leased Premises.

**6.**     **Acceptance; Repairs**.

          a.     TENANT accepts the Leased Premises in "as is" condition. LANDLORD shall have no responsibility to make any repairs to the Leased Premises. TENANT acknowledges that since in or about 19__ and up until the date of this Lease, TENANT has owned and occupied the Leased Premises, has had full opportunity to examine the Leased Premises and has knowledge of the physical condition and surface conditions of the Leased Premises as well as the state of its title, zoning, past and present uses and use restrictions, visible easements, as well as the streets, sidewalks, parking areas, curbs and access ways adjoining it, and TENANT accepts the Leased Premises in the condition in which they now are, without relying on any representation, covenant or warranty by LANDLORD.

          b.     TENANT shall be solely responsible, during the Term of the Lease Agreement, at its sole cost, to do or to cause to be done all maintenance, repairs and replacements of the Leased Premises as may be necessary to maintain and keep the Leased Premises in safe condition and in compliance with all applicable governmental laws, ordinances, codes and requirements. LANDLORD shall have no obligation for any such repairs, maintenance or replacements. TENANT shall be solely responsible for any governmental violations that occur during the Term of this Lease.

**7.**     **Alterations**. TENANT will not substantially alter the Leased Premises and shall not erect any new structure or building on the Leased Premises, without the prior written consent of the LANDLORD, which shall not be unreasonably withheld or delayed if requested for TENANT's delivery of its charitable program or required by regulatory agencies of the TENANT for its program.

**8.**     **Insurance; Subrogation Rights.**

a.     TENANT shall, at its sole cost and expense, obtain and maintain in force at all times during the Term hereof, at its own expense, commercial general liability insurance including contractual liability and personal injury liability and all similar coverage, with combined single limits of $5,000,000 on account of bodily injury to or death of one or more persons as the result of any one accident or disaster and on account of damage to property. Such policy shall be written on an "occurrence" basis and not on a "claims made" basis. The policy limits set forth herein shall be subject to periodic review, and LANDLORD reserves the right to require that TENANT increase the liability coverage limits if, in the reasonable opinion of LANDLORD, the coverage is less than commonly maintained by nonprofit corporations with similar programs and census in the proximate geographic area.

b.     TENANT shall, at its sole cost and expense, obtain and maintain in full force and effect on all buildings on the Leased Premises, a policy of "special form" property insurance covering the full replacement value of such property.

c.     The policy of general liability insurance shall also name LANDLORD as additional insured with respect to the Leased Premises, and shall provide that it not be cancelable or reduced without at least 30 days prior written notice to LANDLORD. If requested by LANDLORD, such policy shall also name as an additional insured any mortgagee or holder of any mortgage which may be or become a lien upon any part of the Leased Premises. Prior to the commencement of the Term, TENANT shall provide LANDLORD with certificates which evidence that the coverages required have been obtained for the policy periods. TENANT shall also furnish to LANDLORD throughout the Term hereof replacement certificates at least thirty (30) days prior to the expiration dates of the then current policy or policies. TENANT shall provide an updated Certificate of Insurance upon request. All the insurance required under this Lease Agreement shall be issued by insurance companies authorized to do business in the State of New Jersey. If TENANT fails to procure and maintain such insurance, LANDLORD may, upon thirty (30) days prior written notice to TENANT (if not cured within such thirty (30) day period), but shall not be required to, procure and maintain the same, at TENANT'S expense to be reimbursed by TENANT as Additional Rent within ten (10) days of written demand.

d.     Anything in this Lease Agreement to the contrary notwithstanding, each party hereto, and anyone claiming through or under them by way of subrogation, waives and releases any cause of action it might have against the other party and their respective employees, officers, members, partners, trustees and agents, on account of any loss or damage that may occur to the Leased Premises, or any improvements thereto, or any personal property of LANDLORD or TENANT, arising from any cause that (i) would be insured against under the terms of any special form, all risk or property insurance required to be carried hereunder; or (ii) is insured against under the terms of any special form, all risk or property insurance actually carried regardless whether it is required hereunder. The foregoing waiver shall apply regardless of the caused or origin of the claim, including but not limited to the negligence of a party or that party's agents, officers employees or contractors. The foregoing waiver shall not apply if the waiver is found by a court of competent jurisdiction to result in the invalidation of insurance coverage to the insured for the claim in question.

**9.** **Indemnification and Hold Harmless.** TENANT will indemnify, defend, and save LANDLORD, and its directors, officers, and employees free and harmless from and against any and all claims, actions, damages, liabilities and expenses (including but not limited to reasonable attorneys' fees and disbursements) in connection with the loss of life, personal injury or damage to property or business directly arising from, related to, or in connection with the occupancy or use of the Leased Premises by the TENANT or directly caused by any act or omission of TENANT or any contractor, invitee, customer, agent, servant or employee of TENANT; except that TENANT shall not be responsible to indemnify LANDLORD for, and LANDLORD will defend, and hold harmless and indemnify TENANT for, the negligence or willful misconduct of LANDLORD or LANDLORD's contractor, invitee, customer, agent, servant or employee. Notwithstanding any provision in this Lease Agreement to the contrary, the obligation of TENANT under this Paragraph 9 shall survive the expiration or earlier termination of the Term of this Lease Agreement.

**10.** **Assignment and Subletting.** TENANT may not assign this Lease Agreement in whole or in part, or sublet all or any part of the Leased Premises, without the prior written consent of LANDLORD. Consent by LANDLORD to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. This prohibition against assigning or subletting shall further include any assignment which would otherwise occur by operation of law, merger, consolidation and reorganization resulting in a transfer of fifty percent (50%) or more of the voting interest in such entity. Notwithstanding any assignment or subletting made with LANDLORD'S consent, TENANT shall remain fully liable to LANDLORD under this Lease Agreement and, if required, TENANT shall provide LANDLORD with a written agreement of any approved assignee or subtenant whereby the approved assignee or subtenant undertakes liability to LANDLORD (along with TENANT) for payment and performance without any limitations as required of TENANT under this Lease Agreement. LANDLORD may not assign its interests in this Lease Agreement to any other party without the prior written consent of TENANT.

**11.** **Custom and Usage.** LANDLORD shall have the right at all times to enforce the covenants and conditions of this Lease Agreement in strict accordance with the terms hereof, notwithstanding any conduct or custom on its part in refraining from so doing. The failure of LANDLORD at any time or times to enforce its rights under said covenants and provisions strictly in accordance with the same shall not be construed as having created a custom in any way or manner contrary to the specific terms, provisions and covenants of this Lease Agreement or as having in any way or manner modified the same.

**12.** **Events of Default.** This Lease Agreement is made upon the condition that TENANT shall punctually and faithfully perform all of the covenants, conditions and agreements by it to be performed as is set forth in this Lease Agreement. The following (and only the following) shall each be deemed to be an event of default (each of which is sometimes referred to as an "Event of Default"):

a.       The failure by TENANT to pay when due the Rent unless paid within ten (10) days after receipt of written notice from LANDLORD to TENANT that such payment was not received when due.

4

b.      The failure of TENANT to comply with any other obligation under this Lease of Tenant and said failure continues for a period of thirty (30) days after receipt of written notice from LANDLORD to TENANT; provided, however, that if, by the nature of such obligation, such failure cannot reasonably be cured within such period of thirty (30) days, an Event of Default shall not exist as long as Tenant commences with due diligence and dispatch the curing of such failure within such period of thirty (30) days and, having so commenced, thereafter prosecutes with diligence and dispatch and completes the curing of such failure.

c.      TENANT's failure to vacate the Leased Premises upon expiration or early termination of this Lease.

**13.   Landlord's Remedies.**

a.      LANDLORD may treat any Event of Default as a breach of this Lease Agreement. LANDLORD shall have the following rights and remedies if there shall occur any Event of Default, any one or more of which may be exercised by LANDLORD without limit and in such order or concurrently, as LANDLORD may decide in LANDLORD'S sole discretion:

i.      To bring suit for the collection of Rent without entering into possession of the Leased Premises or canceling this Lease Agreement. Commencement of any action by LANDLORD for Rent and damages shall not be construed as an election to terminate this Lease Agreement and shall not absolve or discharge TENANT from any of its obligations or liabilities for the remainder of the Term.

ii.      To retake possession of the Leased Premises from TENANT by appropriate legal proceedings. Commencement of any action by LANDLORD for re-entry shall not be construed as an election to terminate this Lease Agreement and shall not absolve or discharge TENANT from any of its obligations or liabilities for the remainder of the Term. If, in the event of any ouster, LANDLORD re-lets the Leased Premises, TENANT shall continue to be liable for the payment of any deficiencies in Rent after such re-let. In the event of any re-entry, LANDLORD shall have the right but not the obligation to remove any personal property from the Leased Premises and place the same in storage at a public warehouse at the expense and risk of the TENANT. For the purpose of such reletting, LANDLORD may decorate or make repairs, changes, alterations or additions in or to the Leased Premises to the extent deemed by LANDLORD desirable or convenient; and the cost of such decoration, repairs, changes, alterations or additions shall be charged to and be payable by TENANT as additional rent hereunder, as well as any reasonable brokerage and legal fees expended by LANDLORD.

iii.      To perform (but shall not be required to) for the account of TENANT any such default of TENANT and immediately recover as additional rent any expenditure made and the amount of any obligations incurred in connection therewith, plus interest at the rate of five percent (5%) per annum.

iv.      To serve notice upon TENANT that this Lease Agreement and the then unexpired term hereof shall cease and expire and become absolutely void on the date specified in such notice, to be not less than thirty (30) days after the date of such notice without any right on the part of the TENANT to save the forfeiture by payment of any sum due or by the

performance of any terms, provision, covenant, agreement or condition broken; and, thereupon and at the expiration of the time limit in such notice, this Lease Agreement and the Term hereof granted, as well as the right, title and interest of the TENANT hereunder, shall wholly cease and expire and become void in the same manner and with the same force and effect (except as to TENANT's liability) as if the date fixed in such notice were the date herein granted for expiration of the Term of this Lease Agreement. Thereupon, TENANT shall immediately quit and surrender to LANDLORD the Leased Premises, and LANDLORD may enter into and repossess the Leased Premises by summary proceedings, detainer, ejectment or otherwise and remove all occupants thereof and, at LANDLORD'S option, any property thereon without being liable to indictment, prosecution or damages thereof. No such expiration or termination of this Lease Agreement shall relieve TENANT of its liability and obligations under this Lease Agreement, whether or not the Leased Premises shall be relet.

v.      To enjoin or restrain the such default and to invoke any remedy allowed by law or in equity, whether or not other remedies, indemnity or reimbursements are herein provided.

b.      Upon any Event of Default, TENANT shall be obligated to reimburse LANDLORD for all reasonable attorney's fees and related expenses and court costs incurred by LANDLORD in connection with such Event of Default and whether or not litigation is commenced in connection with such Event of Default.

### 14.    Subordination of Lease.

a.      Subject to TENANT'S receipt of a Non-Disturbance Agreement reasonably satisfactory to TENANT, TENANT agrees that its rights under this Lease Agreement are subordinate to any lease wherein LANDLORD is the tenant and to the lien of any or all mortgages regardless of whether such lease or mortgage now exist or may hereinafter be created with regard to all or any part of the Leased Premises, and to any and all advances to be made thereunder, and to the interest thereon, and all modifications, consolidations, renewals, replacements and extensions thereof. Such subordination shall be effective without the execution of any further instrument. TENANT also agrees that any landlord or mortgagee may elect to have this Lease Agreement prior to any lease or lien of its mortgage and in the event of such election and upon notification by such landlord or mortgagee to TENANT to that effect, this Lease Agreement shall be deemed prior in lien to the said lease or mortgage, whether this Lease Agreement is dated prior to or subsequent to the date of said lease or mortgage.

b.      TENANT shall, in the event of the sale or assignment of LANDLORD'S interest in the Leased Premises, or in the event of any proceedings brought for the foreclosure of, or in the event of the exercise of the power of sale under any mortgage covering the Leased Premises, or in the event of the termination of any lease in a sale-leaseback transaction wherein LANDLORD is the tenant, attorn to and recognize such purchaser or assignee or mortgagee as LANDLORD under this Lease Agreement.

e.      TENANT agrees that, upon the request of LANDLORD, or any such landlord, mortgagee or trustee, TENANT shall execute and deliver whatever instruments may be required for such purposes and to carry out the intent of this Paragraph 14, and in the event

6

TENANT fails to do so within fifteen (15) days after demand in writing, TENANT does hereby make, constitute and irrevocably appoint LANDLORD as its attorney-in-fact, coupled with an interest, in its name, place and stead to sign and deliver such instruments as if the same had been signed and delivered by TENANT.

### 15.    Tenant Estoppel Certificate.

a.    TENANT agrees to at any time and from time to time, within ten (10) days after receipt of LANDLORD'S written request, to execute, acknowledge and deliver to LANDLORD a written instrument ("Estoppel Certificate") certifying the Occupancy Date, that TENANT has accepted possession of the Leased Premises and is open for business, that this Lease Agreement is unmodified and in full force and effect (or if there have been modifications, that it is in full force and effect as modified and stating the modifications), the dates to which Fixed Minimum Rent, Additional Rent and other charges have been paid in advance, if any, and stating whether or not to the best knowledge of the signer of such certificate, LANDLORD is in default in the performance of any covenant, agreement or condition contained in this Lease Agreement and, if so, specifying each such default of which the signer may or should have knowledge; and certifying such other matters as may be reasonably requested by LANDLORD.

b.    In the event that TENANT fails to provide a TENANT'S Estoppel Certificate within ten (10) days after LANDLORD'S written request therefore, TENANT does hereby irrevocably appoint LANDLORD as attorney-in-fact of TENANT, coupled with an interest, in TENANT'S name, place and stead to sign and deliver TENANT'S Estoppel Certificate as if the same had been signed and delivered by TENANT.

### 16.    Construction Liens.

a.    TENANT will not permit to be created or to remain undischarged any lien, encumbrance or charge (arising out of any work done or materials or supplies furnished by any contractor, subcontractor, mechanic, laborer or materialman or any mortgage, conditional sale, security agreement or chattel mortgage, or otherwise by or for TENANT) which might be or become a lien or encumbrance or charge upon the Leased Premises or any portion thereof or the income therefrom. TENANT will not suffer any other matter or thing whereby the estate, rights and interests of LANDLORD in the Leased Premises or any portion thereof might be impaired. If any lien or notice of lien on account of any alleged debt of TENANT or any notice of contract by a party engaged by TENANT or TENANT'S contractor to work on the Leased Premises shall be filed against the Leased Premises or any portion thereof, TENANT shall within thirty (30) days after demand from LANDLORD, cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise. If TENANT shall fail to cause such lien or notice of lien to be discharged within the period aforesaid, then, in addition to any other right or remedy it may have, LANDLORD may, but shall not be obligated to, discharge such lien by deposit or by bonding proceedings, and in any such event LANDLORD shall be entitled, if LANDLORD so elects, to compel the prosecution of an action for the foreclosure of such lien by the interest, costs and allowances. Any amount so paid by LANDLORD and all costs and expenses, including attorneys' fees, incurred by LANDLORD and all costs therewith, shall constitute Additional Rent payable by TENANT under this Lease

7

Agreement and shall be paid by TENANT to LANDLORD on demand. Nothing herein contained shall obligate TENANT to pay or discharge any lien created by LANDLORD.

      b.     TENANT shall pay promptly all persons furnishing labor or materials with respect to any work performed by TENANT or TENANT'S contractor in the Leased Premises. No work which LANDLORD permits TENANT to do shall be deemed to be for the immediate use and benefit of LANDLORD so that no mechanic's or other lien shall be allowed against the estate of LANDLORD by reason of any consent given by LANDLORD to TENANT to improve the Leased Premises.

### 17.    Environmental Matters.

      a.     Applicable Law. TENANT shall abide by all Applicable Environmental Laws (defined herein), all as the same may be amended, modified, and supplemented from time to time, and all regulations promulgated pursuant thereto. For purposes of this Lease Agreement, Applicable Environmental Laws shall include but not be limited to (x) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601 et seq., ("CERCLA"); the United States Department of Transportation Hazardous Materials Table (49 CFR 172.102); by the Environmental Protection Agency as hazardous substances (40 CFR Part 302); the Clean Air Act; and the Clean Water Act; (y) the Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq., ("ISRA"); the Spill Compensation and Control Act and/or (z) any other rule, regulation, ordinance, statute (including consent decrees and administrative orders) or requirements of any governmental or administrative agency regarding the environment including any rule, etc. which pertains to, governs or otherwise regulates the emission, discharge, release or spill of any substance, or the use, manufacture, processing, sale, treatment, storage, disposal, transportation, or other management of any substance.

      b.   Hazardous Substances; Discharge.

      i.     Without limiting the foregoing, TENANT shall not bring or otherwise cause to be brought or permit any of its agents, employees, contractors or invitees to bring in, on or about any part of the Leased Premises, any "hazardous substances" (defined below).

      ii.     TENANT shall not engage in operations at the Leased Premises which involve the generation, manufacture, refining, transportation, treatment, storage, handling or disposal of hazardous substances.

      iii.     Notwithstanding the foregoing, TENANT may bring to and use at the Leased Premises, hazardous substances incidental to its normal business operations solely in de minimis quantities provided that Tenant shall store and handle such substances in strict accordance with all Applicable Environmental Laws.

      iv.     TENANT will not cause or permit to exist any release, spillage, emission or discharge of any hazardous substance on or about the Leased Premises.

      v.     For purposes of this Lease Agreement, "**hazardous substances**" mean "hazardous substances" or "toxic substances" or "hazardous waste" as those terms are

defined within the meaning of any Applicable Environmental Law, and any pollutant, contaminant, or hazardous, dangerous, or toxic chemical, material, or substance governed, regulated or controlled by any Applicable Environmental Law.

   c. Notification; Liability; Indemnification

      i.      TENANT will promptly notify LANDLORD, in writing, if any hazardous substance is found on or about the Leased Premises or if TENANT has or acquires notice or knowledge that any hazardous substances have been or is threatened to be released, discharged, disposed of or transported in violation of the foregoing, or stored on or about the Leased Premises.

      ii.     TENANT shall be responsible for any and all costs, expenses, or liabilities arising from or relating to the presence of any hazardous substances on or about the Leased Premises caused by TENANT, and any adverse environmental conditions or contamination existing on the Leased Premises as of the date hereof caused by TENANT, or that which occurs on the Leased Premises during the Term hereof caused by TENANT.

      iii.    TENANT, at its own cost and expense, will immediately take such action as is necessary to detain the spread of and remove the hazardous substance in accordance with applicable Environmental Laws, to the complete satisfaction of LANDLORD and appropriate governmental authorities.

      iv.     TENANT shall indemnify and hold LANDLORD harmless from and against any and all loss, cost, damage and expense, including reasonable attorneys fees (collectively "Loss"), suffered, incurred or paid by LANDLORD to the extent such Loss arises out of or results from TENANT's failure in any respect to abide by the provisions of this Paragraph 17.

   **18.    Miscellaneous.**
   a)    Quit and Vacate. TENANT agrees to quit and vacate from the Leased Premises at the end of the Term or sooner termination of this Lease Agreement, without notice and that TENANT will thereupon without delay deliver to LANDLORD all keys TENANT may have for the Leased Premises. If TENANT, or any person claiming through Tenant, continues to occupy the Premises after the expiration of the Term or earlier termination of this Lease or any renewal thereof without prior written consent of Landlord (a "**Holdover**"), the tenancy under this Lease shall become month-to-month terminable by Landlord on thirty (30) days' prior written notice, under the same terms and conditions set forth in this Lease, except that, regardless of whether Landlord grants such consent, (i) the Fixed Minimum Rent during the first sixty (60) days of such Holdover shall be one hundred twenty-five percent (125%) of the amount set forth in Section 3 above for the last month of the Term; the Fixed Minimum Rent from day sixty one (61) to day ninety (90) of such Holdover shall be one hundred fifty percent (150%) of the amount set forth in Section 3 above for the last month of the Term; and thereafter the Fixed Minimum Rent shall be two hundred percent (200%) of the amount set forth in Section 3 above for the last month of the Term; and any Holdover shall constitute an Event of Default, and shall be subject to all the remedies set forth this Lease.

A.      WAIVER OF JURY TRIAL. BOTH LANDLORD AND TENANT AGREE HEREBY TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDINGS OR COUNTER-CLAIM BROUGHT BY EITHER OF THE PARTIES HERETO UNDER OR IN CONNECTION WITH THIS LEASE AGREEMENT.

b.      Waiver of Right of Redemption. TENANT hereby expressly waives any and all rights of redemption granted by or under any present or future law in the event TENANT is evicted by the Order of any Court pursuant to any dispossessory warrant or proceedings in any court.

c.      Quiet Enjoyment. Upon payment by TENANT of the rents and other sums herein reserved and provided to be paid by TENANT and upon the observance and performance by TENANT of all of the covenants, agreements, terms and conditions of this Lease Agreement on TENANT'S part to be observed and performed, TENANT shall peaceably and quietly hold and enjoy the Leased Premises for the Term hereby demised without hindrance or interruption by LANDLORD or by any persons lawfully claiming or holding by, through or under LANDLORD, subject nevertheless, to the terms, provisions and conditions of this Lease Agreement.

**19.     Succession.**     Subject to the limitations against assignment and subleasing hereinbefore set out, all rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the several and respective heirs, executors, administrators, successors and assigns of the said parties.

**20.     Limited Liability.**  LANDLORD shall not be under any personal liability with respect to any of the provisions of this Lease Agreement, and if LANDLORD is in breach or default under this Lease Agreement, TENANT shall look solely to the equity of LANDLORD in the Leased Premises for the satisfaction of TENANT'S remedies. LANDLORD'S liability under the terms, covenants, conditions, warranties and obligations of this Lease Agreement shall in no event exceed the loss of LANDLORD'S equity interest in the Leased Premises.

**21.     Brokers.** TENANT represents and warrants to LANDLORD that TENANT has had no dealings, negotiations or consultations with respect to the Leased Premises or this transaction with any broker or other intermediary and that no other broker or intermediary called the Leased Premises to TENANT's attention for lease or to any part in any dealings, negotiations or consultations with respect to the Leased Premises or this Lease Agreement. TENANT shall indemnify and hold LANDLORD harmless for any damage or liability of LANDLORD caused by any breach of this representation and warranty.

**22.     Notices.**

a.      Any notice by TENANT to LANDLORD must be served by overnight mail (with written evidence of receipt) or by certified mail, postage prepaid and return receipt requested, addressed to LANDLORD at LANDLORD'S address as set forth on the cover page of this Lease Agreement, or at such other address as LANDLORD shall designate to TENANT by

written notice, which change of address by LANDLORD shall not be effective unless received by TENANT.

        b.      Any notice by LANDLORD to TENANT must be served by overnight mail (with written evidence of receipt) or by certified mail, postage prepaid and return receipt requested, addressed to TENANT at the Leased Premises, or at such other address as TENANT shall designate to LANDLORD by written notice, which notice of change of address by TENANT shall not be effective unless received by LANDLORD.

    **23.**    **Severability.** Each of the sections of this Lease Agreement is separate and severable, and if any section is found to be unenforceable or void, either by statute or decision of a court, the remaining sections shall nevertheless be valid and enforceable.

    **24.**    **Corporate Tenants.** In the event the TENANT hereunder is a corporation, the persons executing this Lease Agreement on behalf of the TENANT hereby covenant and warrant that: TENANT is a duly constituted corporation qualified to do business in the State of New Jersey; and the persons executing this Lease Agreement are duly authorized by the governing body of such corporation to execute and deliver this Lease Agreement on behalf of the corporation.

    **25.**    **Execution of Lease.** This Lease Agreement shall become effective as a lease only upon execution and legal delivery thereof by the parties hereto. This Lease Agreement may be executed in more than one counterpart, and each such counterpart shall be deemed to be an original document.

    **26.**    **Entire Agreement; Modifications.** This Lease Agreement, including the Exhibits hereto and any addenda hereto, sets forth all of the covenants, promises, agreements, conditions and understandings between LANDLORD and TENANT concerning the Leased Premises. No alteration, amendment, change or addition to this Lease Agreement shall be binding upon LANDLORD or TENANT unless reduced to writing, signed by them and mutually delivered between them.

[Signatures appear on the following page]

11

IN WITNESS WHEREOF, LANDLORD and TENANT have duly executed this Lease Agreement as of the day and year first above written.

**LANDLORD:**

ATTEST/WITNESS:

**REHAB CENTERS OF AMERICA, L.P.,**
a _____ limited partnership

By:_____
   Name:
   Title:

By:_____
   Name:
   Title:

ATTEST/WITNESS:

**TENANT:**

**BANCROFT NEUROHEALTH,** a New Jersey nonprofit corporation

By:_____
Name:
Title:

By:_____
Name:
Title:

12130822v2

12

## SECOND AMENDMENT TO AGREEMENT OF SALE

THIS **SECOND AMENDMENT TO AGREEMENT OF SALE** (this "Second Amendment") is made as of September 8, 2015 ("Effective Date"), by and between **BANCROFT NEUROHEALTH, a New Jersey nonprofit corporation**, ("Seller") and **2 HOPKINS LANE, LLC, a Delaware limited liability company** ("Purchaser").

### RECITALS

**WHEREAS,** Seller and Purchaser are parties to that certain Agreement of Sale dated March 13, 2015,  as amended by that certain Rider A and Rider B, (the "Original Agreement"), as further amended by that certain First Amendment to Agreement of Sale, dated May 8, 2015, (the "First Amendment", and together with the Original Agreement, the "Agreement"), with respect to  the purchase of that certain land comprised of approximately 19.22 acres and the buildings and improvements thereon, identified as Block 13, Lot 25 and Block 14, Lot 2 on the Official Tax Map of the Borough of Haddonfield, Camden County, New Jersey (the "Property").

**WHEREAS,** Seller and Purchaser desire to clarify certain terms in the Agreement as set forth in this Second Amendment.

### TERMS

**NOW, THEREFORE,** in consideration of the foregoing, of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser, intending to be legally bound, covenant and agree as follows:

1. **Incorporation of Recitals.**   The foregoing  Recitals  are  hereby incorporated in and made a part of this Second Amendment by reference.

2. **Certain Definitions.**   Except as otherwise defined in this Second Amendment, each capitalized term used herein shall have the meaning ascribed to such term in the Agreement.

3. **Amendment to Agreement.** As of the Effective Date of this Second Amendment, the Agreement is hereby amended as follows:

a. **Confirmation of Purchasing Entity.**   The Purchaser, **2 HOPKINS LANE, LLC,** was incorrectly identified as a Pennsylvania limited liability company in the Agreement. This Second Amendment shall confirm that the correct purchasing entity is **2 HOPKINS LANE, LLC, a Delaware limited liability company**. All references to "2 Hopkins Lane, LLC, a Pennsylvania limited liability company" in the Agreement are hereby replaced with "2 Hopkins Lane, LLC, a Delaware limited liability company".

b. **Governing Law.** The First Amendment shall be governed by and construed in accordance with the substantive laws of the State of New Jersey.

{00170686;3}#10753998 v1

4.      **Agreement in Full Force and Effect; No Conflicts; No Defaults.**  The Agreement is hereby ratified and reaffirmed and remains in full force and effect and unmodified, except as modified or amended by this Second Amendment.  If there shall be any conflict or inconsistency between the terms and conditions of this Second Amendment and those of the Agreement, the terms and conditions of this Second Amendment shall control. Both parties agree and acknowledge that (i) the Agreement remains a binding obligation of each respective party, and (ii) there are no defaults under the Agreement as of the Effective Date of this Second Amendment.

5.      **Binding Effect.**  The Agreement as modified by this Second Amendment shall be binding upon and inure to the benefit of the Seller and Purchaser and their respective successors and assigns.

6.      **Counterparts.**  This Second Amendment may be executed in two (2) or more counterpart copies, by facsimile or electronically via "PDF" signatures, all of which counterparts shall have the same force and effect as if the parties hereto had executed a single copy of this Second Amendment.

7.      **Entire Agreement.**  The Agreement, as further amended by this Second Amendment, contains, and is intended as, a complete statement of all of the terms of the arrangements between the parties with respect to the matters pertaining to the Property, supersedes any previous agreements and understandings between the parties with respect to those matters, and cannot be changed or terminated orally.

8.      **Governing Law.**  This Second Amendment shall be governed by and construed in accordance with the substantive laws of the State of New Jersey.

9.      **Authority.**  Seller and Purchaser each represent and warrant to one another: (a) the execution, delivery and performance of this Second Amendment has been duly approved by such party and no further corporate action is required on the part of such party to execute, deliver and perform this Second Amendment; (b) the person(s) executing this Second Amendment on behalf of such party have all requisite authority to execute and deliver this Second Amendment; and (c) this Second Amendment, as executed and delivered by such person(s), is valid, legal and binding on such party, and is enforceable against such party in accordance with its terms.

**[Remainder of Page Intentionally Blank]**

#10753998 v1

**IN WITNESS WHEREOF**, the duly authorized officers or representatives of Seller and Purchaser have executed this Second Amendment under seal as of the day and year first hereinabove written.

WITNESS:

SELLER:

BANCROFT NEUROHEALTH, a New Jersey nonprofit corporation

By: _____

Name: Toni Pergolin

Title: President and CEO

WITNESS:

PURCHASER:

2 HOPKINS LANE, LLC, a Delaware limited liability company

By: TRC-RE LLC, a Delaware limited liability company, its sole member

By: _____

Name: J. Brian O'Neill

Title: Chief Executive Officer

Date: September 8, 2015

{00170686;3}-3-

#10753998 v1

[2HL,LLC,  SUGGESTED  CONCEPT  PLAN  FOR  REDEVELOPMENT]

**EXHIBIT "B"**



# EXHIBIT 3

**MASON, GRIFFIN & PIERSON, PC**
EDWIN W. SCHMIERER, ESQ.
ATTORNEY # 009811974
101 POOR FARM ROAD
PRINCETON, NJ 08540
Telephone:     (609) 436-1200
Facsimile:     (609) 683-7978
Email:         e.schmierer@mgp.law.com
**Counsel for the Petitioner, Borough of Haddonfield**

| | |
|---|---|
| **IN THE MATTER OF THE APPLICATION OF THE BOROUGH OF HADDONFIELD, COUNTY OF CAMDEN.** | SUPERIOR COURT OF NEW JERSEY<br>CAMDEN COUNTY<br>LAW DIVISION<br><br>DOCKET NO: CAM-L-2596-15<br><br>**ORDER GRANTING A CONDITIONAL JUDGMENT OF COMPLIANCE AND REPOSE** |

**THIS MATTER** being opened to the Court by the Petitioner, the Borough of Haddonfield

("Borough") seeking the Court's approval of the Borough's adopted and endorsed Third Round

Housing Element and Fair Share Plan ("HE&FSP") pursuant to N.J.S.A. 52:27D-13, and In Re

N.J.A.C. 5:96 and In Re N.J.A.C. 5:96 and 5:97, 221 N.J. 1 (2015) ("Mount Laurel IV") and the

entry of a Third Round Conditional Judgment of Compliance and Repose confirming the

Borough's compliance with its Fair Share Obligation under the Mount Laurel doctrine and the Fair

Housing Act ("FHA"); and the Court having conducted a Compliance hearing on February 20,

2020 regarding the Settlement Agreement entered into by the Borough and the Fair Share Housing

Center ("FSHC"); and

1

**WHEREAS,** the Court having considered (a) the February 18, 2020 and revised February 24, 2020 Report of the Court Special Master Francis J. Banisch, III, AICP, PP, and the direct testimony of Mr. Banisch, (b) the testimony of Borough resident, Barry J. Brady, (c) the comments put on the record with regard to the Borough's Third Round Compliance Plan by the attorney for the Petitioner and the attorney for FSHC; and

The Court having found the following facts:

1.  The Borough entered into a Settlement Agreement with FSHC on April 2, 2019. This Settlement Agreement was approved by Court Order dated July 1, 2019. Said Settlement Agreement is intended to be implemented by the Borough's Third Round HE&FSP which was adopted by the Borough's Planning Board on November 13, 2019 and endorsed by the Borough Commissioners on December 17, 2019.

2.  The Court-approved Settlement Agreement stipulated that the Borough has a Fair Share Obligation for the period from 1987 through July 1, 2025 as follows:

    a.  Present need (Rehabilitation):        11 units

    b.  Prior Round (1987-1999):              192 units

    c.  Third Round (1999-2025):              320 units

3.  The Settlement Agreement provides that the Borough has a Realistic Development Potential ("RDP") of 83 units and an unmet need of 429 units.

4.  The HE&FSP addresses the Fair Share Obligation set forth above.

5.  The Court appointed Special Master, Francis J. Banisch, III, AICP, PP, reviewed the HE&FSP and the Settlement Agreement dated February 26, 2019 as accepted by the Borough on April 2, 2019 and submitted a report dated February 18, 2020

and a revised report dated February 24, 2020. These reports find that the HE&FSP and the Third Round Settlement Agreement creates a realistic opportunity for the provision of sufficient very low, low and moderate income housing during the period 1987 to July 1, 2025 to satisfy the stipulated Municipal Housing Fair Share Obligation provided the Borough take certain additional steps specified as conditions in the Special Master's amended report dated February 24, 2020. In his reports, the Special Master recommended that the Court approve the HE&FSP and the Settlement Agreement subject to those conditions set forth by the Special Master on the record. The Special Master also testified at the Compliance Hearing that his recommendation for the approval of the HE&FSP and the Settlement Agreement need not be delayed to await satisfaction of the additional conditions recommended by the Special Master and FSHC.

6.   Based upon the written reports of the Special Master, which are incorporated herein by reference as findings of the Court and the testimony by the Special Master at the Compliance Hearing, the Court found that upon the Borough's implementation of the HE&FSP, the Settlement Agreement and the additional conditions recommended by the Special Master, it will have created a realistic opportunity for the provision of sufficient very low, low and moderate income housing needed to satisfy the Borough's constitutional Fair Share Housing Obligation for the period from 1987 to July 1, 2025 under the FHA and the constitutional doctrines enunciated in the Mount Laurel cases; and

**WHEREAS**, based upon these findings and for the reasons set forth on the record and for good cause shown, the Court determined that a Conditional Judgment of Compliance and Repose

3

approving the Borough's plans for addressing its cumulative fair share obligation through July 1,

2025 as well as the requirements of the Settlement Agreement dated February 26, 2019 as

entered into by the Borough on April 2, 2019 should be entered.

NOW, THEREFORE, it is on this __1st__ day of _____June_____, 2020,

**ORDERED AND ADJUDGED** as follows:

1. The Borough of Haddonfield has stipulated to a judicially-approved Fair Share
   Housing Obligation for the period from 1987 through July 1, 2025 of (a) Present
   Need (Rehabilitation):  11 units; (b) Prior Round (1987 – 1999) Obligation:  192
   units; and (c) Third Round 'gap' and prospective need (1999 – 2025) Obligation:
   320 units.

2. The Borough Third Round HE&FSP adopted by the Planning Board on
   November 13, 2019 and endorsed by the Borough Commissioners on December
   17, 2019, the Settlement Agreement dated February 26, 2019 as entered into by
   the Borough on April 2, 2019 and once the additional steps/conditions
   recommended by the Special Master's supplementary report dated February 24,
   2020 are undertaken creates a realistic opportunity for the provision of sufficient
   very low, low and moderate income housing through July 1, 2025 to satisfy the
   judicially approved municipal Fair Share Housing Obligation and, taken together,
   fully address the Borough's constitutional Fair Share Housing Obligation for the
   period from 1987 to July 1, 2025 under the FHA and the constitutional doctrines
   enunciated in the Mount Laurel cases.

4

3.  As recommended by the Special Master in his supplemental report dated February
    24, 2020, the Borough shall satisfy the following conditions before the Court will
    enter a Final Third Round Judgment of Compliance and Repose:

    a.  A contract to extend Camden County Block Grant Program Cooperation
        Agreement be entered by the Borough; and

    b.  An executed Developer's Contract and Site Plan approval for the Snowden
        Avenue site be accomplished by November 30, 2020.

    c.  If necessary, the Preparation of Operating Manuals for Affordability
        Assistance Activities be accomplished by July 1, 2020 unless anticipated
        funds for this proposed affordability assistance program are instead
        needed per condition e. below for acquisition of another site/program
        implementation to address the entire 28-unit Snowden obligation as the
        Borough has already proposed to exceed its affordability assistance
        requirements in other ways as set forth in the court-approved spending
        plan.

    d.  Have prepared by the Borough's Administrative Agent, Piazza and
        Associates, an operating manual within 60 days of the date of this Order.

    e.  A decision is to be made by the Borough on the unit count for the
        Snowden Avenue site by July 1, 2020 consistent with the Settlement
        Agreement and rezoning for the site adopted by that time.

4.  As the Borough satisfies the above-referenced conditions, proof of same shall be
    submitted to the Special Master and Fair Share Housing Center. If the Borough's
    satisfaction of the above-referenced conditions is deemed acceptable to the

Special Master, the Special Master shall file a supplemental report with the Court

confirming that all conditions set forth in this Order have been satisfied. Once the

Special Master submits said supplemental report and if the Court deems the report

acceptable and is satisfied that all conditions have been met, the Court, without

the necessity of an additional hearing, shall issue a Final Third Round Judgment

of Compliance and Repose as submitted by the Petitioner's attorney.

5.  Upon the satisfaction of the aforementioned conditions, the entry of the Final

Third Round Judgment of Compliance and Repose shall resolve all issues raised

by the Borough's Declaratory Judgment Complaint.  That judgment shall

constitute a Final Judgment in said Declaratory Judgment Complaint.

6.  The Borough is permitted to use the 2019 and future income limits based upon the

methodology adopted by the Affordable Housing Professionals of New Jersey

("AHPNJ") to calculate affordable rent levels and sales prices as updated annually

which replicates COAH's procedures for annually establishing income limits.

The Borough has amended its affordable housing ordinance to include this

methodology.

7.  The monitoring and reporting requirements identified in the Settlement

Agreement will remain continuing conditions of the Court's conditional approval

provided for herein.

8.  The requirement that construction shall begin on the Snowden site and any units

that may be used to partially replace the units on the Snowden site in accordance

with the Settlement Agreement no later than January 1, 2022 will remain a

continuing condition of the Court's conditional approval provided for herein.

9.  The Borough's current immunity from "Builders Remedy" lawsuits shall remain in full force and effect subject to further Order of the Court through July 1, 2025.

10. All parties shall bear their own costs.

/s/ Nan S. Famular P.J. Ch.

HONORABLE NAN S. FAMULAR, P.J.Ch.

The undersigned hereby consent to the entry of this Order.

FAIR SHARE HOUSING CENTER

By: _____
        Adam Gordon, Esq.

Date:   May 19, 2020

BOROUGH OF HADDONFIELD

By: _____
        Edwin W. Schmierer, Esq.
        Special Counsel

Date:   May 19, 2020

V:\USERS\Edwin\Haddonfield\Order\20.03.30_rev. Haddonfield - Order Conditional Compliance and Repose 4220 fb amg mbl.docx

7

EXHIBIT 4



# 2019

# Amended Third Round Housing Element and Fair Share Plan

**ADOPTED: NOVEMBER 13, 2019**

Haddonfield Borough, Camden County, New Jersey

Prepared by:

**Clarke Caton Hintz**  |  100 BARRACK STREET  |  TRENTON, N.J.  |  08608



# Amended Housing Element and Fair Share Plan

Haddonfield Borough, Camden County, New Jersey

Adopted by the Planning Board on November 13, 2019

Endorsed by the Borough Commissioners on December 17, 2019

Prepared for Haddonfield Borough by

Clarke Caton Hintz:


Mary Beth Lonergan, PP, AICP
New Jersey Professional Planner License 4288


Austin Maitland, AICP Candidate


Elaine R. Clisham


*A signed and sealed version is available at the municipal building*



## BOROUGH COMMISSIONERS

Neal Rochford, *Mayor*
Colleen Bianco Bezich, *Commissioner*
Jeffrey Stephen Kasko, *Commissioner*

Sharon McCullough, *Borough Administrator*
Deanna Bennett, *Borough Clerk*
Mario Iavicoli, Esq., *Borough Attorney*
Stephanie Cuthbert, PE, *Borough Engineer*

## PLANNING BOARD

John LaProcido, *Chair*
Doug McCollister, *Vice-Chair*
Jon Simonson, *Mayor's Designee*
Jeffrey Stephen Kasko, *Commissioner*
*Environmental Commission Liaison*
Eugene G. Haag
Stuart Harting
Shawn McCaney
Jennifer Johnson
Joyce Howell, *1st Alternate*
William Polise, *2nd Alternate*

Tavis A. Karrow, *Board Secretary*
Don Ryan, Esq., *Board Attorney*
Gregory Sullivan, PE, PP, CME, *Board Engineer*



## TABLE OF CONTENTS

Executive Summary .................................................................................................................. 1

Introduction ............................................................................................................................. 2

Judicial, Legislative, and Regulatory Affordable Housing Background ................................. 2

Affordability Requirements .................................................................................................... 8

Housing Element/Fair Share Plan Requirements ................................................................. 10

Housing, Demographic and Employment Analysis .............................................................. 11

Haddonfield Borough Affordable Housing History ............................................................. 27

Haddonfield Borough's Affordable Housing Obligation ..................................................... 31

Haddonfield Borough's Affordable Housing Plan ............................................................... 32

Affordable Housing Administration and  Affirmative Marketing ....................................... 53

Affordable Housing Trust Fund .......................................................................................... 54

Cost Generation ................................................................................................................... 55

Monitoring ........................................................................................................................... 55

Summary .............................................................................................................................. 56

## APPENDICES TO THE HOUSING ELEMENT & FAIR SHARE PLAN

A.  Resolutions Adopting and Endorsing Amended Third Round Housing Element and Fair Share Plan
B.  Borough/FSHC Settlement Agreement and July 1, 2019 Court Approval
C.  New Jersey American Water Letter of Capacity To Provide Water and Sewer Service
D.  Camden County Rehabilitation Program Documentation
E.  Prior Round: Kings Court Crediting Documentation
F.  Prior Round: Tarditi (Lincoln) Commons Documentation
G.  Bancroft Redevelopment Documentation
H.  Snowden Avenue Municipal Site: Community Investment Strategies Agreement, Pro Forma and Construction Schedule
I.  Ordinance Rezoning Sites and Creating Various Overlay Districts
J.  Updated Fair Share Ordinance, Including Development Fee Ordinance and Mandatory Borough-Wide Set-Aside
K.  Resolution Appointing Municipal Affordable Housing Liaison
L.  Administrative Agent Agreement, Authorizing Resolution, Operating Manuals
M.  Updated Affirmative Marketing Plan
N.  Updated Spending Plan and Resolution of Intent To Bond
O.  Haddonfield Borough Affordability Assistance Program Operating Manual



# EXECUTIVE SUMMARY

This amended Third Round Housing Element and Fair Share Plan has been prepared for Haddonfield Borough, Camden County, in accordance with the New Jersey Fair Housing Act and the rules of the New Jersey Council on Affordable Housing (COAH) at N.J.A.C. 5:93 *et seq.* The plan was prepared in order to address the Court-approved Settlement Agreement (FSHC Agreement) between Haddonfield Borough and Fair Share Housing Center (FSHC), executed April 2, 2019. This plan replaces the prior Third Round plan adopted by the Planning Board and endorsed by the Borough Commissioners on December 9, 2008. The Borough's 2008 plan was certified by COAH in 2010. This 2019 Amended Plan will serve as the foundation for the Borough's submission to the Honorable Nan S. Famular, P.J.Ch., for a Third Round Judgment of Compliance and Repose to July 1, 2025.

There are three components to a municipality's affordable housing obligation: the Rehabilitation share, or Present Need, the Prior Round obligation, and the Third Round obligation. The Court-approved FSHC Agreement established the Borough's 11-unit Rehabilitation share/Present Need obligation, a 192-unit Prior Round obligation for the years 1987 to 1999, and a 320-unit Third Round fair share obligation for the years 1999 to 2025 (including the "gap period"). As the Borough has limited vacant or developable land, the Court also approved the Borough's vacant land adjustment (VLA), resulting in a combined Prior Round and Third Round Realistic Development Potential (RDP) of 83 and a combined Unmet Need of 429 (192 Prior Round + 320 Third Round – 83 RDP = 429 Unmet Need).

> **Haddonfield's Affordable Housing Obligation:**
>
> - Rehabilitation Share: 11 units
>
> - Prior Round Obligation: 192 units
>
> - Third Round Obligation: 320 units

The Borough will address its 11-unit Rehabilitation share through continued participation in the Camden County Housing Rehabilitation Program and is prepared to offer a municipal rental housing rehabilitation program if the need arises.

The Borough has addressed its combined 83-unit Prior Round and Third Round RDP with projects including completed and proposed inclusionary developments, completed and proposed 100% affordable municipally sponsored construction, and rental bonuses.

To address its Unmet Need, the Borough has identified 12 sites, including the area around its PATCO station and nearby it, where it will adopt overlay zoning to create a realistic opportunity for the construction of affordable housing. The Borough will also adopt an updated Affordable Housing Ordinance, including a provision that, for any new residential construction of five or more units anywhere in the Borough, will require 20% of those units be set aside as affordable.



# INTRODUCTION

Haddonfield Borough, a fully developed, primarily residential community of 11,428 people with a land area of 2.824 square miles and a vibrant downtown, is located in the northwestern part of Camden County. The Borough adjoins Haddon Township to the northwest; Cherry Hill Township to the north and east; Tavistock Borough, Lawnside Borough, and Barrington Borough to the south; and Haddon Heights Borough and Audubon Borough to the west.

The Borough constitutes approximately 1.3 percent of the land in Camden County. Haddonfield Borough is approximately seven miles from Philadelphia and located within the Metropolitan Planning Area (PA-1) category as designated by The State Development and Redevelopment Plan (SDRP) of New Jersey. It is easily accessible from much of the region; Interstate 295 and the New Jersey Turnpike run through the southern tip of the Borough. The Borough is served by NJ Transit bus routes 455 and 457, providing access to Camden, Cherry Hill, Woodbury, Paulsboro, and other destinations throughout the region. The Borough is also served by a Port Authority Transit Corporation (PATCO) rail line with service to Camden and Philadelphia.

Haddonfield Borough's Master Plan portrays a community that has developed as a primarily residential municipality with a mixed-use downtown and virtually no vacant, developable land. The Master Plan identifies stable population and traffic levels. Due to the lack of vacant, developable land, any development in the Borough will generally necessitate redevelopment and repurposing of existing uses rather than greenfield construction.

# JUDICIAL, LEGISLATIVE, AND REGULATORY AFFORDABLE HOUSING BACKGROUND

In its landmark 1975 decision now referred to as Mount Laurel I, the New Jersey Supreme Court ruled that developing municipalities have a constitutional obligation to provide a realistic opportunity for the construction of a variety and choice of housing types that would be affordable to low- and moderate-income households. In its 1983 Mount Laurel II decision, the Supreme Court extended the constitutional obligation to all municipalities and determined that each municipality would have to establish its fair share obligation and provide, through its zoning, affirmative measures that would create a realistic opportunity for satisfying that obligation. Subject to certain criteria, Mount Laurel II also gave developers who successfully challenged the constitutionality of a municipality's zoning and who were ready, willing, and able to provide a substantial amount of affordable housing the opportunity to secure a "builder's remedy."[1] The Supreme Court intended a builder's remedy to be a mechanism to force municipal compliance with affordable housing fair share obligations in instances in which a municipality has failed to do so voluntarily. Under a builder's remedy lawsuit, if a developer/plaintiff is successful in demonstrating that a municipality has failed to provide a realistic opportunity for the construction of its fair share of its region's need for low- and moderate-income housing, that developer/plaintiff may be granted a builder's remedy if the developer's site is suitable for inclusionary

---

[1] Southern Burlington NAACP v. Twp. of Mount Laurel, 92 NJ 158 (1983)



development, and if the developer is willing to set aside a substantial number of units to be affordable to low- and moderate-income households. A developer would typically be permitted to build a higher density multi-family residential project on land not zoned to permit this use and/or at densities higher than permitted at the time of the lawsuit, reserving a "substantial" percentage (typically 20%) of the units for occupancy by and affordable to low- and moderate-income households.

In 1985, the Legislature enacted the Fair Housing Act in response to <u>Mount Laurel II</u>. The Fair Housing Act created the Council on Affordable Housing, or COAH, as the administrative alternative to compliance in a court proceeding. The Legislature conferred primary jurisdiction on COAH and charged COAH with promulgating regulations (i) to establish housing regions; (ii) to estimate low- and moderate-income housing needs; (iii) to set criteria and guidelines for municipalities to determine and address their fair share numbers, and (iv) to create a process for the review and approval of appropriate housing elements and fair share plans. As will be discussed further, in March 2015, the New Jersey Supreme Court declared COAH a moribund agency and reactivated a judicial process for the review and approval of affordable housing plans.

In Haddonfield Borough's case, the Borough has already achieved a settlement with FSHC that has been approved by the Superior Court, which details the extent of the Borough's Prior Round and Third Round affordable housing obligations. Consequently, this Housing Element and Fair Share Plan has been prepared for adoption by the Planning Board and endorsement by the governing body to be submitted to the Superior Court in fulfillment of the requirements for a final Third Round Judgment of Compliance and Repose covering the period from 1999 to July 1, 2025. The Judgment of Repose will provide the Borough protection from exclusionary zoning (builder's remedy) lawsuits during the time it is in effect.

## COAH's First and Second Round

COAH determined municipal affordable housing obligations,[2] or number of affordable dwellings required, and created the criteria and guidelines for municipalities to address their respective fair share obligations. COAH originally established municipal affordable housing obligations for the six-year period between 1987 and 1993 (<u>N.J.A.C.</u> 5:92-1 *et seq*.), which became known as the First Round. These rules established an existing need where substandard housing was being occupied by low- and moderate-income households (variously known as Present Need or Rehabilitation share) and a future demand to be satisfied with new construction (prospective need). COAH followed guidelines established by the U.S. Dept. of Housing and Urban Development (HUD), which defined affordable housing as dwellings that are affordable to and occupied by households earning 80% (or less) of the regional median household income by household size.

The First Round regulations were superseded by COAH's Second Round regulations, adopted in 1994 (<u>N.J.A.C.</u> 5:93-1.1 *et seq*.). The 1994 regulations recalculated the 1987-1993 affordable housing obligations for each municipality and projected the additional municipal affordable housing need for the next six years (from 1993 to 1999) using 1990 U.S. Census data. The regulations COAH adopted in 1994 thus identified a cumulative fair share obligation for the 12-year period encompassing the First

---

[2] A.k.a. a municipality's "fair share" of affordable housing.



and Second Rounds. When COAH adopted its regulations for the Third Round (see below), the cumulative 12-year First and Second Round obligations became known simply as the Prior Round obligation. This plan will refer to the new construction obligation for the First and Second housing cycles as the Prior Round obligation.

## COAH's Third Round and Related Judicial Activity

On December 20, 2004, COAH's first version of the Third Round rules (<u>N.J.A.C.</u> 5:94-1 and 5:95-1,known as Round 3.1) became effective, some five years after the end of the Second Round in 1999. While the first two rounds covered periods of six years each, the FHA had been amended by the Legislature in 2001 to extend to 10 years the period covered by a Substantive Certification. The Third Round was defined as the time period from 1999 to 2014 but the fair share obligation was intended to be addressed during a delivery period from January 1, 2004, through January 1, 2014. In other words, 15 years of affordable housing activity was to take place in 10 years.

The Third Round rules marked a significant departure from the methods utilized in COAH's Prior Round. Previously, COAH assigned affordable housing obligations as an absolute number allocated to each municipality. The Third Round rules implemented a "growth share" approach that linked the requirement to produce affordable housing to new residential and non-residential development within a municipality. Each municipality was required to project the amount of residential and non-residential growth that would occur during the period from 2004 through 2014. Municipalities were then required to provide the opportunity of one affordable unit for every eight market-rate housing units developed and one affordable unit for every 25 jobs created. Jobs were not counted directly, but rather by using non-residential building square footage as a substitute for employment. In 2005, the Borough prepared and adopted its initial Third Round housing element and fair share plan based on these rules.

On January 25, 2007, the 2004 set of rules was partially invalidated when the New Jersey Appellate Court invalidated key elements of the first version of the Third Round rules, including the growth share approach, <u>In re Adoption of N.J.A.C. 5:94 and 5:95, 390 N.J. Super.</u> 1. The Court ordered COAH to propose and adopt amendments to its rules within six months to address the deficiencies identified by the Court. COAH missed this deadline but did issue revised rules effective on June 2, 2008 (as well as a further rule revision effective on October 20, 2008). COAH retained the growth share approach but implemented several changes intended to create compliance with the 2007 Appellate Court decision. Additionally, the time period covered by the Third Round was expanded to 2018. This meant that 19 years of affordable housing activity (1999-2018) would need to take place during a 10-year delivery period (2008-2018). Again in 2008, the Borough prepared and adopted an amended Third Round plan and petitioned COAH for Substantive Certification.

Just as various parties challenged COAH's initial Third Round regulations, parties challenged COAH's 2008 revised Third Round rules. On October 8, 2010, the Appellate Division issued its decision, <u>In re Adoption of N.J.A.C. 5:96 and 5:97, 416 N.J. Super. 462</u>, in response to the challenges to the second iteration of COAH's Third Round rules. The Appellate Division validated the portions of the rules pertaining to the Rehabilitation share and the Prior Round obligations assigned to each municipality, but invalidated the growth share methodology for calculating Third Round obligations. Instead COAH



was directed to use similar methods to those that were used in the First and Second Rounds. The Court gave COAH five months to change its method for calculating Third Round obligations and to provide revised regulations regarding certain aspects of municipal compliance. Other highlights of the Appellate Court's 2010 decision:

- To be credited, municipally sponsored or 100% affordable housing sites must show site control, site suitability, and a proposed source of funding.

- COAH's rules did not provide sufficient incentive for the private construction of inclusionary developments (market-rate and affordable units). Clearly defined percentages supported by economic data must be provided. The Court noted that a 20% affordable housing set-aside was typical.

- The Court invalidated crediting of Prior Round rental bonuses for developments that were not built within a reasonable timeframe.

- Bonuses for smart-growth and redevelopment activities were upheld; however, the Court invalidated Third Round compliance bonuses.

- The Court upheld its prior ruling on COAH's formula that eliminated the reallocation of the excess present need obligation from urban aid-eligible municipalities to other municipalities in the region. The Court also questioned whether or not urban aid municipalities should be assigned an allocation for future growth.

*Judicial Activity from 2011 to the Present*

COAH sought a stay from the New Jersey Supreme Court of the March 8, 2011, deadline for the agency to issue new Third Round housing rules that the Appellate Division had imposed in its October 2010 decision. The Supreme Court granted COAH's application for a stay and granted petitions and cross-petitions to all of the various challenges to the Appellate Division's 2010 decision. The Supreme Court heard oral argument on the various petitions and cross petitions on November 14, 2012.

The New Jersey Supreme Court decided on the appeal by the executive branch of the Appellate Court's decision of March 8, 2012, that disallowed the dissolution of COAH under Governor Christie's Reorganization Plan No. 001-2011. The Supreme Court upheld the lower court's ruling, finding that the governor did not have unilateral power to reorganize COAH out of existence. The judges found that such an action required the passage of new legislation.

On September 26, 2013, the New Jersey Supreme Court upheld the 2010 Appellate Court decision in In re Adoption of N.J.A.C. 5:96 and 5:97 by New Jersey Council On Affordable Housing, 215 N.J. 578 (2013), and ordered COAH to prepare the necessary rule revisions. Subsequent delays in COAH's rule preparation and ensuing litigation led to the New Jersey Supreme Court, on March 14, 2014, setting forth a schedule for adoption.

Although ordered by the New Jersey Supreme Court to adopt revised new rules on or before October 22, 2014, COAH deadlocked 3-3 at its October 20, 2014, meeting and failed to adopt the draft rules it



had issued on April 30, 2014. In response, FSHC filed with the New Jersey Supreme Court a motion in aid of litigant's rights, and oral argument on that motion was heard on January 6, 2015.

On March 10, 2015, the Supreme Court issued a ruling on the motion in aid of litigant's rights (In re Adoption of N.J.A.C. 5:96 & 5:97, 221 NJ 1, known as Mount Laurel IV). This long-awaited decision provides a new direction for how New Jersey municipalities are to comply with the constitutional requirement to provide their fair share of affordable housing. The Court transferred responsibility to review and approve housing elements and fair share plans from COAH to designated Mount Laurel trial judges in each vicinage. The implication of this was that municipalities could no longer wait for COAH to adopt Third Round rules before preparing new Third Round housing plans, and municipalities must now apply to the Court, instead of COAH, if they wished to be protected from exclusionary zoning lawsuits. These trial judges, with the assistance of a Court-appointed Special Master in each case, were directed to review municipal plans in much the same manner as COAH. Towns whose plans were approved by the Court would receive a Judgment of Compliance and Repose, the judicial equivalent of Substantive Certification.

While the New Jersey Supreme Court's decision set a process in motion for towns to address their Third Round obligation, it did not calculate or prepare a methodology to determine municipal fair share obligations. This responsibility fell, instead, to the individual trial courts. The Supreme Court stated that municipalities should rely on COAH's first and Second Round rules (N.J.A.C. 5:93) and those components of COAH's 2008 regulations that were not specifically invalidated, as well as the Fair Housing Act (N.J.S.A. 52:27D – 301 et seq.), in their preparation of Third Round housing elements and fair share plans. This Housing Element and Fair Share Plan is prepared in response to and in compliance with the March 10, 2015, New Jersey Supreme Court decision.

On January 17, 2017, the New Jersey Supreme Court issued a decision, In Re Declaratory Judgment Actions Filed By Various Municipalities, 227 N.J. 508 (2017), that found that the gap period during which municipalities awaited new COAH regulations, defined as 1999-2015, generated an affordable housing obligation. This obligation requires an expanded definition of the municipal Present Need to include new housing for low- and moderate-income households formed during that period. Accordingly, the municipal affordable housing obligation is composed of the following four parts: Present Need (Rehabilitation), Prior Round (1987-1999, new construction), Gap Period Present Need (1999-2015, new construction), and Prospective Need (2015 to 2025, new construction). The structure of the obligation established through the Borough's Court-approved Settlement Agreement with FSHC complies with the findings of this recent Supreme Court decision, as the Borough's Third Round obligation (1999-2025) includes the 1999-2015 gap period.

*Other Legislative Activity*

In addition to the COAH regulatory process and judicial decisions, the New Jersey Legislature has amended the Fair Housing Act in recent years. On July 17, 2008, Governor Corzine signed P.L.2008, c.46 (referred to as the Roberts Bill, or A500), which amended the Fair Housing Act in a number of ways. Key provisions of the legislation included the following:



- It established a mandatory statewide 2.5% nonresidential development fee instead of requiring nonresidential developers to provide affordable housing;

- It eliminated regional contribution agreements (RCAs), whereby a municipality was permitted to transfer up to 50% of its fair share to a so-called "receiving" municipality, as a compliance technique available to municipalities;

- It added a requirement that 13% of all future affordable housing units and 13% of all similar units funded by the state's Balanced Housing Program and its Affordable Housing Trust Fund must be restricted to very low-income households (earning 30% or less of the regional median household income by household size); and

- It added a requirement that municipalities had to commit to spend development fees within four years of the date of collection after its enactment, which commitment obligation deadline was initially the four-year anniversary of the law (July 17, 2012[3]).

These amendments to the FHA were never promulgated in any valid COAH regulations.

On July 27, 2009, Governor Corzine signed the New Jersey Economic Stimulus Act of 2009,[4] which instituted a moratorium on the collection of nonresidential affordable housing development fees through July 2010. This moratorium was later extended until July 1, 2013 (P.L. 2011, c. 122). Since the moratorium has now expired, municipalities are obligated to collect the fee of 2.5% of the equalized assessed value of a nonresidential development. Municipalities were always permitted to impose and collect the residential development fees approved by COAH following a 1990 New Jersey Supreme Court decision[5].

---

[3] - The four-year period of fund commitment will start when the Court approves the municipal fair share plan and spending plan, per the subsequent Appellate Division decision on trust fund expenditures.
[4] - P.L. 2009, c.90.
[5] - Holmdel Builders Assn. v. Tp. of Holmdel, 121 N.J. 550, 583 A.2d 277 (1990).



# AFFORDABILITY REQUIREMENTS

Affordable housing is defined under New Jersey's Fair Housing Act as a dwelling, either for sale or rent, that is within the financial means of households of low- or moderate-income, as is measured within each housing region. Haddonfield Borough is in COAH's Region 5, which includes Burlington, Camden and Gloucester counties. Moderate-income households are those earning between 50% and 80% of the regional median income. Low-income households are those with annual incomes that are between 30% and 50% of the regional median income. Very low-income households must also be accounted for. These households, which are a subset of low-income households, are defined as households earning 30% or less of the regional median income.

> **Income Categories**
>
> Moderate = 50% to 80% of regional median income
>
> Low = 30% to 50% of regional median income
>
> Very Low = less than 30% of regional median income.

The Uniform Housing Affordability Controls (UHAC) at <u>N.J.A.C.</u> 5:80-26.3(d) and (e) require that the maximum rent for a qualified unit be affordable to households that earn 60% or less of the median income for the region. The average rent must be affordable to households earning no more than 52% of the median income. The maximum sale price for a qualified unit must be affordable to households that earn 70% or less of the median income. The average sale price must be affordable to a household that earns 55% or less of the median income.

In the spring of each year, HUD releases updated regional income limits, which COAH has historically reallocated to its regions. It is from these income limits that the rents and sale prices for affordable units are derived. COAH last published regional income limits in 2014. The Affordable Housing Professionals of New Jersey and FSHC released income limits for 2019, which are shown for Housing Region 5 in Tables 1 through 3. The Borough included a process to update income limits on an annual basis in its agreement with FSHC, which was approved by the Superior Court on July 1, 2019.[6] The sample rents and sale prices below are gross figures and do not account for the specified utility allowance.

---

[6] Future annual income limits will be developed by the Borough or another entity with relevant jurisdiction, such as the Affordable Housing Professionals of New Jersey (AHPNJ), which developed the Borough's Court-approved income limits attached to the FSHC Agreement.



| TABLE 1. 2019 INCOME LIMITS FOR REGION 5 | | | | | |
|---|---|---|---|---|---|
| Household Size Income Levels | 1 Person Household | 2 Person Household | 3 Person Household | 4 Person Household | 5 Person Household |
| Moderate | $50,456 | $57,664 | $64,872 | $72,080 | $77,846 |
| Low | $31,535 | $36,040 | $40,545 | $45,050 | $48,654 |
| Very Low | $18,921 | $21,624 | $24,327 | $27,030 | $29,192 |
| Source: Affordable Housing Professionals of New Jersey Affordable Housing Regional Income Limits, May 2019 | | | | | |

| TABLE 2. ILLUSTRATIVE 2019 AFFORDABLE RENTS FOR REGION 5 | | | |
|---|---|---|---|
| Household Income Levels | 1 Bedroom Unit Rent | 2 Bedroom Unit Rent | 3 Bedroom Unit Rent |
| Moderate (60% of median) | $1,014 | $1,216 | $1,406 |
| Low (50% of median) | $845 | $1,014 | $1,171 |
| Very Low (30% of median) | $507 | $608 | $703 |
| Source: Affordable Housing Professionals of New Jersey Affordable Housing Regional Income Limits, May 2019; Maximum rent increases per the Court-approved 2019 income limits table. | | | |

| TABLE 3. ILLUSTRATIVE 2019 AFFORDABLE SALES PRICES FOR REGION 5 | | | |
|---|---|---|---|
| Household Income Levels | 1 Bedroom Unit Price | 2 Bedroom Unit Price | 3 Bedroom Unit Price |
| Moderate (70% of median) | $136,354 | $168,590 | $198,676 |
| Low (50% of median) | $90,303 | $113,328 | $134,819 |
| Very Low (30% of median) | $44,251 | $58,067 | $70,961 |
| Source: Affordable Housing Professionals of New Jersey Affordable Housing Regional Income Limits, May 2019; Maximum sales increases per the Court-approved 2019 income limits table. | | | |



# HOUSING ELEMENT/FAIR SHARE PLAN REQUIREMENTS

In accordance with the Municipal Land Use Law (<u>N.J.S.A.</u> 40:55D-1, *et seq*.), a municipal Master Plan must include a housing element as the foundation for the municipal zoning ordinance. Pursuant to the FHA, a municipality's housing element must be designed to provide access to affordable housing to meet present and prospective housing needs, with particular attention to low- and moderate-income housing. The housing element must contain at least the following, as per the FHA at <u>N.J.S.A.</u> 52:27D-310:

- An <u>inventory of the municipality's housing stock</u> by age, condition, purchase or rental value, occupancy characteristics, and type, including the number of units affordable to low- and moderate-income households and substandard housing capable of being rehabilitated (refer to the Housing, Demographic, and Employment Analysis section);

- A <u>projection of the municipality's housing stock</u>, including the probable future construction of low- and moderate-income housing, for the next 10 years, taking into account, but not necessarily limited to, construction permits issued, approvals of applications for development, and probable residential development trends (refer to the Consideration of Lands Appropriate for Affordable Housing sub-section);

- An <u>analysis of the municipality's demographic characteristics</u>, including, but not necessarily limited to, household size, income level, and age;

- An <u>analysis of the existing and probable future employment characteristics</u> of the municipality and its residents;

- A <u>determination of the municipality's present and prospective fair share of low- and moderate-income housing and its capacity to accommodate</u> its present and prospective housing needs, including its fair share of low- and moderate-income housing (refer to the Affordable Housing Obligation sub-section); and

- A <u>consideration of the lands most appropriate for construction of low- and moderate-income housing and of the existing structures most appropriate for conversion to</u>, or rehabilitation for, low- and moderate-income housing, including a consideration of lands of developers who have expressed a commitment to provide low- and moderate-income housing (refer to the Consideration of Lands Appropriate for Affordable Housing sub-section).



# HOUSING, DEMOGRAPHIC AND EMPLOYMENT ANALYSIS

## HOUSING CHARACTERISTICS

The 2013-2017 American Community Survey (ACS) [7] indicates that Haddonfield Borough has approximately 4,360 housing units, with 165, or 3.8%, vacant. The Borough's housing stock consists predominantly of single-family detached units (77.7%). The Borough's percentage of single-family detached units is higher than that of the state (50.2%) and Camden County (55.3%). Of all occupied units, approximately 14.8% are renter-occupied, with 85.2% owner-occupied. The percent of renter-occupied units in the Borough is lower than the county (33.2%) and the state (35.9%).  See Table 4, Housing Units by Number of Units in Structure.

| Number of units | Total Units | % Total | Owner Occupied | % Owner Occupied | Rentals | Vacant |
|---|---|---|---|---|---|---|
| 1, detached | 3,387 | 77.7% | 3,207 | 73.6% | 111 | 69 |
| 1, attached | 320 | 7.3% | 272 | 6.2% | 26 | 22 |
| 2 | 169 | 3.9% | 15 | 0.3% | 140 | 14 |
| 3 or 4 | 134 | 3.1% | 10 | 0.2% | 89 | 35 |
| 5 to 9 | 41 | 0.9% | - | 0.0% | 41 | - |
| 10 to 19 | 39 | 0.9% | - | 0.0% | 39 | - |
| 20 or more | 270 | 6.2% | 72 | 1.7% | 173 | 25 |
| Mobile home | - | 0.0% | - | 0.0% | - | - |
| Boat, RV, van, etc. | - | 0.0% | - | 0.0% | - | - |
| **Total** | **4,360** | **100.0%** | **3,576** | **82.0%** | **619** | **165** |

*Table title: TABLE 4. HADDONFIELD HOUSING UNITS BY NUMBER OF UNITS IN STRUCTURE, 2017*

Source: 2013-2017 American Community Survey 5-Year Estimate (B25032, DP04).
*The margins of error for these values exceed the estimated counts. As such, the estimates may be unreliable.

---

[7] The American Community Survey replaced the long-form Census as the source for much of the housing data necessary to complete this section. The Census is a one-time count of the population while this ACS is an estimate taken over five years through sampling. For this reason, data in the ACS is subject to a margin of error.



Table 5, <u>Housing Units by Year Built</u>, illustrates the decades during which the Borough's housing units were built. Approximately 77.6% of Haddonfield Borough's housing stock was built prior to 1960. The median year homes in the Borough were built (1939) makes the Borough's homes older than those of both the county (median year built = 1960) and the state (median year built = 1967).

| TABLE 5. HADONFIELD HOUSING UNITS BY YEAR BUILT, 2017 | | | | |
|---|---|---|---|---|
| Year Built | Total Units | Percent | Owner | Renter |
| 2014 or later | 55* | 1.3% | 20* | 35* |
| 2010 to 2013 | 30 | 0.7% | 30 | - |
| 2000 to 2009 | 124 | 3.0% | 72 | 52 |
| 1990 to 1999 | 81 | 1.9% | 69 | 12* |
| 1980 to 1989 | 109 | 2.6% | 79 | 30 |
| 1970 to 1979 | 263 | 6.3% | 195 | 68 |
| 1960 to 1969 | 276 | 6.6% | 251 | 25 |
| 1950 to 1959 | 769 | 18.3% | 746 | 23 |
| 1940 to 1949 | 296 | 7.1% | 259 | 37 |
| 1939 or earlier | 2,192 | 52.3% | 1,855 | 337 |
| *Totals* | *4,195* | *100.0%* | *3,576* | *619* |
| Median year built: | 1939 | | 1939 | 1939 |
| *Source: 2013-2017 American Community Survey 5-Year Estimate (B25036, B25037)* | | | | |



Table 6, <u>Housing Units by Number of Rooms, 2017</u> and Table 7, <u>Number of Bedrooms per Housing Unit, 2017</u> show that housing in Haddonfield Borough is generally larger than housing across the county and the state, as evidenced by the number of bedrooms and rooms overall per housing unit. Housing units with three or more bedrooms comprise 79.4% of all housing units in Haddonfield Borough, compared to 63.4% and 57.4% in Camden County and New Jersey, respectively.

| Rooms | Number of Units | Percentage of Total |
|---|---|---|
| \multicolumn{3}{c|}{**TABLE 6. HADDONFIELD HOUSING UNITS BY NUMBER OF ROOMS, 2017**} |
| 1 | 49 | 1.1% |
| 2 | 60 | 1.4% |
| 3 | 169 | 3.9% |
| 4 | 257 | 5.9% |
| 5 | 326 | 7.5% |
| 6 | 501 | 11.5% |
| 7 | 626 | 14.4% |
| 8 | 869 | 19.9% |
| 9+ | 1,503 | 34.5% |
| **Total** | **4,360** | **100.0%** |

Source: 2013-2017 American Community Survey 5-Year Estimate (DP04)

**TABLE 7. HADDONFIELD NUMBER OF BEDROOMS PER HOUSING UNIT, 2017**

| Bedrooms | Number of Units | Percent of Total |
|---|---|---|
| Efficiency | 53 | 1.2% |
| 1 | 393 | 9.0% |
| 2 | 453 | 10.4% |
| 3 | 1,482 | 34.0% |
| 4 | 1,260 | 28.9% |
| 5+ | 719 | 16.5% |
| **Total** | **4,360** | **100.0%** |

Source: 2013-2017 American Community Survey 5-Year Estimate (DP04)



Table 8, <u>Housing Values</u>, shows that the median housing value in Haddonfield Borough increased 122.7% between 2000 and 2017, a greater percentage increase than values across Camden County overall (75.6%). Haddonfield Borough had dramatically higher median home values compared to the county in 2000 ($221,100 vs. $110,200) and in 2017 ($492,500 vs. $193,500).

| TABLE 8. HADDONFIELD HOUSING VALUES, 2017 AND 2000 | | | | |
|---|---|---|---|---|
| Housing Unit Value | 2017 Units | Percent | 2000 Units | Percent |
| Less than $10,000 | 50 | 1.4% | - | 0.0% |
| $10,000 to $99,999 | 20 | 0.6% | 89 | 2.5% |
| $100,000 to $249,999 | 288* | 8.1% | 1,907 | 54.0% |
| $250,000 to $299,999 | 249 | 7.0% | 501 | 14.2% |
| $300,000 to $399,999 | 589 | 16.5% | 508 | 14.4% |
| $400,000 to $499,999 | 640 | 17.9% | 256 | 7.3% |
| $500,000 to $749,999 | 1,121 | 31.3% | 190 | 5.4% |
| $750,000 to $999,999 | 396 | 11.1% | 47 | 1.3% |
| $1,000,000 or more | 223 | 6.2% | 31 | 0.9% |
| **Total** | **3,576** | **100.0%** | **3,529** | **100.0%** |
| Median home value | $492,500 | | $221,100 | |

*Sources: 2000 Census (H074, H085), 2013-2017 American Community Survey 5-Year Estimate (DP04, B25075)*
*\*The margins of error for this information exceed the estimated counts, thus the estimates may be unreliable.*



The median rent in Haddonfield Borough in 2017 was $1,274, compared to $1,018 across Camden County. Based on 2019 illustrative rents, seven units are affordable to very low-income renters (based on a one-bedroom unit). Approximately 28 units (4.5% of rental units) may be affordable to low-income renters (exclusive of rental units affordable to very low-income renters) and approximately 91 units (14.7% of rental units) may be affordable to moderate-income renters (exclusive of those units affordable to lower income groups). In total, approximately 126 rental units, or 20.4% of all renter-occupied housing units, may be affordable to low- and moderate-income households. See Table 9, Comparison of Haddonfield Borough and Camden County, Gross Rent.

| TABLE 9. HADDONFIELD BOROUGH AND CAMDEN COUNTY GROSS RENTS, 2017 | | | | |
|---|---|---|---|---|
| | Haddonfield Borough | | Camden County | |
| Gross Rent | Units | Percent | Units | Percent |
| Less than $100 | - | 0.0% | 270 | 0.4% |
| $100 to $149 | - | 0.0% | 376 | 0.6% |
| $150 to $199 | - | 0.0% | 525 | 0.8% |
| $200 to $249 | - | 0.0% | 1,804 | 2.9% |
| $250 to $299 | - | 0.0% | 1,109 | 1.8% |
| $300 to $349 | - | 0.0% | 1,029 | 1.7% |
| $350 to $399 | - | 0.0% | 686 | 1.1% |
| $400 to $449 | - | 0.0% | 645 | 1.0% |
| $450 to $499 | - | 0.0% | 990 | 1.6% |
| $500 to $549 | 7* | 1.1% | 831 | 1.3% |
| $550 to $599 | - | 0.0% | 663 | 1.1% |
| $600 to $649 | - | 0.0% | 1,163 | 1.9% |
| $650 to $699 | 13* | 2.1% | 1,122 | 1.8% |
| $700 to $749 | 15 | 2.4% | 1,904 | 3.1% |
| $750 to $799 | 11 | 1.8% | 2,609 | 4.2% |
| $800 to $899 | 18 | 2.9% | 6,616 | 10.7% |
| $900 to $999 | 62 | 10.0% | 6,665 | 10.7% |
| $1,000 to $1,249 | 165 | 26.7% | 13,048 | 21.0% |
| $1,250 to $1,499 | 103 | 16.6% | 8,428 | 13.6% |
| $1,500 to $1,999 | 121 | 19.5% | 6,634 | 10.7% |
| $2,000 or more | 87* | 14.1% | 2,777 | 4.5% |
| No cash rent | 17 | 2.7% | 2,110 | 3.4% |
| *Total* | *619* | *100.0%* | *62,004* | *100.0%* |
| Median rent | $ 1,274 | | $1,018 | |

*Source: 2013-2017 American Community Survey 5-Year Estimate (DP04, B25063)*
*\*The margin of error for this information exceeds the estimated counts, thus the estimates may be unreliable.*

Housing is generally considered to be affordable if the costs of rents, mortgages, and other essential costs consume 28% or less of an owner-household's income or 30% or less of a renter-household's income. Homeowner rates are lower to account for the additional home maintenance costs associated



with ownership. In Haddonfield Borough, 29.8% of homeowner households and 47.9% of renter households (an average of 32.3% of all households in the Borough) pay 30% or more of their monthly income toward housing costs. See Table 10, Housing Affordability.

| TABLE 10. HADDONFIELD HOUSING AFFORDABILITY, 2017 | | | | | | |
|---|---|---|---|---|---|---|
| Monthly Housing Cost as % of Income | Owner-Occupied | % of Total | Renter | % of Total | All Occupied | % of Total |
| Less than 20 Percent | 1,619 | 45.3% | 184 | 31.8% | 1,803 | 43.4% |
| 20 to 29 Percent | 889 | 24.9% | 117 | 20.2% | 1,006 | 24.2% |
| 30 Percent or More | 1,064 | 29.8% | 277 | 47.9% | 1,341 | 32.3% |
| Total | 3,572 | 100.0% | 578 | 100.0% | 4,150 | 100.0% |
| Source: 2013-2017 American Community Survey 5-Year Estimate (DP04) *Difference in number due to margin of error | | | | | | |

Though the definition of deteriorated housing has evolved over several iterations of the state's affordable housing regulations, the currently accepted criteria for determining whether a housing unit is deficient are as follows: (1) the unit is overcrowded (contains more than 1 person per room) and is more than 50 years old; (2) the unit has inadequate plumbing; or (3) the unit has inadequate kitchen facilities. While Table 11, Indicators of Deficiency, 2013-2017, demonstrates the number of units meeting each criterion, it should not be interpreted as reflecting the Borough's Rehabilitation obligation, as it does not account for double-counting units containing more than one indicator of deficiency. Due to constraints in available data tables, it shows overcrowding in units built prior to 1950 instead of 1965.

| TABLE 11. HADDONFIELD INDICATORS OF HOUSING DEFICIENCY, 2013-2017 | | | |
|---|---|---|---|
| Indicator | Incomplete Plumbing | Incomplete Kitchen | Crowded or Overcrowded, and Built Pre-1950 |
| Number of Units | 16 | 49 | 12* |
| Source: 2013-2017 American Community Survey 5-Year Estimate (DP04, B25050) *The margin of error for this information exceeds the estimated counts, thus the estimates may be unreliable | | | |



## GENERAL POPULATION CHARACTERISTICS

The Borough has seen its population shrink slightly, by 0.7%, since the 2000 census, while New Jersey has grown by 4.5% and Camden County has grown slightly, by 0.9%, in the same period. See Table 12, Population Growth.

| TABLE 12. HADDONFIELD AND CAMDEN COUNTY POPULATION GROWTH | | | | | |
|---|---|---|---|---|---|
| | 1990 | 2000 | % Change | 2010 | % Change |
| Haddonfield Borough | 11,628 | 11,669 | 0.4% | 11,593 | -0.7% |
| Camden County | 502,824 | 508,932 | 1.2% | 513,657 | 0.9% |
| New Jersey | 7,730,188 | 8,414,350 | 8.9% | 8,791,894 | 4.5% |
| Sources: 1990, 2000, and 2010 US Census | | | | | |

Haddonfield Borough has seen its 25- to 34-year-old population shrink by 22.5% and its under-5 population shrink by 7.0%, which suggests a decrease in the number of young families in the Borough. The population in the Borough aged 55 to 64 increased by 39.6%, more than any other age group. This suggests that more empty-nesters, those whose children have recently moved out, are calling Haddonfield home.

While the population of empty-nesters grew substantially, the population over 65 contracted by 6.1%. The median age of Borough residents experienced a modest increase from 41.3 to 42.9. See Table 13, Age Distribution, 2000-2010.

| TABLE 13. HADDONFIELD AGE DISTRIBUTION, 2000 – 2010 | | | | | |
|---|---|---|---|---|---|
| Age Group | 2000 | Percent | 2010 | Percent | Percent Change |
| Under 5 | 743 | 6.4% | 691 | 6.0% | -7.0% |
| 5-14 | 1,848 | 15.9% | 1,918 | 16.5% | 3.8% |
| 15-24 | 1,006 | 8.6% | 1,216 | 10.5% | 20.9% |
| 25-34 | 1,042 | 8.9% | 808 | 7.0% | -22.5% |
| 35-44 | 1,918 | 16.5% | 1,556 | 13.4% | -18.9% |
| 45-54 | 2,048 | 17.6% | 1,986 | 17.1% | -3.0% |
| 55-64 | 1,204 | 10.3% | 1,681 | 14.5% | 39.6% |
| 65-74 | 900 | 7.7% | 840 | 7.2% | -6.7% |
| 75+ | 950 | 8.1% | 897 | 7.7% | -5.6% |
| Total | 11,659 | 100% | 11,593 | 100% | -0.6% |
| Median Age: | 41.3 | | 42.9 | | 3.9% |
| Sources: 2000 and 2010 US Census | | | | | |



**Household Characteristics**

The U.S. Census Bureau defines a household as people who occupy a single room or group of rooms constituting a housing unit, whether or not they are related. As a subset of households, a family is a group of people including a householder and one or more people related by blood, marriage or adoption, all living in the same household. In 2010, there were 4,436 households in the Borough, with an average of 2.61 people per household and an average of 3.17 people per family. Approximately 61.7% of the households are married couples, with or without children. Approximately 28.3% of the Borough's households are non-family households, which include individuals living alone. See Table 14, Household Composition, 2010.

| TABLE 14. HADDONFIELD HOUSEHOLD COMPOSITION, 2010 | | |
|---|---|---|
| Household Type | Number of Households | Percent |
| *Family households* | 3,179 | 71.7% |
| Married-couple family | 2,737 | 61.7% |
| With Children | 1,371 | 30.9% |
| Male householder, no spouse present | 95 | 2.1% |
| With Own Children Under 18 | 42 | 0.9% |
| Female householder, no spouse present | 347 | 7.8% |
| With Own Children Under 18 | 182 | 4.1% |
| *Nonfamily households* | 1,257 | 28.3% |
| Householder living alone | 1,103 | 24.9% |
| ***Total Households*** | **4,436** | **100%** |
| *Source: 2010 US Census* | | |



## INCOME CHARACTERISTICS

Households and families in Haddonfield Borough have on average much higher incomes than in Camden County as a whole. Median income in 2017 in Haddonfield Borough was $138,920 for households and $174,375 for families. Comparable figures for the county were $65,037 for households and $82,375 for families. Table 15, Household Income by Income Brackets, 2017, illustrates this disparity in more detail by noting the number of households in each of the income categories. The Borough's poverty rates for individuals and families (2.9% and 2.2%, respectively) are much lower than the county's individual and family poverty rates (13.1% and 10.1%, respectively). See Table 16, Individual and Family Poverty Rates, 2017, for the comparison.

| TABLE 15. HADDONFIELD HOUSEHOLD INCOME BY INCOME BRACKET, 2017 | | |
|---|---|---|
| | Households | Percent |
| Less than $10,000 | 83 | 2.0% |
| $10,000-$14,999 | 18 | 0.4% |
| $15,000-$24,999 | 155 | 3.7% |
| $25,000-$34,999 | 205 | 4.9% |
| $35,000-$49,000 | 227 | 5.4% |
| $50,000-$74,999 | 466 | 11.1% |
| $75,000-$99,999 | 401 | 9.6% |
| $100,000-$149,999 | 721 | 17.2% |
| $150,000-$199,999 | 506 | 12.1% |
| $200,000 + | 1,413 | 33.7% |
| *Total* | *4,195* | *100%* |
| Median Income: | **$138,920** | |
| *Source: 20013-2017 American Community Survey 5-Year Estimate (DP03)* | | |

| TABLE 16. HADDONFIELD INDIVIDUAL AND FAMILY POVERTY RATES, 2017 | | |
|---|---|---|
| Location | Individuals | Families |
| Haddonfield Borough | 2.9% | 2.2% |
| Camden County | 13.1% | 10.1% |
| New Jersey | 10.7% | 7.9% |
| *Source: 2013-2017 American Community Survey 5-Year Estimate (DP03)* | | |



**EMPLOYMENT CHARACTERISTICS**

Table 17, <u>Distribution of Employment by Industry, Haddonfield Borough Residents, 2017</u>, shows the distribution of employment by industry for employed Haddonfield Borough residents. The four industries that capture the largest segments of the population are the education, health and social services industry at 31.9%; professional, scientific, management, administrative and waste management services industry at 18.1%; financing, insurance, real estate, renting, and leasing industry at 14.4%; and manufacturing industry at 7.0%.

| TABLE 17. DISTRIBUTION OF EMPLOYMENT BY INDUSTRY, HADDONFIELD BOROUGH RESIDENTS, 2017 | | |
|---|---|---|
| **Sector Jobs** | **Number** | **Percent** |
| **Agriculture, Forestry, Fishing and Hunting, and Mining** | - | 0.0% |
| **Construction** | 161 | 2.9% |
| **Manufacturing** | 383 | 7.0% |
| **Wholesale Trade** | 147 | 2.7% |
| **Retail Trade** | 344 | 6.3% |
| **Transportation, Warehousing, and Utilities** | 71 | 1.3% |
| **Information** | 202 | 3.7% |
| **Financing, Insurance, Real Estate, Renting, and Leasing** | 785 | 14.4% |
| **Professional, Scientific, Management, Administrative, and Waste Management Services** | 991 | 18.1% |
| **Educational, Health and Social Services** | 1,740 | 31.9% |
| **Arts, Entertainment, Recreation, Accommodation and Food Services** | 330 | 6.0% |
| **Other** | 130 | 2.4% |
| **Public Administration** | 178 | 3.3% |
| **Total** | **5,462** | **100.0%** |
| *Source: 2013-2017 American Community Survey 5-Year Estimate (DP03)* | | |



Table 18, <u>Employment by Occupation, Haddonfield Borough, 2017</u>, identifies the occupations of employed residents. While Haddonfield Borough residents work in a variety of industries, 72.9% of employed residents work in management, professional, and related occupations, while sales and office occupations employ 16.5% of residents.

| TABLE 18. EMPLOYMENT BY OCCUPATION, HADDONFIELD BOROUGH, 2017 | | |
|---|---|---|
| Sector Jobs | Number | Percent |
| Management, Business, Science, Arts | 3,981 | 72.9% |
| Service | 361 | 6.6% |
| Sales and Office | 900 | 16.5% |
| Natural Resources, Construction, Maintenance | 146 | 2.7% |
| Production, Transportation, Material Moving | 74 | 1.4% |
| Total | 5,462 | 100.0% |
| Source: 2013-2017 American Community Survey 5-Year Estimate (DP03) | | |

Since 2010, the size of the Haddonfield Borough labor force has fluctuated while unemployment has fallen. The Borough's unemployment rate fell from 5.6% in 2010 to 2.5% in 2018. In 2017, the labor force in Haddonfield Borough comprised 5,651 residents; the 2017 ACS indicates that in 2017 there were 8,584 residents ages 16 and older, indicating that approximately 2,933 working-age residents have not entered the labor force or are not looking for employment. Table 19, <u>Change in Employment Since 2010</u>, illustrates these trends.

| TABLE 19: HADDONFIELD RESIDENTS CHANGE IN EMPLOYMENT SINCE 2010 | | | | |
|---|---|---|---|---|
| Year | Labor Force | Employment | Unemployment | Unemployment Rate (%) |
| 2010 | 5,400 | 5,098 | 302 | 5.6% |
| 2011 | 5,508 | 5,237 | 271 | 4.9% |
| 2012 | 5,732 | 5,403 | 329 | 5.7% |
| 2015 | 5,670 | 5,375 | 295 | 5.2% |
| 2014 | 5,536 | 5,317 | 219 | 4.0% |
| 2015 | 5,612 | 5,405 | 207 | 3.7% |
| 2016 | 5,626 | 5,470 | 156 | 2.8% |
| 2017 | 5,651 | 5,504 | 147 | 2.6% |
| 2018 | 5,598 | 5,458 | 140 | 2.5% |
| Source: New Jersey Department of Labor and Workforce Development | | | | |



The New Jersey Department of Labor tracks covered employment throughout the state. Covered employment data includes only those jobs for which unemployment compensation is paid. By definition, it does not cover the self-employed, unpaid family workers, most part-time or temporary employees, and certain agricultural and in-home domestic workers. See Table 20, Covered Employment Estimates, for the number of jobs in Haddonfield Borough and in Camden County.

| TABLE 20. HADDONFIELD COVERED EMPLOYMENT ESTIMATES | | |
|---|---|---|
| Year | Haddonfield Borough | Camden County |
| 2017 | 4,837 | 203,757 |

Source: New Jersey Department of Labor, Division of Planning and Research, Office of Demographic and Economic Analysis, New Jersey Covered Employment Trends.

Professional/technical and health/social trades were the largest sectors of in-town private-sector occupations, with 976 and 675 jobs, respectively. Amongst the public sector, local government employment captured the largest number of jobs for an average of 447. Although limited data was available, Table 21, Covered Employment by Sector, 2017 provides additional employment information.

| TABLE 21. HADDONFIELD COVERED EMPLOYMENT BY SECTOR, 2017 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Employment** | | | | | **Wages** | |
| | March | June | Sept. | Dec. | Average | Annual | Weekly |
| Private Sector Municipality Total | 4,040 | 4,193 | 4,034 | 4,084 | 4,058 | $58,856 | $1,132 |
| Construction | 102 | 81 | 77 | 92 | 87 | $58,421 | $1,123 |
| Manufacturing | 44 | 40 | 36 | 39 | 38 | $29,273 | $563 |
| Wholesale Trade | 43 | 42 | 41 | 40 | 42 | $86,025 | $1,654 |
| Retail Trade | 296 | 280 | 258 | 258 | 274 | $23,361 | $449 |
| Finance/Insurance | 205 | 202 | 202 | 210 | 205 | $73,649 | $1,416 |
| Real Estate | 40 | 40 | 40 | 39 | 40 | $87,398 | $1,681 |
| Professional/Technical | 976 | 1,014 | 1,009 | 998 | 993 | $105,115 | $2,021 |
| Health/Social | 675 | 683 | 608 | 630 | 644 | $42,576 | $819 |
| Arts/Entertainment | 43 | 79 | 51 | 41 | 53 | $45,828 | $881 |
| Accommodations/Food | 355 | 368 | 379 | 414 | 370 | $16,599 | $319 |
| Other Services | 259 | 264 | 263 | 274 | 262 | $31,620 | $608 |
| Unclassified | 34 | 38 | 50 | 38 | 36 | $26,932 | $518 |
| Federal Government Municipality Total | 4 | 5 | 5 | 5 | 5 | $55,498 | $1,067 |
| Local Government Municipality Total | 499 | 516 | 464 | 500 | 447 | $58,508 | $1,125 |
| Local Government Education Total | 375 | 389 | 354 | 374 | 327 | $65,643 | $1,262 |
| *Total Covered Employment* | *4,918* | *5,103* | *4,857* | *4,963* | *4,837* | *$59,626* | *$1,147* |

Source: New Jersey Department of Labor, Division of Planning and Research, Office of Demographic and Economic Analysis, New Jersey Covered Employment Trends.



As Table 22, <u>Journey to Work, 2013-2017</u> below shows, workers from Haddonfield Borough are approximately as likely to drive to work (74.1%) as are workers across the county or state (76.8% and 71.5%, respectively) and less likely to carpool (4.3% vs. 9.2% and 8.0%). Borough workers are more likely to take mass transit (11.1%) than workers in the county (7.4%) and approximately as likely as those in the state (11.5%). Among employed residents, 6.9% of workers work from home, and 2.2% walk to work.

| TABLE 22. HADDONFIELD AND CAMDEN COUNTY JOURNEY TO WORK, 2013-2017 | | | |
|---|---|---|---|
| **Mode** | **Haddonfield Borough** | **Camden County** | **New Jersey** |
| **Drive Alone** | 74.1% | 76.8% | 71.5% |
| **Carpool** | 4.3% | 9.2% | 8.0% |
| **Transit** | 11.1% | 7.4% | 11.5% |
| **Walk** | 2.2% | 2.0% | 3.0% |
| **Work at Home** | 6.9% | 3.4% | 4.2% |
| **Other** | 1.3% | 1.3% | 1.8% |
| *Source: 2013-2017 American Community Survey: Selected Economic Characteristics (DP03)* | | | |

About 71% of the Borough's households own two or more personal vehicles, and 3.5% of households in Haddonfield Borough own no vehicle, perhaps an indicator of lower-income households, or perhaps an indicator of good transit options. See Table 23, <u>Available Vehicles by Household, 2013-2017</u>.

| TABLE 23. HADDONFIELD AVAILABLE VEHICLES BY HOUSEHOLD, 2013-2017 | | |
|---|---|---|
| **Vehicles** | **Count** | **Percent** |
| **None** | 146 | 3.5% |
| **One** | 1,065 | 25.4% |
| **Two** | 2,179 | 51.9% |
| **Three +** | 805 | 19.2% |
| ***Total*** | ***4,195*** | **100.0%** |
| *Source: 2013-2017 American Community Survey: Selected Housing Characteristics (DP04)* | | |



As shown in Table 24, <u>Top 10 Commuting Destinations for Haddonfield Borough Residents</u> below, Haddonfield Borough is the most common place of employment for employed residents of Haddonfield Borough, with 367 (7.9%) workers remaining in their home town for their primary jobs. Philadelphia is the second most common destination, with 251 (5.4%) residents traveling there for their primary jobs. The remaining eight of the top 10 municipalities employ 12.1% of the Borough's employed residents, and 74.6% of Borough residents work elsewhere.

| TABLE 24. TOP 10 COMMUTING DESTINATIONS FOR HADDONFIELD RESIDENTS, 2015 | | |
|---|---|---|
| Destination | Jobs | Percent |
| Haddonfield | 367 | 7.9% |
| Philadelphia | 251 | 5.4% |
| Camden | 92 | 2.0% |
| Collingswood | 75 | 1.6% |
| Haddon Heights | 75 | 1.6% |
| Ashland | 73 | 1.6% |
| Audubon | 67 | 1.4% |
| Moorestown-Lenola | 62 | 1.3% |
| Springdale | 60 | 1.3% |
| Cherry Hill Mall | 58 | 1.2% |
| All Other Locations | 3,462 | 74.6% |
| *Source: US Census and Center for Economic Studies. Longitudinal Employer-Household Dynamics, 2015* | | |

## POPULATION PROJECTIONS

The Delaware Valley Regional Planning Commission (DVRPC), the Metropolitan Planning Organization (MPO) that addresses Haddonfield Borough as well as the remainder of Camden County, published population and employment projections for the year 2040. The DVRPC projects that the Borough's population and employment will both increase by 1.4% from 2010 to 2040. As Table 25, <u>Population, Household, and Employment Projections, 2010 to 2040</u> shows, the Borough's projected population and employment growth rates are lower than those of the county.

| TABLE 25. POPULATION AND EMPLOYMENT PROJECTIONS, 2010 to 2040 | | | | | | |
|---|---|---|---|---|---|---|
| | Haddonfield Borough | | | Camden County | | |
| | 2010 | 2040 | % Change | 2010 | 2040 | % Change |
| Population | 11,593 | 11,753 | 1.4% | 513,657 | 528,303 | 2.9% |
| Employment | 6,686 | 6,778 | 1.4% | 263,406 | 274,124 | 2.1% |
| *Sources: DVRPC Regional, County, and Municipal Population Forecasts, 2010-2040. ADR 18-A, March 2013; DVRPC Regional, County, and Municipal Employment Forecasts, 2010-2040. ADR 19, January 2013* | | | | | | |



The Fair Housing Act requires that housing plans include a 10-year projection of new housing units based on the number of building permits, development applications approved, and probable developments, as well as other indicators deemed appropriate (N.J.S.A. 52:27D-310.b). Building permit issuance for residential new construction in Haddonfield Borough during the years 2000 through 2018 averaged approximately seven units per year. Given the lack of buildable land in the Borough, many of these were for replacement of houses torn down and rebuilt. When demolition permits are included in the calculations, the average number of net new units constructed drops to less than one per year.

If this rate were to remain constant, Haddonfield Borough would see approximately five net new dwelling units by July of 2025, and eight net new dwellings by July 2029. However, during the Third Round, the Borough anticipates residential development activity planned for the Bancroft site as well as, on a smaller scale, at the Borough-owned site off of Snowden Avenue, behind Borough Hall. In addition, the Borough will adopt Third Round overlay zoning to address its Unmet Need, which may also trigger some new residential development. Factors such as economic cycles, environmental constraints, and physical obstacles to development may result in a lower or higher actual number. Table 26, Housing Projections, provides an estimate of anticipated residential growth based on the extrapolation of prior housing activity and anticipated redevelopment.



| TABLE 26. HADDONFIELD HOUSING PROJECTIONS TO 2029 | | | |
|---|---|---|---|
| Year | Demolition Permits Issued | Building Permits Issued | Net New Housing Units |
| 2000 | 4 | 7 | 3 |
| 2001 | 0 | 10 | 10 |
| 2002 | 0 | 3 | 3 |
| 2003 | 1 | 18 | 17 |
| 2004 | 0 | 15 | 15 |
| 2005 | 7 | 32 | 25 |
| 2006 | 8 | 14 | 6 |
| 2007 | 7 | 7 | 0 |
| 2008 | 5 | 6 | 1 |
| 2009 | 3 | 5 | 2 |
| 2010 | 3 | 4 | 1 |
| 2011 | 11 | 7 | -4 |
| 2012 | 7 | 8 | 1 |
| 2013 | 10 | 7 | -3 |
| 2014 | 12 | 13 | 1 |
| 2015 | 9 | 11 | 2 |
| 2016 | 13 | 13 | 0 |
| 2017 | 14 | 15 | 1 |
| 2018 | 11 | 17 | 6 |
| Total 2000 to 2018 | 113 | 127 | 14 |
| 19-year average | 5.95 round up to 6 | 6.68 round up to 7 | 0.74 |
| 10-year projection of background growth (July 2019 to July 2029) | 59.5 round up to 60 | 66.8 round up to 67 | 7.4 round up to 8 |
| 10-year projection – growth and redevelopment | | +/-100 (Bancroft) + 28 (Snowden Avenue) + units from overlay zones | 136 |
| *Source: NJDCA Construction Reporter, Building Permits, Yearly Summary Data, Housing Units Authorized by Building Permit for New Construction.* | | | |



# HADDONFIELD BOROUGH AFFORDABLE HOUSING HISTORY

On June 26, 1989, Haddonfield received First Round Substantive Certification from COAH for a plan that addressed a Rehabilitation share of 13 (based on the 1980 census) through the Camden County Home Improvement Program, and a new construction component of 271 which was reduced to a realistic development potential (RDP) of zero (0) after a COAH-approved vacant land adjustment.

In 1994, COAH adopted Second Round rules (N.J.A.C. 5:93) for the years 1987 to 1999, and assigned the Borough a new construction obligation of 192 units. Again COAH recognized the Borough's limited vacant land and reaffirmed the Borough's RDP of zero (0), resulting in a 192-unit Prior Round Unmet Need. COAH also assigned the Borough a Rehabilitation share of 63 units, based on the 1990 census. On July 7, 1999, the Borough received Second Round Substantive Certification for a plan addressing its Rehabilitation share of 63 units as its new construction component of 192 units was reduced to zero (0) by COAH's continued approval of the prior vacant land adjustment.

To address Unmet Need in its Second Round, Haddonfield supported the affordable housing constructed as part of Tarditi Commons (formerly known as Lincoln Commons), a 48-unit senior affordable housing complex completed in 2002 and occupied in 2003, through both the adoption of a Resolution of Need on January 12, 1999 and the approval of a payment in-lieu of taxes (PILOT) on September 11, 2001. In addition, the Borough continued to utilize the Camden County Home Improvement Program to address its Second Round Rehabilitation obligation.

In 2004, there was new interest in the redevelopment of several previously developed commercial properties in and around the Borough's Central Business District. This redevelopment interest was not anticipated at the time COAH granted Second Round Substantive Certification to the Borough in 1999. In fact, the COAH staff report that preceded the grant of Substantive Certification specifically noted that "a site visit indicated no immediate area that may redevelop within six years." FSHC filed a motion with COAH to require the Borough to amend its housing element and fair share plan to address these "changed circumstances."  FSHC also filed a lawsuit against the Borough and various redevelopers. Subsequently, COAH ordered Haddonfield to amend its housing plan "so as to capture affordable housing opportunities to help meet the [192-unit] Unmet Need as redevelopment occurs." On November 22, 2004, COAH issued an opinion restraining development approvals until COAH acted on Haddonfield's amended Second Round plan.  In the ensuing years, the Borough amended its Second Round certified plan to address COAH's concerns and subsequently petitioned with a Third Round plan in December 2005. COAH had not acted on the Borough's 2005 Third Round plan prior to the Appellate Court's January 2007 decision invalidating COAH's first "growth share" regulations. Prior to this date, COAH had only certified approximately six municipalities statewide.

On December 9, 2008, Haddonfield adopted an amended Third Round housing element and fair share plan addressing the COAH-revised 37-unit RDP and its 155-unit Unmet Need, as well as a 29-unit Rehabilitation obligation (based on the 2000 census) and an anticipated 20-unit growth share obligation. On December 31, 2008, the Borough petitioned COAH for Substantive Certification for the plan, pursuant to N.J.A.C. 5:96 and 5:97.



To address its 29-unit Rehabilitation share, the Borough's 2008 amended Third Round plan relied upon its continued participation in the Camden County Home Improvement Program. For the Prior Round fair share obligation (First and Second Rounds combined), the 2008 plan addressed the COAH-required 37-unit RDP (emanating from the fully-developed Bancroft School site) through completed and proposed Third Round affordable housing credits, reductions, and rental bonuses, and addressed its 155-unit Unmet Need through COAH-certified compliance mechanisms. To address a possible Third Round growth share obligation, the Borough relied upon built affordable units and a proposed municipally sponsored site on Snowden Avenue. The Borough was granted Third Round Substantive Certification by COAH on March 10, 2010.

The Borough's 2008 Third Round certified plan addressed its 37-unit RDP through existing family affordable sales units, proposed family affordable units generated from the Bancroft site redevelopment, existing senior affordable rental units, group home credits, proposed family affordable rentals on a municipally owned site, and rental bonuses. The plan addressed the Borough's 155-unit Unmet Need through multiple compliance mechanisms, including excess existing senior affordable rental units, surplus RDP affordable units, a 2005 COAH-approved development fee ordinance, and a 2006 COAH-approved Borough-wide overlay zone (Ordinance 2006-02) that requires a 20% affordable housing set-aside on residential developments of five units or more with a specific focus on the 2008 Borough-adopted Downtown Zoning Districts.

On June 22, 2010, Haddonfield Borough adopted a minor revision (Ordinance 2010-07) to its 2009 fair share ordinance to include an enforcement section, and amended its 2006 Borough-wide affordable housing overlay zoning to increase from 20% to 25% the required affordable housing set-aside on the Port Authority Transit Corporation (PATCO) site and to require that a certain percentage of development on that site be residential. Haddonfield Borough is required to maintain all of the COAH-certified compliance mechanisms towards Unmet Need until such time as the entire Unmet Need is addressed.

After the Appellate Division's October 8, 2010 decision invalidating the second iteration of COAH's Third Round rules, the Borough's 2008 Third Round certified plan remained under COAH's jurisdiction by virtue of the Borough's Third Round Substantive Certification and a COAH resolution adopted on December 8, 2010, in response to a series of motions filed. In pertinent part, the COAH Board determined that:

> "WHEREAS, in light of the Appellate Division decision, COAH is refraining from further review of the Third Round prospective growth share obligations of any municipal Third Round plans because there are no standards to guide COAH due to the Court's invalidation of the growth share portion of the Third Round regulations; and ...

> "BE IT FURTHER RESOLVED that going forward municipalities are not required to seek a stay from COAH proceedings concerning Third Round prospective growth share obligation; and ...



> *"BE IT FURTHER RESOLVED that municipalities that have received Third Round Substantive Certification or have petitioned COAH pursuant to N.J.A.C. 5:96 and 5:97 continue to be under the jurisdiction of COAH."*

To comply with the State Supreme Court's March 10, 2015 decision regarding municipalities deemed to be certified, the Borough filed a Motion for a Declaratory Judgment with the Superior Court on July 6, 2015. On August 25, 2015, the Superior Court issued a Case Management Order granting the Borough initial immunity from builder's-remedy lawsuits and requiring the Borough to submit a full Third Round plan by January 11, 2016. The Court requirement for a full plan was subsequently amended to permit the Borough to submit a plan summary, which the Borough timely filed.[8] Since then, the Borough's immunity from exclusionary zoning lawsuits has been extended numerous times and remains in place through October 22, 2019.

On September 1, 2016, Judge Famular appointed Frank Banisch, PP AICP, as Special Master to assist the Court with plan review and mediation in the hopes the Borough would settle with FSHC on its three-part fair share obligation.

Through numerous mediation sessions during 2017, 2018, and 2019 among the Borough, Mr. Banisch, and FSHC, on February 26, 2019, a final Settlement Agreement between the Borough and FSHC was reached, and fully executed by the Borough on April 2, 2019 (see Appendix B). The Settlement Agreement established the Borough's three-part fair share obligation, which included a Rehabilitation share of 11 units, a Prior Round obligation of 192 units, and a Third Round obligation of 320 units. The combined Prior Round and Third Round obligations were reduced to an RDP of 83 units and an Unmet Need of 429 units (192+320=512; 512-83=429). The Settlement Agreement also set forth the Borough's preliminary RDP compliance mechanisms and Unmet Need mechanisms. The Borough's Settlement Agreement was approved by Judge Famular at a fairness hearing on May 8, 2019, as reflected in an order dated July 1, 2019 (Appendix B). The Court's approval established the Borough's fair share of 11 Rehabilitation units and 192 Prior Round Units and 320 Third Round units, reduced to an RDP of 83 units and an Unmet Need of 429 units, and provided preliminary approval of the Borough's Rehabilitation, RDP, and Unmet Need compliance measures. This 2019 Amended Third Round Plan includes updated information to address the terms of the Court-approved Settlement Agreement.

## Availability of Existing and Planned Infrastructure

Haddonfield Borough started receiving sewer and water service entirely from New Jersey American Water in the spring of 2015. According to New Jersey American Water, the Borough of Haddonfield has adequate water and sewer capacity to satisfy its RDP of 83 units and its Unmet Need, and any limited nonresidential redevelopment that may occur. According to Camden County's Municipal Utilities Authority, the County's sewage treatment system has adequate capacity to accommodate any additional flow generated by new development. (See Appendix C for documentation of capacity to serve.)

---

[8] Virtually all Mount Laurel trial judges across the state, including in Camden County, elected to have municipalities file plan summaries instead of full housing plans prior to a Court-determined Third Round fair share obligation.



**Anticipated Land Use Patterns**

Anticipated land use patterns in the Borough continue to range from single-family residential infill units in existing residential neighborhoods to upper-story apartments with an affordable-housing set-aside in the downtown. The Borough has adopted a redevelopment plan for the Bancroft School site that provides for an inclusionary residential development. The Borough has significantly expanded its overlay zoning sites to include not only the PATCO train station site, the Acme grocery store site, and the PNC Bank site, but also other sites that may redevelop, including several groups of lots along both sides of North Haddon Avenue north of the PATCO site, as well as a small group of lots in the Grove Street commercial district. In addition, Haddonfield has adopted and will amend Borough-wide zoning mechanisms to capture affordable housing opportunities. While the Borough does not project significant nonresidential growth or redevelopment, it will continue to preserve its commercial zoning districts, highlighted by its Downtown Zoning Code, in accordance with its economic development policies.

**Constraints on Development**

The Borough is located entirely in the Metropolitan Planning Area, PA 1, and not within the jurisdiction of the Meadowlands, Highlands, Pinelands or CAFRA. There are no known federal regulations that would hinder the development projected as part of the Borough's amended 2019 Third Round Housing Element and Fair Share Plan.

Haddonfield has no vacant developable land; new development will require the redevelopment of existing structures. This may be complicated by the land ownership patterns in the Borough: The municipality is densely settled with small lots, so new residential and commercial development will require developers to assemble a number of small parcels from different owners, which may be costly and time-consuming.

The Borough's waterways are not designated as Category 1 waterways and associated buffers. While the New Jersey Department of Environmental Protection (NJDEP) wetlands layer shows areas in Haddonfield that are affected by wetlands, the areas in question do not limit the proposed redevelopment to address the RDP and the possibility of redevelopment of significant overlay zones to assist in addressing the Borough's Unmet Need. Although according to NJDEP mapping the Borough has some contaminated sites such as gas stations that require remediation, none of these sites affects the Borough's affordable housing compliance efforts.

**Consideration of Lands Appropriate for Affordable Housing**

As part of this housing element, the Borough has considered land that is appropriate for the construction of low- and moderate-income housing in existing residential neighborhoods (infill sites) and as part of future redevelopment efforts for inclusion in the plan to address Prior Round RDP or potential future redevelopment towards Unmet Need. The housing element describes the Borough's continued reliance on a municipally owned site for 100% affordable family rental housing and the on-site affordable housing production on the projected residential redevelopment of the Bancroft site to address the 83-unit RDP. The Borough's analyses are discussed in the sections entitled Satisfaction of the Prior Round Obligation and Satisfaction of the Third Round Obligation.



# HADDONFIELD BOROUGH'S AFFORDABLE HOUSING OBLIGATION

## Rehabilitation Obligation

The Rehabilitation obligation can be defined as an estimate of the number of deteriorated housing units existing in Haddonfield Borough that are occupied by low- and moderate-income households. The Court-approved agreement with FSHC established the Borough's Third Round Rehabilitation obligation as 11 units. The basis for this obligation is FSHC's May 2016 calculations, which used the most recent decennial census year, 2010, as the point in time in determining the number of deteriorated housing units.

## Prior Round Obligation

The Prior Round obligation can be defined as the cumulative 1987 through 1999 new construction affordable housing obligation. This time period corresponds to the First and Second Rounds of affordable housing. The Court approved usage of COAH's Prior Round obligation of 192 units per N.J.A.C. 5:93 as reflected in the Borough's agreement with FSHC.

## Third Round Obligation

The estimated demand for affordable housing includes the gap portion of the Third Round that has already passed by (1999-2015), as well as a projection 10 years into the future starting in July 2015 (2015-2025). The 10-year period is derived from the Fair Housing Act that, when amended in 2001, set the projection for this length of time (N.J.S.A. 52:27D-310).

As established by the Borough's Court-approved 2019 FSHC Settlement Agreement, Haddonfield Borough's Third Round obligation (1999-2025) was agreed upon at 320 units.[9]

---

[9] The 320-unit Third Round obligation represented a 43% reduction of Dr. David Kinsey's May 2016/April 2017 calculation of 565 units. As a term of the Borough's agreement with FSHC, if the ultimate Third Round obligation for the Borough is determined to be reduced by at least 20% by a court of competent jurisdiction, the Borough can petition the Superior Court to reduce its Third Round obligation. Notwithstanding any potential reduction, the Borough has committed to keeping in place all the compliance mechanisms reflected in the 2019 agreement.



# HADDONFIELD BOROUGH'S AFFORDABLE HOUSING PLAN

## Satisfaction of the Rehabilitation Obligation

Haddonfield Borough's Rehabilitation obligation is 11 units. The Borough proposes to address this obligation through continued participation in the Camden County Home Improvement Program. If the need arises, the Borough will establish a rental rehabilitation program to supplement the county's housing rehabilitation program.

### Camden County Home Improvement Program

COAH's Second Round rules require that the Rehabilitation obligation be satisfied by bringing deficient units up to building code standard. Per COAH's Third Round rules and as adhered to by Superior Court judges, a minimum average of $10,000 is to be expended for actual hard costs of bringing units up to code and repairing or replacing at least one major system per unit. The Borough of Haddonfield has an ongoing contract with the Camden County Home Improvement Program, an experienced administrator of an affordable housing rehabilitation program, to satisfy its 11-unit rehabilitation obligation. Because the county's rehabilitation program is open only to owner-occupied housing, the Borough will institute a local program open to rental units if necessary, and provide any funding necessary from the affordable housing trust fund to supplement the cost to satisfy its Rehabilitation obligation. (See Appendix D for the Borough's Interlocal Services Agreement with Camden County and the county's rehabilitation manual.)

Haddonfield's rehabilitation program will adhere to the regulations in N.J.A.C. 5:93-5.2. Specifically, all units designated for rehabilitation will comply with the definition of a substandard housing unit in N.J.A.C. 5:93-1.3, which describes such a unit as "a housing unit with health and safety code violations that require the repair or replacement of a major system." Major systems include weatherization, roofing, plumbing, heating, electricity, sanitary plumbing, lead paint abatement and/or load-bearing structural systems. All rehabilitated units will meet the applicable construction code. Additionally, all rehabilitated units will be occupied by low- or moderate-income households and upon completion of the rehabilitation, at least 10-year affordability controls will be placed on the property in the form of a lien or deed restriction.

Should a shortfall in funding occur, the governing body of Haddonfield Borough will adopt a Resolution of Intent to Bond that commits to fund or issue debt for any shortfall in its affordable housing program.

The Borough will provide annual marketing of the county's rehabilitation program through Borough mailings and will have information on the county program available on the Borough's website.

Lastly, the Borough will oversee the completion of the rehabilitation program monitoring reports and will submit them in a timely manner in accordance with N.J.A.C. 5:93-5.2 and pursuant to the terms of the Borough's agreement with FSHC.



## Satisfaction of the Combined Prior Round and Third Round (1987-2025) RDP

Pursuant to its settlement with FSHC, the Borough's Prior Round and Third Round (1987-2025) combined obligation of 512 units has been adjusted to an RDP of 83 units and Unmet Need of 429 units. In addition to satisfying the RDP and proposing mechanisms to assist in addressing Unmet Need, the Borough must also adhere to a minimum rental obligation, a minimum family rental obligation, a maximum number of age-restricted units, a minimum very low-income requirement, and a minimum number of family very low-income units. As demonstrated in the summary tables at the end of this section, the Borough has addressed these requirements.

**RDP Maximum Age-Restricted = 20 units**

0.25 (RDP obligation)

=.25 (83) round down = 20

**RDP Minimum Rental Obligation = 21 units**

0.25 (RDP obligation)

=.25 (83) round up = 21

**RDP Minimum Family units = 31 units**

0.50 (RDP obligation - bonuses)

= .50 (83-21) = 31

**RDP Family Rental Obligation = 11 units**

0.5 (RDP rental obligation)

=.5 (21) round up = 11

**RDP Minimum Very Low-Income = 5 units**

0.13 (units approved or created after 7/17/2008)

= .13 (38 from proposed developments)

= 4.94 round up = 5

**RDP Minimum Very Low-Income Family = 3 units**

.50 (minimum very low-income units)

.5 (5) round up = 3

**Rental Bonus Credits**

- A rental unit available to the general public receives one rental bonus;

- An age-restricted unit receives a 0.33 rental bonus, but no more than 50% of the rental obligation shall receive a bonus for age-restricted units; and

- No rental bonus is granted in excess of the rental obligation.



Pursuant to its settlement with FSHC, the Borough's Prior Round and Third Round (1987-2025) combined obligation of 512 units has been adjusted to an RDP of 83 units and Unmet Need of 429 units. COAH permits new construction credits/reductions and rental bonuses to be used to address the 83-unit combined RDP obligation.

As summarized in Table 27, <u>Summary of Combined Prior and Third Round RDP Compliance Mechanisms</u>, the Borough has addressed its 83-unit combined RDP with completed affordable family for-sale units, completed affordable senior rental units, and proposed affordable family rental units in both a redevelopment project and a municipally sponsored 100% affordable project.

| Compliance Mechanism | Type | Total Credits | Bonuses | Total |
|---|---|---|---|---|
| King's Court (B 34, L 10) | Affordable family for-sale | 4 | - | 4 |
| Tarditi Commons (B 41, L 15) | Affordable senior rental | 20 | - | 20 |
| Bancroft Redevelopment (B 14, L 2) | Affordable family rental | 10 | 10 | 20 |
| Snowden Avenue Municipally Sponsored (B 33.02, L 1; B 33, Lot 48; portions of B 33, L 12, 16.01, 18.01, 60.01) | Affordable family rental | 28 | 11 | 39 |
| **Total** | | **62** | **21** | **83** |

TABLE 27. HADDONFIELD SUMMARY OF COMBINED PRIOR AND THIRD ROUND RDP COMPLIANCE

*Kings Court – Inclusionary Family Affordable Sales*

Kings Court developed 16 market-rate units and four affordable units at 146-148 Kings Highway (Block 34, Lot 10). The four affordable family for-sale units are completed and had certificates of occupancy issued between September 2006 and February 2007, have 30-year affordability controls through deed restrictions, and are administered by the New Jersey Housing Affordability Service (HAS), which is part of the New Jersey Housing Mortgage and Finance Agency, in accordance with the UHAC at <u>N.J.A.C.</u> 5:80-26.1 *et seq*. Two of the units – a one-bedroom unit and a two-bedroom unit – are restricted for low-income households, and two – again, a one-bedroom unit and a two-bedroom unit – are restricted to moderate-income households (see Appendix E for Kings Court crediting documentation).





Affordable Housing Sites: RDP & Unmet Need



*Tarditi Commons (formerly Lincoln Commons) – 100% Affordable Senior Rentals*

The Ingerman Group, an experienced affordable housing provider, developed and administers Tarditi Commons Senior Housing (formerly known as Lincoln Commons), 325 Lincoln Ave. (Block 41, Lot 15). Tarditi Commons comprises 48 affordable age-restricted rental units. The units received tax-credit financing and have 45-year affordability controls. Haddonfield supported the affordable housing constructed as part of Lincoln Commons through both the adoption of a Resolution of Need on January 12, 1999, and the approval of a payment in lieu of taxes (PILOT) on September 11, 2001. The development, comprising all low-income, one-bedroom units, was completed in 2002 and occupied in 2003. Due to the RDP senior cap, 20 units from this development will address the Borough's RDP and the remaining 28 units will address the Unmet Need. (See Appendix F for Tarditi Commons documentation.)

*Bancroft Inclusionary Redevelopment*

The former Bancroft NeuroHealth, Inc. (Bancroft) school site is an approximately 19.2-acre site (Block 14, Lot 2 and Block 13, Lot 25) that fronts on Kings Highway, is bisected by Hopkins Lane, and is adjacent to the Township of Cherry Hill across the Cooper River. It is surrounded by Haddonfield High School to the southeast, Cooper River Park (a county-owned open-space tract in both Haddonfield and Cherry Hill) to the east and north, and single-family residences both detached and townhouse-style across Kings Highway to the west. The property had historically been home to Bancroft's nonprofit school for severely developmentally disabled children.

The Borough is in negotiations with Two Hopkins Lane Urban Renewal, LLC ("Redeveloper"), the Borough-designated redeveloper for the site, for an inclusionary residential redevelopment of a portion of the Bancroft Site (11 acres on the east side of Hopkins Lane). A total of 90 housing units – 80 market-rate units and 10 affordable family rental units – are proposed for the site. The balance of the site (seven acres on the west side of Hopkins Lane) will be utilized for school, open space and other public purposes.

Portions of the site are affected by steep slopes, wetlands and flood plains associated with the Cooper River (see aerial maps of site). These constraints do not impinge on any of the land where redevelopment will take place.

In addition to the historic Lullworth Hall, there are three original structures on the eastern portion of the site that are under the review process of the State Historic Preservation Office (SHPO). Of those, a small structure (three rooms, two floors) was used as a hospital and is proposed to be repurposed as a redevelopment community amenity; and the Borough will ask SHPO for permission to remove an addition from a small stone building that will remain in place. Also, a small 1920's shed will be moved to a Borough facility such as a public site or Centennial Field. The stone structure that will remain in place does not impinge on any of the land where redevelopment will take place.



CONTEXT AND HISTORIC DISTRICT MAP

## Bancroft Redevelopment Plan
Haddonfield Borough, NJ     March 17, 2016









AMENDED THIRD ROUND HOUSING ELEMENT AND FAIR SHARE PLAN

## Bancroft Redevelopment Site
## Block 14, Lot 2







In July 2005, Bancroft issued a Request for Proposals regarding the potential sale and redevelopment of the property. In October of that year, Heyer, Gruel & Associates prepared a redevelopment area determination report for the site. The Commissioners designated the site as an area in need of redevelopment in 2006. Bancroft challenged the Borough's action in Superior Court. Upon subsequent agreement between Bancroft and the Borough, this court action has been stayed. Since then, Bancroft representatives and Borough officials have been in negotiations to resolve the litigation.

In October of 2015, Clarke Caton Hintz conducted a reinvestigation of redevelopment need on the site that reaffirmed the 2005 Heyer, Gruel report's finding that the site is suitable for redevelopment due to conditions consistent with criterion "d" of N.J.S.A. 40A:12A – 6:

> d. Areas with buildings or improvements which, by reason of dilapidation, obsolescence, overcrowding, faulty arrangement or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals, or welfare of the community.

As the reinvestigation report notes, Bancroft received preliminary site plan approval on March 12, 2015, from the Planning Board of Mount Laurel Township for the construction of a new 80-acre campus on which it would relocate the operations that existed on its property in Haddonfield. (The Mount Laurel Bancroft campus was completed and opened in 2018.) On January 5, 2016, the Borough adopted a resolution (see Appendix G) designating the property as an area in need of redevelopment.

The 10 affordable family rental units to be developed at the Bancroft site are the subject of a redevelopment plan adopted April 6, 2018 (see Appendix G). The development will occur on 7.98 acres at a density of 11.3 units per acre, pursuant to a draft developer's agreement with the Redeveloper. Pursuant to N.J.A.C. 5:97-6.6(e), an executed redevelopment agreement is required to be submitted to the Court as a condition of the Court's grant of a Third Round Judgment of Compliance and Repose.

- Site Suitability – The site is suitable as defined in COAH's regulations at N.J.A.C. 5:93-1.3. A one-acre portion at the eastern end of the site is encumbered by a New Jersey Historic Trust easement (Lullworth Hall), which does not affect the portion of the site contemplated for redevelopment. There are no other encumbrances that would preclude the development of affordable housing on the balance of the redevelopment property. The site is adjacent to residential land uses as noted above. The site has access to both Kings Highway and Hopkins Lane.

  Water and sewer infrastructure are currently available at the site and there is sufficient water and sewer capacity to meet the needs of the proposed redevelopment. The site can be developed consistent with the Residential Site Improvement Standards (RSIS) and all other state regulations such as those of the NJDEP.

  A portion of the site is undevelopable due to environmental constraints including wetlands and associated buffers, and steep slopes. Any redevelopment activity that occurs on the site must prepare a wetlands report on the location and value of the wetlands (thereby establishing the resulting wetlands buffer) for submission and approval by the NJDEP. The environmental



constraints do not inhibit the redevelopment of the existing Bancroft school buildings as an inclusionary residential development.

Like all of Haddonfield Borough, the site is located in the Metropolitan Planning Area, PA 1, pursuant to the 2001 SDRP. A PA 1 site is the preferred location for a municipality to address its affordable housing obligation.

- Administrative Entity – The developer will be required to retain an experienced affordable housing administrative entity acceptable to the Borough to administer the affordable units in accordance with UHAC at N.J.A.C. 5:80-26.1, including affirmative marketing, at least 30-year controls on affordability, bedroom distribution, provision of very low-income housing per the FHA (see below), and low-/moderate-income split.

- Affirmative Marketing – The units will be affirmatively marketed in accordance with COAH's rules per UHAC per N.J.A.C. 5:80-26.1.

- The affordable units on the Bancroft site will meet the accessible and adaptable requirements pursuant to COAH's regulations.

- Low/Moderate Income Split – At least five of the 10 affordable units on the site will be affordable to low-income households, per UHAC at N.J.A.C. 5:80-26.3. In addition, to address the amended Fair Housing Act (Roberts Bill) and the terms of the Settlement Agreement, the Borough will ensure that at least two of the newly constructed units will be affordable to very low-income households. See Table 29 for the distribution of units by income.

- Bedroom Distribution – In accordance with UHAC at N.J.A.C. 5:80-26.3, no more than two of the affordable units will be efficiencies or one-bedroom units; at least two of the affordable units will be three-bedroom units; and the balance of six units will be two-bedroom units. See Table 28 for the distribution of units by number of bedrooms.

| TABLE 28: INCOME AND BEDROOM DISTRIBUTION FOR AFFORDABLE UNITS AT BANCROFT REDEVELOPMENT | | | | |
|---|---|---|---|---|
| Income<br>Bedrooms | Very Low-Income | Low-Income | Moderate Income | Total |
| One-bedroom | 0 | 1 | 1 | 2 |
| Two-bedroom | 1 | 2 | 3 | 6 |
| Three-bedroom | 1 | 0 | 1 | 2 |
| *Totals* | *2* | *3* | *5* | *10* |



*Snowden Avenue – Municipally Sponsored 100% Affordable Family Rental*

This approximately 1.05-acre site, comprising Block 33.02 Lot 1; Block 33, Lot 48; and portions of Block 33, Lots 12, 16.01, 18.01, and 60.01, is behind the Haddonfield Borough Hall and currently is occupied by municipally-owned surface parking lots serving municipal business as well as downtown and resident parking needs (see aerial map of site). The Borough purchased land adjacent to the municipal parking lot and behind properties fronting Kings Highway with the intent of relocating as much of the existing parking as possible to the newly acquired area and using the original parking area to develop a 100% affordable family rental complex. The site has access via two public streets (Snowden Avenue and Harding Avenue) out to Haddon Avenue and through the existing municipal parking lot to Kings Highway.

The site will be developed with 28 affordable family rental units. The Court-approved Settlement Agreement provides that the planned 28 units may be reduced to 20 units provided that the Borough demonstrates within one year of Court approval of the executed Settlement Agreement (or by July 1, 2020) that

> *"… it has adopted zoning that provides a realistic opportunity for eight affordable family rental units in accordance with applicable law and through a motion to amend the fairness hearing order or judgment in this matter.  If the Borough determines to address eight affordable family rental units off-site, the Borough recognizes that its 83-unit RDP may be increased and the increased RDP will be satisfied.  Under no circumstance shall the option to reduce the number of units in the Snowden Avenue development or any delays, whether unanticipated or not, related to the ability of the Borough to exercise that option provide a justification for the municipality not complying with the deadlines agreed to with regard to this development.  If the Borough has not adopted zoning by July 1, 2020, that provides a realistic opportunity for eight affordable family rental units, including with a commitment by the owner of the relevant parcel for those units to be rentals, it must develop all 28 family rental units on the Snowden Avenue site."*

Prior to preparing and adopting its 2008 Third Round plan, the Borough issued a Request for Qualifications for an experienced affordable housing developer to develop the site. The Borough chose Community Investment Strategies (CIS) to develop, own and manage the affordable family rental housing. In 2012, the Borough entered into a Memorandum of Understanding with CIS.

The Borough will donate the property and use trust funds to help subsidize the affordable rental units, including very low-income units, at the site. CIS will develop, own and manage the affordable family rental housing. In addition to using trust fund monies to finance this project, CIS will seek funding from the Camden County HOME program. Pursuant to N.J.A.C. 5:93-5.5(a)4, construction will begin within two years of the Court's issuance of a Judgment of Compliance and Repose. (See Appendix H for the draft Developer's Agreement with CIS and pro forma and construction schedule for the Snowden Avenue site.)







AMENDED THIRD ROUND HOUSING ELEMENT AND FAIR SHARE PLAN

## Snowden Avenue Site

Block 33.02, Lot 1 / Block 33 Lot 48
and a portion of Block 33 Lots 12, 16.01, 18.01 and 60.01

Haddonfield Borough, Camden County, NJ    September 2019



As set forth in Mr. Banisch's Special Master's Report dated May 6, 2019, that was presented and testified to at the May 8, 2019 Fairness Hearing, a number of residents objected to the inclusion of the Snowden Avenue site in the Settlement Agreement. The Master's Report addressed the "COAH suitability" objections and stated, "Based on my review of site conditions and my involvement in mediation, I believe the proposed Snowden Avenue site meets site suitability criteria and will create a realistic opportunity for the production of 28 units of affordable housing at an appropriate location to address Haddonfield's Third Round obligation" (Banisch report, p. 5).

In addition, recognizing the objections raised to this proposed 100% affordable housing development, Judge Famular, in approving the terms of the Settlement Agreement, said as part of her decision:

> "… although I believe that the residents are concerned about the density of this project … that's not the only part of the project I have to be concerned with. And I also believe that significant thought and planning was put into the location of the affordable housing and its proximity to the main road in town. Its proximity to public transportation. Its proximity to schools, to the Haddonfield library, to the municipal building, to shops along Haddon Avenue, and most importantly, along Kings Highway, which includes a drug store within walking distance, an Acme supermarket within walking distance. These are all things that are important to people who would be low- and moderate-income with regard to the location of these particular tracts that will … contain the improvements as set forth in the agreement. The developer's site that I was looking at is approvable, it's available, it's developable and it's suitable as defined by the code."

COAH's Second Round rules at N.J.A.C. 5:93-5.5, "Municipally Sponsored Construction," are addressed as follows:

- Site Control – The Borough owns the site. The Borough will assist CIS in its funding applications and is committed to funding any project funding shortfall with trust fund monies or through bonding/appropriation commitments if necessary as required by COAH's regulations for municipally sponsored 100% affordable developments, and as previously adopted by the Borough. The Borough will transfer title of the property to CIS once all funding and approvals are received, or enter into a long-term lease arrangement with CIS.

- Site Suitability – The site is suitable as defined in COAH's regulations at N.J.A.C. 5:93-1.3. There are no encumbrances that preclude development of affordable housing on the site.

   There are no environmental constraints on the site and the site has adequate developable land to accommodate the proposed 28 units of affordable housing. The site is free of wetlands.

   Like all of Haddonfield Borough, the site is located in PA 1 pursuant to the 2001 SDRP. A PA 1 site is the preferred location for a municipality to address its affordable housing obligation.

   The site is adjacent to a single-family residential neighborhood and is located behind businesses fronting both Haddon Avenue and Kings Highway at the center of town. There are no historic structures listed on the state or National Historic Registers on the site. The property borders the Borough's historic district and the proposed development will meet local standards.



The site is within the Borough's water and sewerage area, and New Jersey American Water confirmed the availability of sufficient sewer and water capacity to serve the site. The site can be developed consistent with RSIS and all other regulations of agencies with jurisdiction over the site such as those of the NJDEP.

- Administrative Entity – CIS is an experienced affordable housing provider, and will develop and administer the affordable units pursuant to COAH's regulations and UHAC. CIS will affirmatively market the units, income-qualify applicants, place minimum 30-year affordability-control deed restrictions on the units, and provide long-term administration and management of the units in accordance with COAH rules and UHAC per N.J.A.C. 5:80-26.1.

- Low/Moderate Income Split – At least 14 of the 28 affordable units will be affordable to low-income households, per UHAC at N.J.A.C. 5:80-26.3. In addition, to address the amended Fair Housing Act (Roberts Bill) and the terms of the Settlement Agreement, the Borough will ensure that at least four of the newly constructed units will be affordable to very low-income households at 30% of regional median income, superseding the UHAC very low-income requirement at 35% of regional median income. Trust fund monies will be used as affordability assistance to make the creation and administration of these units financially feasible. See Table 30 for the distribution of units by income.

- Affirmative Marketing – The units will be affirmatively marketed in accordance with COAH's rules per UHAC at N.J.A.C. 5:80-26.1.

- Funding – The Borough will assist CIS in funding the creation of these 28 affordable family rental units using trust fund monies. Additionally, CIS will pursue funding from Camden County's HOME program. See Appendix H for a full pro forma for this site, including both total development costs and sources of funds and documentation of the funding available to CIS, and any applications still pending.  In the case where an application for outside funding is still pending, the Borough must provide a stable alternative source, such as municipal bonding, in the event that the funding request is not approved.

- Construction Schedule – CIS will ensure that construction begins no later than two years from the Court's approval of the Settlement Agreement on July 1, 2019. In accordance with N.J.A.C. 5:93-5.5, for non-inclusionary developments, a construction or implementation schedule, or timetable, must be submitted for each step in the development process,  including preparation of a site plan, granting of municipal approvals, applications for state and federal permits, selection of a contractor, and construction.  This schedule should provide for site plan approvals to be received for the Snowden Avenue site within 16 months of Court approval of the Settlement Agreement on July 1, 2019, or by November 1, 2020, and for construction to begin within 30 months of that date, or by February 1, 2022. The Borough will indicate the entity responsible for undertaking and monitoring the construction and overall development activity. (See Appendix H for the Snowden Avenue construction schedule.)



- Bedroom Distribution – The units will be required to be developed in accordance with the UHAC requirements at N.J.A.C. 5:80-26.3 regarding bedroom distribution. No more than five of the units will be efficiencies or one-bedroom units; at least six of the units will be three-bedroom units; and the balance of 17 units will be two-bedroom units. See Table 30 for the distribution of units by number of bedrooms.[10] See Table 29 for proposed bedroom distribution.

| TABLE 29: INCOME AND BEDROOM DISTRIBUTION FOR UNITS AT SNOWDEN AVENUE SITE | | | | |
|---|---|---|---|---|
| Income<br>Bedrooms | Very Low-Income | Low-Income | Moderate Income | Total |
| One-bedroom | 1 | 2 | 2 | 5 |
| Two-bedroom | 2 | 6 | 9 | 17 |
| Three-bedroom | 1 | 2 | 3 | 6 |
| Totals | 4 | 10 | 14 | 28 |

*Rental Bonuses*

Pursuant to N.J.A.C. 5:93-5.15, Haddonfield is eligible for 21 rental bonuses, the maximum it is allowed, as it has a firm commitment to produce affordable family rental units at both the Bancroft inclusionary redevelopment site, from which it will claim 10 rental bonuses, and at the Snowden Avenue 100% affordable family rental site from which it will claim 11 bonuses. The Borough is claiming no bonuses for age-restricted units.

**Addressing Prior Round and Third Round Cumulative Unmet Need**

COAH granted Haddonfield Borough Substantive Certification for its 2008 adopted Third Round plan, based on consideration of a number of factors including the Borough's proposed mechanisms for addressing its then 155-unit Unmet Need. COAH's rules at N.J.A.C. 5:93-4.2(h) do not require Unmet Need mechanisms to generate a specified number of units equal to the Unmet Need number. Rather, the mechanisms must provide a realistic opportunity that affordable housing can be created through private redevelopment (i.e., via inclusionary overlay zones) or publicly facilitated projects (i.e., via a development fee ordinance). Haddonfield continues to address its Unmet Need with a combination of an updated development fee ordinance, expansions to its proposed inclusionary overlay zones on specific sites, and an updated Borough-wide inclusionary overlay zoning ordinance that requires any development or redevelopment of multi-family housing at a minimum density of six dwelling units per acre that results in five or more housing units to include a 20% affordable set-aside. N.J.A.C. 5:93-4.2(h)

---

[10] The funding sources may require 25% of the units to be three-bedroom units; thus a total of seven instead of six three-bedroom units may be provided, which would reduce the total number of two-bedroom units by one.



states that in addressing Unmet Need, COAH "may require at least any combination of the following in an effort to address the housing obligation:

- Zoning amendments that permit apartments or accessory apartments;

- Overlay zoning requiring inclusionary development or the imposition of a development fee consistent with N.J.A.C. 5:93-8. In approving an overlay zone, COAH or the Superior Court may allow the existing use to continue and expand as a conforming use, but provide that where the prior use on the site is changed, the site shall produce low- and moderate-income housing or a development fee; or

- Zoning amendments that impose a development fee consistent with N.J.A.C. 5:93-8."

Haddonfield exceeded these requirements by addressing its Unmet Need with inclusionary zoning and a development fee ordinance, and a 2008 COAH-approved Borough-wide overlay zone that requires a 20% affordable housing set-aside on residential developments of five or more units, with a specific focus on the 2008 adopted Downtown Zoning Districts. (The updated Borough-wide inclusionary overlay zoning ordinance is also triggered when there is a change of use to residential resulting in five or more units.) Haddonfield's compliance mechanisms for addressing its Unmet Need were greater in number and variety than the mechanisms adopted by all of the other municipalities with vacant land adjustments that received similar Third Round Substantive Certification from COAH. The proposed inclusionary overlay zones are shown on the attached map and described in detail below. (See Appendix I for the ordinance to rezone and create the various overlay districts.)

*PATCO Site*

The PATCO Site overlay zone consists of approximately 7.28 acres on Block 118, Lot 14 and Block 134, Lot 9. The zone covers the area immediately surrounding the existing PATCO commuter rail station. PATCO provides service to Philadelphia and to the Lindenwold train station, which offers NJ Transit connections to Camden and Atlantic City. Existing uses in the zone include the commuter rail station and parking lots associated with commuter rail. The zone is located west of the Borough's central business district along Kings Highway. The zone is bordered by commercial development to the north, east and south, and single-family residential development to the west. The zone provides a desirable location for multi-family housing as both the train station and downtown business district are within walking distance.

The Borough will adopt an amended overlay zoning ordinance that permits multi-family residential development with a 20% affordable housing set-aside. The zone provides developers with compensatory benefit for providing affordable housing by introducing residential as a permitted use at a density higher than that of the surrounding residential uses. It accomplishes this while preserving the design intent of the Borough's existing Maximum Height Zone by allowing a maximum height of five stories within 100 feet of the PATCO right-of-way (with the exception of Block 134/Lot 9, which will have no change in its maximum height limit); a maximum height of four stories for buildings between 100 feet and 200 feet of the PATCO right-of-way; and a maximum height of three stories for buildings more than 200 feet from the PATCO right-of-way and along Euclid Avenue.





*Acme Site*

The Acme Site overlay zone consists of approximately 2.28 acres on Block 39, lots 6, 6.01, and 9.01. The zone is occupied by the Acme supermarket and associated parking. The zone is located at the southeast end of the Borough's central business district adjacent to the intersection of South Haddon Avenue and Ellis Street. The zone is bordered by commercial development to the north and east, and single-family residential development to the south and west.

The Borough has adopted an inclusionary zoning ordinance that extends the existing Downtown 3, or D-3, zone to include all lots comprising the Acme site. Prior to the ordinance's extension of the boundaries of the D-3 zone, the D-3 zone did not cover lots 6.01 and 9.01, which instead were covered by the D-2 and D-1 zones, respectively. The D-3 zone allows for a mix of uses, including apartment buildings and residential over commercial, which would be conducive to an inclusionary redevelopment project. The extension of the D-3 zone provides a realistic opportunity for the production of affordable housing by standardizing the zoning across the Acme zone and permitting up to a three-story mixed-use development where one-story commercial exists.

*PNC Bank*

The PNC Bank zone consists of approximately 1.18 acres on Block 11.05, Lot 1. The zone is occupied by a PNC bank branch and associated parking. The zone is located along North Haddon Avenue about a third of a mile north of the PATCO station. The zone is bordered by commercial development to the south and west, and single-family residential development to the north and east. The overlay zone preserves a permissible building height of three stories and adds residential as a permitted use.

*Archer-Greiner*

The Archer-Greiner overlay zone consists of approximately three acres on Block 129, Lot 3. The zone is occupied by an office building and associated parking just north of the PATCO site. The zone is bordered by commercial development to the east, a professional building and residences to the north, PATCO parking to the south, and the PATCO rail line and single-family residential development to the west.

The Borough will adopt overlay zoning that permits inclusionary residential development of up to five stories along the PATCO high-speed line, stepping down to four stories along Veterans Lane and three stories along Redman Avenue and Euclid Avenue. This represents an increase in intensity from the site's former zoning.

*TD Bank*

The TD Bank overlay zone consists of approximately 0.6 acres across Block 130, lots 6 and 9. The site is occupied by a TD Bank branch and associated parking. The site is located north of the PATCO station and just east of the Archer-Greiner site. The site is surrounded by commercial uses along Euclid Avenue and North Haddon Avenue. The Borough will adopt overlay zoning that permits inclusionary development up to four stories. This represents an increase in intensity from the site's former D-3 zoning, which permitted only three stories.



### South (West) side of North Haddon from Woodland to Redman

This overlay zone encompasses every parcel fronting the west side of North Haddon Avenue from Woodland Avenue to East Redmond Avenue (Block 131, lots 2, 2.01, 3, 4 and 5, and Block 132, lots 1, 3, 4, 4.01, 4.02 and 5) and consists of approximately 2.52 acres. The zone is located just north of the Archer-Greiner zone. The area contains a mix of uses, including a café, medical offices, and single-family residential in one- and two-story buildings. The Borough will adopt overlay zoning that increases the maximum building width from 100 feet to 150 feet over the existing D-2 and D-3 zones.

### Wells Fargo Bank

This overlay zone consists of approximately 1.12 acres (Block 11 lot 1). The zone is located across from the TD Bank site and adjacent to the North (East) North Haddon Avenue site. The site is occupied by a Wells Fargo bank and associated parking. The Borough will adopt overlay zoning that permits inclusionary development up to four stories, an increase from the existing D-2 zoning. The Borough will perform an analysis of nearby parcels via a methodology prescribed in Section _____ of the Borough Zoning Ordinance in order to determine frontage setbacks for this zone.

### North Side of North Haddon Avenue south of Euclid

This overlay zone encompasses block 11, lots 2, 14 and 24, and consists of slightly more than two acres. The zone is located across Euclid Avenue from the Wells Fargo zone. The area contains low-rise professional buildings and a funeral home. The Borough will rezone these tracts to a Downtown district that permits up to three stories, an increase from the existing R-2(o) zoning. The Borough will determine frontage setbacks based on an average of setbacks of the existing buildings.

### Grove Street

This overlay zone comprises two tracts, one north of Lake Street on the west side of Grove Street (Block 11, lots 7, 7.01 and 7.02) and the other north of Glover Avenue on the east side of Grove Street (Block 13, lots 15.02, 16, 17, and 19). It consists of approximately 2.74 acres. Both tracts are zoned Commercial. The area contains a range of low-density non-residential uses. The Borough will adopt overlay zoning that introduces residential as a permitted use on upper stories. Because of projected capacity issues at the nearby elementary school, all residential units (market and affordable) on this site will be limited in size.





*Summary*

Table 31, <u>Summary of Combined Prior and Third Round RDP Compliance</u>, and Table 32, <u>Satisfaction of Required Maximums and Minimums</u>, demonstrate compliance with the Court-approved Settlement Agreement for maximum and minimum units by income and by type.

| TABLE 31. HADDONFIELD SUMMARY OF COMBINED PRIOR AND THIRD ROUND RDP COMPLIANCE | | | | | | | |
|---|---|---|---|---|---|---|---|
| Compliance Mechanism | Type | Very Low-Income | Low-Income | Moderate-Income | Total Credits | Bonuses | Total |
| King's Court (B 34, L 10) | Affordable family for-sale | | 2 | 2 | 4 | - | 4 |
| Tarditi Commons (B 41, L 15) | Affordable senior rental | | 20 | | 20 | - | 20 |
| Bancroft Redevelopment (B 14, L 2; B 13, L 25) | Affordable family rental | 2 | 3 | 5 | 10 | 10 | 20 |
| Snowden Avenue (B 33.02, L 1; B 33, Lot 48; portions of B 33, L 12, 16.01, 18.01, 60.01) | Affordable family rental | 4 | 10 | 14 | 28 | 11, bonus cap | 39 |
| **Total** | | **6** | **35** | **21** | **62** | **21** | **83** |

| TABLE 32. HADDONFIELD SATISFACTION OF REQUIRED MINIMUMS AND MAXIMUMS | | | | |
|---|---|---|---|---|
| Requirement | Ratio | Rounded | Provided | Net Surplus |
| Maximum senior | 0.25 (RDP) | 20 | 20 | |
| Minimum rental | 0.25 (RDP) | 21 | 58 | 37 |
| Minimum family rental | 0.50 (minimum rental) | 11 | 38 | 27 |
| Maximum rental bonus | 0.25 (RDP) | 21 | 21 | |
| Minimum family | 0.5 (RDP – bonuses) | 31 | 42 | 11 |
| Minimum very low-income | 0.13 (all affordable units approved or constructed after July 17, 2008) | 5 | 6 | 1 |
| Minimum very low-income family | 0.50 (very low-income units) | 3 | 6 | 3 |



# AFFORDABLE HOUSING ADMINISTRATION AND AFFIRMATIVE MARKETING

Haddonfield Borough has prepared an updated Affordable Housing Ordinance in accordance with COAH's substantive rules and UHAC, as well as to address terms of the court-approved FSHC agreement (see Appendix J). The Fair Share Ordinance will govern the establishment of affordable units in the Borough as well as regulating the occupancy of such units. The Borough's Fair Share Ordinance covers the phasing of affordable units, the low/moderate income split, bedroom distribution, occupancy standards, affordability controls, establishing rents and prices, affirmative marketing, income qualification, etc., including an exception that the UHAC requirement for 10% of the affordable units in rental developments being required to be at 35% of median income be replaced by the statutory requirement, N.J.S.A. 52:27D329.1, that 13% of affordable units in such projects shall be required to be at 30% of median income.

Additionally, the Affordable Housing Ordinance will establish a mandatory set-aside requirement of 20% for any multi-family residential development created through any municipal rezoning; Zoning Board use or density variance; redevelopment plan or rehabilitation plan that provides a substantial density increase resulting in a minimum density at or above six units per acre (or other compensatory benefit). This requirement does not give any developer the right to any such rezoning, variance or other relief, or establish any obligation on the part of Haddonfield Borough to grant such rezoning, variance or other relief.

As approved by municipal resolution in 2006, the Borough Administrator has held and will continue to hold the position of the Municipal Housing Liaison (see resolution, Appendix K). The Borough utilizes a number of existing experienced affordable housing administrative agents, including Housing Affordability Services and Piazza & Associates (see Appendix L for the draft agreement with Piazza & Associates and sample operating manuals).

The Borough will adopt an affirmative marketing plan (see Appendix M) for all affordable housing sites. The affirmative marketing plan is designed to attract buyers and/or renters of all majority and minority groups, regardless of race, creed, color, national origin, ancestry, marital or familial status, gender, affectional or sexual orientation, disability, age, or number of children, to the affordable units located in the Borough. Additionally, the affirmative marketing plan is intended to target those potentially eligible persons who are least likely to apply for affordable units and who reside in the Borough's housing region, Region 5, consisting of Burlington, Camden, and Gloucester counties.

The affirmative marketing plan lays out the random selection and income-qualification procedure of the administrative agent, which is consistent with COAH's rules and N.J.A.C. 5:80-26.1. All newly created affordable units will comply with the minimum 30-year affordability control required by UHAC, N.J.A.C. 5:80-26.5 and 5:80-26.11. This plan must be adhered to by all private, nonprofit or municipal developers of affordable housing units and must cover the period of deed restriction or affordability controls on each affordable unit.

As required by the court-approved FSHC agreement, the affirmative marketing plan lists Fair Share Housing Center; the Latino Action Network; Willingboro NAACP; Southern Burlington County



NAACP; the Supportive Housing Association; and the New Jersey Housing Resource Center among its list of community and regional organizations. The Borough shall, as part of its regional affirmative marketing strategies during its implementation of this plan, provide notice to those organizations of all available affordable housing units. The Borough also agrees to require any other entities, including developers or persons or companies retained to do affirmative marketing, to comply with this paragraph.

## AFFORDABLE HOUSING TRUST FUND

Haddonfield Borough initially adopted a development fee ordinance in 2005. Most recently, the Borough adopted an updated development fee ordinance, approved by COAH, in 2009. The updated ordinance permits collection of residential development fees equal to 1.5% of the equalized assessed value of new residential construction and additions, and mandatory nonresidential development fees equal to 2.5% of the equalized assessed value of new nonresidential construction and additions. The Borough will update its development fee ordinance again as part of this housing element and fair share plan to eliminate references to COAH's invalidated Third Round regulations, instead citing COAH's Second Round regulations, and to provide references to the Superior Court's jurisdiction instead of COAH's (see Appendix J).

A new spending plan has been prepared consistent with this Plan (see Appendix N). The Spending Plan, which discusses anticipated revenues, collection of revenues, and the use of revenues, was prepared in accordance with COAH's applicable substantive rules. All collected revenues will be placed in the Borough's Affordable Housing Trust fund and will be dispensed for the use of eligible affordable housing activities including, but not limited to:

- Rehabilitation program;
- New construction of affordable housing units and related development costs;
- Extensions or improvements of roads and infrastructure directly serving affordable housing development sites;
- Acquisition and/or improvement of land to be used for affordable housing;
- Purchase of affordable housing units for the purpose of maintaining or implementing affordability controls;
- Maintenance and repair of affordable housing units;
- Repayment of municipal bonds issued to finance low- and moderate-income housing activity; and
- Any other activity as specified in the approved spending plan.

The Borough is required to fund eligible programs in its Court-approved housing element and fair share plan, as well as provide statutorily required affordability assistance.

At least 30% of collected development fees, excluding expenditures made through July 17, 2008, when affordability assistance became a statutory requirement in the Fair Housing Act, shall be used to provide affordability assistance to very low-, low-, and moderate-income households in affordable units included in a municipal fair share plan. At least one-third of the affordability assistance must be expended on very-low-income units. The Borough will provide very low-income affordability assistance funds to CIS



for the affordable family rental development at Snowden Avenue. In addition, the Borough will develop an affordability assistance program that provides residents and small developers subsidies of approximately $25,000 per unit for the production of one to two affordable units. (See Appendix O for the Borough's affordability assistance program manual.)

No more than 20% of the revenues collected from development fees each year will be expended on administration, including, but not limited to, salaries and benefits for municipal employees or consultant fees necessary to prepare or implement a rehabilitation program, a new construction program, a housing element and fair share plan, and/or an affirmative marketing program.

In accordance with the agreement with FSHC, the expenditures of funds contemplated under the FSHC agreement constitute a "commitment" for expenditure pursuant to N.J.S.A. 52:27D-329.2 and -329.3, with the four-year time period for expenditure designated pursuant to those provisions beginning to run with the entry of a final judgment approving the Settlement Agreement in accordance with the provisions of In re Tp. Of Monroe, 442 N.J. Super. 565 (Law Div. 2015) (aff'd 442 N.J. Super. 563). On the first anniversary of the April 2, 2019 execution of the FSHC agreement, and on every anniversary thereafter through the end of the FSHC agreement, the Borough will provide annual reporting of trust fund activity to the New Jersey Department of Community Affairs, COAH, New Jersey Local Government Services, or other entity designated by the State of New Jersey, with a copy provided to FSHC and posted on the municipal website, using forms developed for this purpose by NJDCA, COAH, or NJLGS. The reporting shall include an accounting of all housing trust fund activity, including the source and amount of funds collected and the amount and purpose for which any funds have been expended.

## COST GENERATION

Haddonfield Borough's Land Development Ordinance has been reviewed to eliminate unnecessary cost generating standards; it provides for expediting the review of development applications containing affordable housing. Such expedition may consist of, but is not limited to, scheduling of pre-application conferences and special monthly public hearings. Furthermore, development applications containing affordable housing shall be reviewed for consistency with the Land Development Ordinance, Residential Site Improvement Standards (N.J.A.C. 5:21-1 et seq.) and the mandate of the FHA regarding unnecessary cost-generating features. Haddonfield Borough will comply with COAH's requirements for unnecessary cost-generating requirements, N.J.A.C. 5:93-10.1, procedures for development applications containing affordable housing, N.J.A.C. 5:93-10.4, and requirements for special studies and escrow accounts where an application contains affordable housing, N.J.A.C. 5:93-10.3.

## MONITORING

On the first anniversary of the April 2, 2019 execution of the FSHC agreement, and on every anniversary thereafter through the end of the agreement, the Borough agrees to provide annual reporting of the status of all affordable housing activity within the municipality through posting on the



municipal website with a copy of such posting provided to FSHC, using forms previously developed for this purpose by COAH or any other forms endorsed by the special master and FSHC.

The Fair Housing Act includes two provisions regarding action to be taken by the Borough during the period of protection to 2025 acknowledged by the agreement. The Borough agrees to comply with those provisions as follows:

a. For the midpoint realistic opportunity review due on July 1, 2020, as required pursuant to N.J.S.A. 52:27D-313, the Borough will post on its municipal website, with a copy provided to FSHC, a status report as to its implementation of its plan and an analysis of whether any unbuilt sites or unfulfilled mechanisms continue to present a realistic opportunity and whether any mechanisms to meet Unmet Need should be revised or supplemented. Such posting shall invite any interested party to submit comments to the municipality, with a copy to FSHC, regarding whether any sites no longer present a realistic opportunity and should be replaced and whether any mechanisms to meet Unmet Need should be revised or supplemented. Any interested party may by motion request a hearing before the Court regarding these issues.

b. For the review of very low-income housing requirements required by N.J.S.A 52:27D-329.1, within 30 days of the third anniversary of the FSHC agreement executed April 2, 2019, and every third year thereafter, the Borough will post on its municipal website, with a copy provided to FSHC, a status report as to its satisfaction of its very low-income requirements, including the family very low-income requirements referenced in the Settlement Agreement. Such posting shall invite any interested party to submit comments to the municipality and FSHC on the issue of whether the municipality has complied with its very low-income housing obligation under the terms of the settlement with FSHC.

## SUMMARY

The Borough of Haddonfield has prepared this Amended Third Round Plan to address its affordable housing requirements in accordance with the Fair Housing Act, COAH regulations, and a Settlement Agreement with FSHC. At a Fairness Hearing, the Court approved the three-part fair share and preliminary compliance plan specified in the Settlement Agreement, including an 11-unit Rehabilitation share, an 83-unit RDP, and a 429-unit Unmet Need. The Borough will satisfy its combined Prior Round and Third Round RDP requirements with a combination of existing affordable family sales and affordable senior rental units, and with proposed affordable family rentals from an inclusionary redevelopment project and a 100% affordable municipally sponsored development. In addition, the Borough will expand its inclusionary overlay zones and update its Borough-wide Affordable Housing Ordinance in an effort to provide a realistic opportunity for development of additional affordable housing units to address its Unmet Need. At a future compliance hearing, the Borough will seek from the Superior Court a Third Round Judgment of Compliance and Repose through July 1, 2025.